**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ULTRA PETROLEUM CORP., *et al.*,[1] | § | Case No. 20-32631 (MI) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, REIMBURSABLE EXPENSES, AND DIRECTOR OBLIGATIONS AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON MAY 15, 2020, AT 11:00 A.M. (CENTRAL TIME) IN COURTROOM 404, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
**RELIEF IS REQUESTED NOT LATER THAN MAY 15, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832)-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING". THE CODE FOR JOINING THIS HEARING BEFORE JUDGE ISGUR IS "JUDGEISGUR". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".**

**HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number (if any) are the following: Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC (N/A); Ultra Resources, Inc. (0643); Ultra Wyoming, LLC (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158). The Debtors' service address is 116 Inverness Drive East, Suite 400, Englewood, Colorado 80112.

**1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**

**2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**

**3) SELECTING JUDGES' PROCEDURES AND SCHEDULES;**

**4) SELECTING "VIEW HOME PAGE" FOR JUDGEISGUR;**

**5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**

**6) SELECT ULTRA PETROLEUM CORP. FROM THE LIST OF ELECTRONIC APPEARANCE LINKS, AND**

**7) AFTER SELECTING ULTRA PETROLEUM CORP FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**

**SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion.[2]

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"), authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, reimbursable expenses, and director obligations and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

2. By this motion, the Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits and the Non-Employee Compensation Obligations (each as defined herein) and to continue to honor the Employee Compensation and Benefits and the Non-Employee Compensation Obligations in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedure:

[2] The facts and circumstances supporting this motion are set forth in the *Declaration of Brad Johnson in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this motion and incorporated by reference herein.

| Workforce Programs | Amounts |
|---|---|
| **Employee Compensation and Benefits** | |
| Wage Obligations | $120,000 |
| Independent Contractor and Temporary Staff Obligations | $120,000 |
| Withholding Obligations | $370,000 |
| Leave Benefits | $845,000 |
| Expense Reimbursements | $102,500 |
| Employee Incentive Programs | $2,525,000 |
| Health and Welfare Benefits | $494,650 |
| 401(k) Plan | $30,000 |
| Benefits Program Consultation | $13,000 |
| Unpaid P-Card Expenses | $25,000 |
| Payroll Processing Fees | $13,000 |
| Employee Retention Programs | $266,375 |
| Severance | $0 |
| Gift Matching Program | $0 |
| **Non-Employee Compensation Obligations** | |
| Non-Employee Compensation | $0 |
| **Total** | **$4,924,525** |

## Jurisdiction and Venue

3. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rules 1075-1 and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules").

## Background

6. The Debtors are independent exploration and production companies that primarily focus on developing long-life natural gas reserves in the Pinedale Anticline and Jonah fields located in Wyoming's Green River Basin. They are party to various agreements with midstream service providers that gather, compress, and process natural gas from the Debtors' fields. Their customer base is a diverse group of non-affiliated entities that purchase the Debtors' natural gas "as produced" and is located across the United States. The Debtors' headquarters are in Englewood, Colorado. In fiscal year 2019, the Debtors earned approximately $742 million in revenue from their operations.

7. On May 10, 2020, (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Procedural consolidation and joint administration of these chapter 11 cases have been requested pursuant to Bankruptcy Rule 1015(b). No committees have been appointed or designated, and no request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

## Workforce Overview

8. The Debtors employ approximately 150 individuals on a full-time basis and one individual on a part-time basis (these individuals, collectively, the "Employees"). Approximately 47 Employees are paid on an hourly basis and approximately 103 Employees are salaried. No union or collective bargaining unit represents any of the Debtors' Employees. The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances,

the Debtors' Employees include highly trained personnel who cannot be replaced easily. Without the continued, uninterrupted services of their Employees, the Debtors' restructuring efforts will be halted.

9. The vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. Thus, the Employees will be exposed to significant financial hardships if the Debtors are not permitted to continue paying their compensation, providing benefits, and maintaining existing programs. Consequently, the relief requested is necessary and appropriate.

10. The Debtors supplement their workforce with independent contractors (the "Independent Contractors") engaged to complete discrete projects as well as temporary workers (the "Temporary Staff") from several staffing agencies (collectively, the "Staffing Agencies"). The Independent Contractors and Temporary Staff perform services related to, among other things, human resources, environmental compliance, geoscience, production, and information technology. The Debtors currently retain approximately fifteen Independent Contractors and Temporary Staff in the aggregate, although this number fluctuates based on the Debtors' specific needs at any given time. The Employees rely on the support of the Independent Contractors and Temporary Staff to operate the Debtors' business. Accordingly, continuing to honor obligations due and owing to Independent Contractors and Temporary Staff is critical to maintaining and administering the Debtors' estates.

11. The Debtors pay Independent Contractors and Temporary Staff either directly or through the Staffing Agencies (collectively, the "Independent Contractor and Temporary Staff Obligations"). The Independent Contractor and Temporary Staff Obligations include certain fees the Debtors remit to the Staffing Agencies for services related to the staffing of the Independent

Contractors and Temporary Staff. As of the Petition Date, the Debtors estimate that there are approximately $120,000 in Independent Contractor and Temporary Staff Obligations outstanding. The Debtors request authority to pay or satisfy all Independent Contractor and Temporary Staff Obligations in the ordinary course of business.

**Employee Compensation and Benefits**

12. The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected. The Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other related obligations and health and welfare benefits that the Debtors have historically provided to their Employees (collectively, the "Employee Compensation and Benefits"). The Debtors also seek to pay all costs incident to the Employee Compensation and Benefits.

13. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business on a postpetition basis and to pay prepetition amounts (if any) related thereto. The Debtors also request authority to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

**I. Compensation and Withholding Obligations.**

**A. Unpaid Wages.**

14. The Debtors pay their Employees' wage and salary obligations (collectively, the "Wages") on either a salaried or hourly basis. Approximately 47 Employees are paid on an hourly basis and approximately 103 Employees are salaried. Salaried Employees' Wages are paid

to date every 14 days. The hourly Employees, on the other hand, are paid one week in arrears for work performed during a given 14-day period.

15. As of the Petition Date, the Debtors' average bi-weekly gross payroll expense, including all Wages, was approximately $826,000. As of the Petition Date, the Debtors believe that approximately $120,000 on account of accrued prepetition wages, salaries, overtime, and other compensation remains outstanding (collectively, the "Unpaid Wages"). The Debtors do not believe that any of the Unpaid Wages will exceed the $13,650 priority cap in place under subsections (a)(4) and (a)(5) of section 507 of the Bankruptcy Code with respect to any individual Employee.

**B. Withholding Obligations.**

16. The Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and other pre-tax deductions payable pursuant to certain of the health and welfare programs (collectively, the "Deductions") for remittance to various third-party recipients. As of the Petition Date, the Debtors estimate that they hold aggregate Deductions of approximately $15,000.

17. Applicable law also requires the Debtors to withhold from the Employees' Wages certain amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (collectively, the "Employer Payroll Taxes," and, together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, or local taxing authority in connection

with the disbursement of Employees' Wages. As of the Petition Date, the Debtors estimate that aggregate Payroll Taxes of approximately $355,000 remain outstanding.

18. The Debtors seek authority to transfer any unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") to the appropriate recipients in the ordinary course of business and consistent with past practice and to continue remitting any Withholding Obligations in the ordinary course of business on a postpetition basis.

**C. Payroll Processing.**

19. The Debtors utilize ADP LLC ("ADP"), a third-party payroll service, to process payroll disbursements and provide certain related services. Historically, the Debtors have paid approximately $8,100 per month in fees to ADP on account of such services. As of the Petition Date, the Debtors estimate that approximately $13,000 in prepetition fees remain outstanding. The failure to pay prepetition or postpetition payroll servicing fees may delay employee payroll disbursements to the detriment of the Debtors' Employees and operations. The Debtors seek to continue administering payroll in the ordinary course of business on a postpetition basis (including paying any prepetition or postpetition amounts payable to ADP).

**D. Expense Reimbursements.**

20. The Debtors have historically reimbursed Employees or paid credit card invoices of certain Employees for certain expenses incurred in the scope of their employment (collectively, the "Expense Reimbursements") related to, among other things, travel, lodging, ground transportation, meals, relocation costs, continuing professional education, and other reasonable and documented business-related expenses. On average, the Debtors have historically paid approximately $36,500 per month on account of Expense Reimbursements. As of the Petition Date, the Debtors estimate that aggregate Expense Reimbursements of approximately $102,500 remain outstanding, which Employees incurred through the use of personal funds. The Debtors

seek authority to honor such outstanding prepetition obligations in the ordinary course of business and consistent with past practice and to continue paying any such obligations related thereto in the ordinary course of business on a postpetition basis.

21. The Debtors provide certain Employees with corporate credit cards (the "Corporate Credit Cards"). Currently, two Corporate Credit Cards are used by the Employees. The Corporate Credit Cards are issued to Employees in each Employee's own name and monthly invoices are sent to the Company. BMO Bank issues the Corporate Credit Cards. The Debtors are liable on account of the Corporate Credit Cards and must make payments in a timely manner. In the twelve months prior to the Petition Date, the average monthly amount paid on account of the Corporate Credit Cards was approximately $1,000 to $16,000 (the "Unpaid Corporate Credit Card Expenses"). Accordingly, by this motion the Debtors request authority to pay the Unpaid Corporate Credit Card Expenses in the ordinary course and consistent with past practice and to continue paying the Unpaid Corporate Credit Card Expenses in the ordinary course on a postpetition basis.

22. The Debtors provide certain purchasing cards used by Employees for the purchase of fuel (the "P-Cards"). Currently, 93 P-Cards are used by Employees. The P-Cards are assigned to particular Company-owned vehicles and used by Employees exclusively for fuel purchases in the field. WEX Bank issues the P-Cards. The Debtors are liable on account of the P-Cards and must make payments in a timely manner. Historically, the average monthly amount paid on account of the P-Cards was $15,000 (the "Unpaid P-Card Expenses"). As of the Petition Date, the Debtors estimate that aggregate Unpaid P-Card Expenses of approximately $25,000 remain outstanding. The Debtors seek authority to honor such outstanding prepetition obligations in the

ordinary course of business and consistent with past practice and to continue paying any such obligations related thereto in the ordinary course of business on a postpetition basis.

## II. Employee Incentive Programs.

### A. Bonus Programs.

23. The Debtors maintain certain incentive programs to drive performance, promote productivity, and boost morale among their Employees, including incentive bonus programs (the "Bonus Programs"). The Debtors offer bonuses to hourly non-insider Employees based on factors including time worked, specific job role, and the particular Employee's performance (the "Hourly Employee Bonus Program"). The Hourly Employee Bonuses are paid on a semi-annual basis. As of the Petition Date, the Debtors have accrued approximately $55,000 in obligations on account of the Hourly Employee Bonus Program, which becomes payable in October. Accordingly, the Debtors seek authority to continue the Hourly Employee Bonus Program in the ordinary course of business during the administration of these chapter 11 cases.

24. The Debtors offer discretionary bonuses to salaried Employees based on the Debtors' corporate performance and the individual Employee's performance (including achievement of target goals) (the "Salaried Employee Bonus Program"). The Salaried Employee Bonuses are paid on an annual basis. As of the Petition Date, the Debtors have approximately $2,470,000 in accrued obligations to Employees on account of the Salaried Employee Bonus Program. Accordingly, the Debtors seek authority to continue the Salaried Employee Bonus Program in the ordinary course of business during the administration of these chapter 11 cases. For the avoidance of doubt, the Debtors will not make any payments under the Salaried Employee Bonus Program to Employees that are "insiders" as that term is defined in section 101(31) of the Bankruptcy Code.

**B. Retention Awards Programs**.

25. The Debtors maintain two retention programs, including one retention bonus program for executive Employees (the "Executive Retention Award Program") and one program for non-executive Employees (the "Non-Executive Retention Award Program", and together with the Executive Retention Award Program, the "Retention Award Programs"). The Retention Award Programs have been implemented to retain specific key personnel. In 2019, one non-insider Employee was eligible for the Executive Retention Award Program and 93 non-insider Employees were eligible for the Non-Executive Retention Award Program. These Employees work in land, engineering, marketing, operations, IT, HR, administrative and accounting departments and are crucial to the Debtors' operations. Historically, the Non-Executive Retention Award Program cost $550,000 per quarter. As of the Petition Date, the Debtors believe they have accrued approximately $241,375 in outstanding obligations to Employees on account of the Non-Executive Retention Award Programs, which become payable in July. The Debtors believe they have accrued approximately $25,000 in outstanding obligations to the non-insider Employee on account of the Executive Retention Award Program, which becomes payable in March 2021. Accordingly, the Debtors seek to continue paying amounts due under the Retention Awards Programs in the ordinary course of business during the administration of these chapter 11 cases. For the avoidance of doubt, the Debtors will not make any payments under the Retention Award Programs to Employees that are "insiders" as that term is defined in section 101(13) of the Bankruptcy Code.

## III. Employee Benefit Programs.

### 1. Health Benefit Plans.

#### a. The Medical Plans.

26. The Debtors' medical plans (the "Medical Plans") constitute partially self-funded medical plans administered by Anthem Blue Cross and Blue Shield ("Anthem") and a prescription drug plan administered by Ingenio. The Medical Plans provide coverage for, among other costs, preventive care, doctor visits, hospital care, prescription drugs, vision care, confidential counseling and referral services, and wellness. In addition to the Debtors' contributions to, administrative and premium payments for, and claims under the Medical Plans, Medical Plan participants pay bi-weekly contributions, which are deducted from their paychecks.

27. The Debtors have historically paid approximately $250,000 per month in the aggregate for their contributions to, the administrative and premium payments for, and claims under the Medical Plans. As of the Petition Date, the Debtors estimate that prepetition Medical Plans-related obligations of approximately $460,000 remain outstanding. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Medical Plans and to continue administering the Medical Plans in the ordinary course of business and consistent with past practice.[3]

#### b. Stop-Loss Insurance.

28. The Debtors also maintain a stop-loss insurance policy (the "Stop-Loss Insurance Policy") with Sun Life to protect against catastrophic claims under the Medical Plan (*i.e.*, claims

[3] The Debtors also continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Debtors are partially self-insured and only pay administrative fees to Discovery Benefits for each COBRA participant as a portion of the Benefits Administration Fees (as defined below). The Debtors do not pay any COBRA premiums. Thus, payment of the COBRA premiums imposes no net costs on the Debtors or their estates.

in excess of $150,000). The Debtors estimate the ongoing monthly administrative cost of the Stop-Loss Insurance Policy is approximately $29,000. As of the Petition Date, the Debtors believe there are no outstanding obligations on account of the Stop-Loss Insurance Policy. The Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Stop-Loss Insurance Policy and to continue administering the Stop-Loss Insurance Policy in the ordinary course of business and consistent with past practice.

**c. Health Savings Accounts**.

29. The Debtors provide certain Employees enrolled in a high-deductible Medical Plan access to health savings accounts (the "HSAs") administered by PNC Bank. They made an initial contribution to the participating Employees' HSAs. Participating Employees opt to make pre-tax contributions to their individual HSAs through payroll deductions up to the maximum amount permitted by the Internal Revenue Service. The Debtors believe that they hold the HSA amounts in trust and that such amounts are not property of the Debtors' estates. Employees can use amounts in their HSAs to pay for qualifying medical expenses. As of the Petition Date, the Debtors believe that there are no accrued and unremitted HSA amounts remains outstanding (the "Unremitted HSA Amounts"). Nevertheless, the Debtors seek to transfer any Unremitted HSA Amounts out an abundance of caution to the appropriate recipients in the ordinary course of business and consistent with past practice and to continue to administer the HSAs in the ordinary course of business on a postpetition basis.

**d. Flexible Savings Accounts**.

30. The Debtors also provide Employees with access to flexible spending accounts (the "FSAs") administered by Discovery Benefits. The FSAs allow Employees to contribute pre-tax dollars for eligible out-of-pocket health care expenses. As the Debtors do not contribute to the FSAs, the Debtors believe that they hold the FSA amounts are in trust and that such amounts

are not property of the Debtors' estates. Employees can use amounts in their FSAs to pay for certain medical costs (including certain dental or vision costs), or dependent child care. When Employees seek to use their elected FSA amounts, the Debtors remit such amounts to the requested healthcare provider through Discovery Benefits. As of the Petition Date, the Debtors believe that there are no accrued and unremitted FSA amounts outstanding (the "Unremitted FSA Amounts"). Accordingly, the Debtors seek to transfer any Unremitted FSA Amounts to the appropriate recipients out of an abundance of caution in the ordinary course of business and consistent with past practice and to continue to administer the FSAs in the ordinary course of business on a postpetition basis.

**e. The Benefits Administration Fees.**

31. The Debtors have paid $7,400 in administrative fees to Discovery Benefits on an annual basis for Discovery Benefits' administrative services as to the FSAs and to COBRA (the "Benefits Administration Fees"). As of the Petition Date, the Debtors believe that approximately $1,100 on account of the Benefits Administration Fees. Accordingly, the Debtors seek to continue paying amounts due pursuant to the Benefits Administration Fees in the ordinary course of business during the administration of these chapter 11 cases.

**f. The Dental and Vision Plan.**

32. The Debtors also provide their Employees dental and vision insurance through a plan (the "Dental and Vision Plan") administered by the Guardian Life Insurance Company America ("Guardian"). The Dental and Vision Plan, which is self- insured, has historically cost approximately $15,000 per month exclusive of Employee contributions, which have historically totaled approximately $3,500 per month. As of the Petition Date, prepetition Dental and Vision Plan-related obligations of approximately $15,000 remain outstanding. Accordingly, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account

of the Dental and Vision Plan and to continue administering the Dental and Vision Plan in the ordinary course of business.

**2. Insurance, Disability, and Workers' Compensation Programs**.

**a. Life and AD&D Insurance Programs**.

33. The Debtors provide basic life and accidental death and dismemberment insurance coverage through Lincoln Financial Group ("Lincoln"), which provides maximum coverage per Employee at one times annual base salary (up to $300,000) for term life insurance and one times base salary (up to $300,000) for accidental life and dismemberment insurance coverage. The Debtors also provide supplemental life and accidental death and dismemberment insurance coverage through Lincoln, which provides varying levels of coverage for the Debtors' Employees, Employee spouses, and Employees' dependent children at no cost to the Debtors. As of the Petition Date, prepetition life and accidental death and dismemberment insurance obligations of approximately $50 remain outstanding.

**b. Disability Benefits**.

34. The Debtors provide Employees with short-term and long-term disability benefits (the "Disability Benefits") administered by Lincoln. The Disability Benefits are available to Employees after 90 consecutive days of employment and generally permit eligible Employees to continue to receive 60 percent of their monthly wages (subject to a monthly maximum of $8,000 for non-management employees and $12,500 for certain executives) in the event of qualified non-work-related illness or injury. As of the Petition Date, three Employees currently receive Disability Benefits.

35. The Debtors have historically paid approximately $725 per month on account of the Disability Benefits and associated premiums. As of the Petition Date, the Debtors do not

believe that any accrued and unpaid amounts related to the Disability Benefits and associated premiums remain outstanding.

**c. Workers' Compensation Program.**

36. The Debtors maintain workers' compensation insurance for Employees at the levels required by laws in the states in which the Debtors operate (collectively, the "Workers' Compensation Program").[4] Coverage for Wyoming-based Employees is maintained through a state-administered workers' compensation program, for which the Debtors pay quarterly fees of approximately $16,000 (the "Wyoming Workers' Compensation Fees"). As of the Petition Date, the Debtors estimate Wyoming Workers' Compensation Fees of approximately $8,500, which amount is expected to become payable in connection with the next quarterly reconciliation in July.

37. No Employees are collecting workers' compensation from the Debtors, and no Employees are expected to assert claims under the Workers' Compensation Program against the Debtors at this time. Nevertheless, it is possible that certain obligations under the Workers' Compensation Program may have been incurred prepetition but have yet to be asserted against the Debtors. The Debtors must be able to continue to assess, determine, and adjudicate workers' compensation claims (if any) for the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with applicable state law. Accordingly, the Debtors seek authority to continue to maintain the Workers' Compensation Program in the ordinary course of business and seek to modify the automatic stay solely to facilitate the administration of the Workers' Compensation Program.

[4] The Debtors do not seek authority to pay amounts related to the private workers' compensation insurance policy, but rather request such authority as part of the *Debtors'* Emergency *Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (III) Continue the Surety Bond Program*, filed concurrently herewith.

**3. The 401(k) Plan.**

38. The Debtors provide all Employees with the opportunity to participate in a 401(k) employee stock ownership program (the "401(k) Plan") administered by Fidelity Investments ("Fidelity")[5] and advised in its investment strategy by Cook Street Consulting, Inc. ("Cook Street").[6] Historically, Employees generally have been eligible to participate in the 401(k) Plan as of the first day of the calendar quarter following the date they are hired. In accordance with the Debtors' regular plan administration review and modification process, effective June 1, 2020, Employees will become eligible to participate in the 401(k) Plan as of the first day of the month following the date they are hired. The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set forth in the Internal Revenue Code, as well as for certain post-tax deductions. Each Employee's 401(k) contributions are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions").

39. The Debtors match each eligible Employee's 401(k) Plan contributions on a dollar-for-dollar basis up to five percent of such Employee's eligible compensation (the "Matching Contributions"). The Debtors also supplement eligible Employees' 401(k) plan contributions with additional discretionary contributions in an amount up to 8 percent of such Employee's eligible compensation (collectively, the "Discretionary Contributions" and, together with the Matching Contributions, the "401(k) Contributions").[7] The 401(k) Contributions, which

---

5 The Debtors do not believe that any 401(k) Plan administrative fees owed to Fidelity are outstanding as of the Petition Date.

6 Cook Street is paid on a quarterly basis from the 401(k) Plan funds. The Debtors do not believe that any 401(k) Plan administrative fees owed to Cook Street are outstanding as of the Petition Date.

7 The Debtors' 401(k) Contributions are fully vested after four years of service with the Debtors. Historically, forfeited unvested 401(k) Contributions have been stored in a Fidelity forfeiture account, which balance is contributed to expenses related to the 401(k) Plan.

have historically totaled approximately $2,750,000 per year, are transferred to the 401(k) Plan each pay period. As of the Petition Date, the Debtors are holding approximately $30,000 in 401(k) Contributions and 401(k) Deductions on behalf of eligible Employees.

**B. Tuition Reimbursement Programs.**

40. The Debtors reimburse certain tuition costs and other educational expenses for Employees (the "Tuition Reimbursement Program"). Currently, one Employee participates in the Tuition Reimbursement Program, which has historically cost approximately $10,000 per semester. As of the Petition Date, the Debtors believe that they have accrued approximately $10,000 in obligations pursuant to the Tuition Reimbursement Program.

**C. Voluntary Employee-Funded Benefits Programs.**

41. The Debtors provide Employees with access to certain voluntary benefits programs (the "Voluntary Employee-Funded Benefits Programs"), which permit Employees to make contributions to enroll and participate in such programs, including supplemental insurance programs for critical illness, veterinary care, and accident and accidental death and dismemberment programs. The Debtors do not incur any costs in connection with the Voluntary Employee-Funded Benefits Programs. But given that the Debtors administer Employees' funds on account of Employees' participation in such programs, the Debtors seek authority to continue the Voluntary Employee-Funded Benefits Programs in the ordinary course out of an abundance of caution.

**D. Wellness Incentive Program.**

42. The Debtors provide Employees with certain wellness-related incentives on an ongoing basis (the "Wellness Incentive Program"). Approximately 75 Employees have recently participated in the Wellness Incentive Program, which has historically cost approximately $2,500 per month. As of the Petition Date, the Debtors believe they do not have any amounts outstanding

on account of the Wellness Incentive Program. Accordingly, the Debtors seek authority to continue to pay the Wellness Incentive Program in the ordinary course of business on a postpetition basis.

**E. Gift Matching Program.**

43. The Debtors also have a program in place to match certain charitable gifts made by Employees in an amount up to $500 per employee per year (the "Gift Matching Program"). The Debtors believe that maintaining the Gift Matching Program is essential to sustaining Employee morale. On average, the Debtors pay a *de minimis* amount per month in the aggregate on account of the Gift Matching Program, and as of the Petition Date, the Debtors believe there are no accrued obligations outstanding on account of the Gift Matching Program. However, out of an abundance of caution, the Debtors seek authority to pay any prepetition amounts outstanding on account of the Gift Matching Program and to continue the Gift Matching Program in the ordinary course of business on a postpetition basis and consistent with past practice.

**F. Paid Leave.**

44. The Debtors maintain the following paid leave benefit programs for Employees.

- PTO. In the ordinary course of business, the Debtors provide paid time off ("PTO") to each eligible Employee in the form of vacation days and sick days. Employees may carry over 5 vacation days (40 hours) and up to 15 sick days from one calendar year to the next. Employees who are terminated or resign are entitled to cash payment for accrued but unused vacation days, but are not entitled to any cash payment on account of accrued but unused sick days. As of the Petition Date, the Debtors believe that have accrued approximately $845,000 in outstanding PTO obligations.

- Holidays. The Debtors also offer Employees eleven paid holidays, comprising nine corporate holidays and two floating holidays, throughout the year (collectively, the "Holidays"). Employees who are terminated or resign are not entitled to a cash payment on account of accrued but unused Holidays.

- Paid Leave. The Debtors also permit their Employees to take certain other paid leaves of absence for personal reasons (including bereavement leave,

jury duty, or voting leave), many of which are required pursuant to applicable law in certain jurisdictions which the Debtors operate (the "Other Paid Leave"). Employees are not entitled to any separate cash payments in addition to their normal compensation for the Other Paid Leave.

45. The Debtors believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. Finally, the Debtors anticipate that their Employees will use any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**4. Benefits Program Consultation.**

46. The debtors utilize Lockton Mountain West ("Lockton") to provide benefits-related employee communications (*e.g.*, benefit updates and benefits guide), assist with benefits enrollment, and provide other benefits consulting and brokerage services. Historically, the Debtors have paid approximately $8,000 per month in fees to Lockton on account of such services. As of the Petition Date, the Debtors estimate that approximately $13,000 in prepetition fees remain outstanding. The failure to pay such fees may have a detrimental impact on the Debtors' ability to continue to administer the various benefits programs to the Employees, including enrollment periods. Accordingly, the Debtors seek to continue to utilize Lockton's services on a postpetition basis (including paying any prepetition or postpetition amounts payable to Lockton).

**G. Postpetition Non-Employee Director Compensation of Debtor Ultra Petroleum Corp.**

47. The Board of Directors for Debtor Ultra Petroleum Corp. comprises one Employee and seven non-Employee directors (collectively, the "Non-Employee Directors"). As of the Petition Date, six of the Non-Employee Directors receive cash compensation in the amount of $220,000 annually, payable quarterly in advance (collectively, the "Annual Retainer"). One Non-

Employee Director also receives an additional $15,000 in retainer for chairing the Audit Committee (the "Supplemental Audit Chair Retainer"), a second Non-Employee Director also receives an additional $10,000 in annual compensation for chairing the Compensation Committee (the "Supplemental Compensation Chair Retainer"), and a third Non-Employee Director also receives an additional $5,000 in annual compensation for chairing the Nominating and Governance Committee (the "Supplemental Governance Chair Retainer," and together with the Supplemental Audit Chair Retainer and the Supplemental Compensation Chair Retainer, the "Supplemental Retainers"). The Supplemental Retainers are payable quarterly in advance. The Non-Employee Directors are also entitled to expense reimbursement for out-of-pocket expenses (together with the Annual Retainers, Supplemental Retainers, and Additional Fees, the "Non-Employee Compensation Obligations"). The Debtors do not believe that any Non-Employee Compensation Obligations remain outstanding as of the Petition Date.

**IV. Severance.**

48. In the ordinary course of business, the Debtors, as a discretionary exercise of their business judgment, may elect to offer severance ("Severance") to certain regular, full-time and part-time employees, excluding circumstances where termination is due to poor performance, misconduct, or if the Employee voluntary resigns (the "Non-Insider Discretionary Severance Program"). Seasonal or temporary employees are not eligible for severance benefits unless they have separately bargained for such benefits. In general, the amount of Severance offered is determined by reference to the Employee's length of services and compensation level. Severance is normally paid out in a lump sum cash payment in exchange for a release of claims by the Employee. As of the Petition Date, the Debtors do not believe they owe any accrued or outstanding amounts on account of the Non-Insider Discretionary Severance Program.

49. The Debtors seek, upon entry of the final order, authority to continue the Non-Insider Discretionary Severance Program in the ordinary course of business on a postpetition basis. For the avoidance of doubt, the Debtors are not seeking, as part of this motion, authority to make any Severance payments not permitted by section 503(c)(2) of the Bankruptcy Code but reserve all rights to do so at a later date.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

50. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. Under section 1129(a)(9)(b) of the Bankruptcy Code, the Debtors must pay these priority claims in full to confirm a chapter 11 plan. Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").

#### B. Payment of Certain Employee Compensation and Benefits Is Required by Law.

51. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that

governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b)(1), (d); *see also In re Equalnet Commc'ns*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *In re Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

52. Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003 (same). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

53. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

**II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity**.

54. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. at 369–70 (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

55. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. at 497). Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a); *In re CoServ*,

273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims); *In re CEI Roofing, Inc.*, 315 B.R. at 60 (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)" the court's job is easier when it considers approval of such prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business). The Bankruptcy Code thus authorizes the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re CoServ*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

56. Payment of Employee Compensation and Benefits easily satisfies these standards. The Employees are the bedrock of the Debtors' businesses. The majority of the Employees and Independent Contractors exclusively rely on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees and Independent Contractors will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

57. Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees and Independent Contractors, the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases. The oil and gas

industry is a highly specialized business that requires unique technical expertise. The Debtors believe that without these payments, their workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees, Independent Contractors, and Temporary Staff may face. Such individuals may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims is Appropriate Here.

58. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

59. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. Cause exists to modify the automatic stay because staying the Employees' workers' compensation claims could have a detrimental effect on

the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

**Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

60. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors request that the Court authorize and direct all applicable financial institutions, upon the Debtors' request, to receive, process, honor, and pay any and all checks or wire transfer requests related to the relief requested in this motion.

**Emergency Consideration**

61. The Debtors request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Local Rule 9013-1(i). An immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to

receive the requested relief during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, request that the Court approve the relief requested in this motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

62. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

63. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any ground, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates, (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession from the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this

motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

64. The Debtors will provide notice of this motion to (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the agent for the revolving credit facility; (d) counsel to the agent for the term loan facility; (e) counsel to the trustee for the 9.00% Cash / 2.00% PIK senior notes due 2024; (f) counsel to the trustee for the 6.875% senior notes due 2022 and 7.125% senior notes due 2025; (g) counsel to the ad hoc group of 6.875% senior notes due 2022 and 7.125% senior notes due 2025 notes; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) all applicable state taxing authorities; (k) the Environmental Protection Agency; (l) the office of the attorneys general for the states in which the Debtors operate; (m) the Securities and Exchange Commission; (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice is required.

WHEREFORE, the Debtors request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: May 15, 2020
Houston, Texas

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
**JACKSON WALKER LLP**
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221

-and-

David R. Seligman, P.C. (*pro hac vice* admission pending)
Brad Weiland (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

-and-

Christopher T. Greco, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and-

AnnElyse Scarlett Gains (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5046
Facsimile: (202) 389-5200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on May 15, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh