**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| ULTRA PETROLEUM CORP., *et al.*, | ) | |
| | ) | Case No. 20-32631 |
| Debtors.[1] | ) | |
| | ) | |
| | ) | |

**OBJECTION TO THE (I) CONFIRMATION OF PLAN OF REORGANIZATION, AND (II) APPROVAL OF DEBTORS' DISCLOSURE STATEMENT**

"The conduct of bankruptcy proceedings not only should be right but must seem right." – J. Friendly, *In re Haupt & Co.*, 36 F.2d 164, 168 (2nd Cir. 1966)

## INTRODUCTION

The undersigned party is an owner of equity interests in Ultra Petroleum Corp. ("Ultra" or the "Debtors") and submits this objection (the "Objection") to the (I)

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number (if any) are the following: Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC (N/A); Ultra Resources, Inc. (0643); Ultra Wyoming, LLC (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158). The Debtors' service address is 116 Inverness Drive East, Suite 400, Englewood, Colorado 80112.

Confirmation of Plan of Reorganization, and (II) Approval of Debtors' Disclosure Statement.[2]

Louis C. Talarico, III (the "Shareholder") is an individual who resides at 80 Pascal Ln, Austin, Texas 78746 and as of May 14, 2020 (the "Petition Date") is the beneficial owner of 160,000 shares of common stock in Ultra that are held in "street name". The Shareholder is an expert in evaluating energy company business plans and is also an expert in oil & gas company valuation.

The Shareholder has over twenty years of corporate business transaction experience, involving over $300 billion in announced deal value. The Shareholder has previously served in a senior investment banking role at Goldman, Sachs as a member of that firm's energy group and was previously a senior investment banker at J.P. Morgan as a member of that firm's mergers department. The Shareholder has significant bankruptcy and restructuring experience having been involved in several complicated and contested transactions including the bankruptcy of Enron Corporation as well as the bankruptcy and subsequent restructuring of SemGroup L.P., among many others.

[2] Capitalized terms used but not otherwise defined in this Objection will have the meaning ascribed to such terms in the Plan and/or Disclosure Statement.

The Shareholder is representing his interests pro se. That is, Shareholder is only representing himself in connection with the bankruptcy and does not represent or purport to represent any persons or entities in connection with Debtors' chapter 11 cases (the "Bankruptcy"). At this time, the Shareholder has no intention to serve on or represent any committees that have or may be formed in this Bankruptcy. If circumstances change and Shareholder determines to engage legal counsel, Shareholder will notice the Court.

## PRELIMINARY STATEMENT

1. According to Debtors' own presentations,[3] the Pinedale field is one of the top gas fields in the U.S. A prolific reserve base that has been exploited by Ultra over its 22-year track record producing over 3.5 Tcf of gas and 26.5 million barrels of oil. Ultra has ~2,260 operated wells with an inventory of over 4,000 drilling locations – over half that are economic in the current natural gas price environment. That is, even with 3.5 Tcf of gas having been produced, there is at least as much undeveloped resource still to be exploited. What do Ultra and its advisors think this resource is worth? ***Precisely, Zero!***

2. Yet, this very Court confirmed a plan of reorganization just three years ago (the "2016 Bankruptcy") that ascribed a value of multiple billions of dollars to

[3] Ultra's December 2019 Investor Presentation is attached as **Exhibit 1**.

the same exact assets.[4] While Debtors' try to fault the current global pandemic and a crude oil price war between OPEC and Russia, the simple fact is the fundamentals of natural gas – which is what matters to Ultra – have improved. Advertised as a "balance sheet restructuring," the Plan is nothing more than an improper cram-down.

3. As described further herein: i) the valuation analysis of the Debtors' advisor is not credible; ii) the insiders are taking self-interested steps to reset their compensation and obtain a broad release from their actions; and iii) the cram-down tactics of the creditors are improper. The plan of reorganization is in bad faith.

4. The Disclosure Statement, for its part, is inadequate, inaccurate, and misleading.

5. Rather than slow down the bankruptcy process, Shareholder is proposing to dramatically simplify and accelerate the reorganization through the confirmation of an Alternative Restructuring that can be re-circulated within 20 business days of an Order approving such action. The bare bones structure of a balance sheet restructuring is in place. The documentation is largely complete and can be simplified. But the plan of reorganization must be fair and equitable.

[4] In the 2016 Bankruptcy, the liquidation analysis ascribes a value to Oil & Gas Properties of $3.7-$4.45 billion. As such, a proxy for the value of the proved undeveloped properties would be $2.0-$2.7 billion (i.e. the value of the Oil & Gas Properties less the proved developed producing reserves from the proximate NSAI reserve report which was $1.7 billion) at the time.

6. The current proposed plan of reorganization is nothing more than double-barreled cram-down litigation. There are significant public policy interests at stake. The oil & gas industry is dealing with external shocks and there is a potential wave of oil & gas bankruptcies coming in the years that follow. Bankruptcies grounded in artificial impairment, dubious cram-down tactics and the unilateral cancelling of company commitments will have an everlasting negative impact on the oil & gas industry and its ability to achieve capital formation.

## BACKGROUND

7. On May 14, 2020, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The same day, Debtors filed the Joint Chapter 11 Plan of Reorganization of Ultra Petroleum and Its Debtor Affiliates (the "Plan") (Docket No. 20). Debtors' also filed the Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of Ultra Petroleum and its Debtor Affiliates (the "Disclosure Statement") (Docket No. 18). The Disclosure Statement includes, among other things, exhibits containing a Restructuring Support Agreement (the "RSA"), Financial Projections, a Valuation Analysis and a Liquidation Analysis.

8. On May 18, 2020 at approximately 3:00 pm central time, Shareholder spoke with Mr. Brad Johnson, CEO of Ultra, regarding the Bankruptcy filings. At

the time, Shareholder had not fully reviewed the Bankruptcy filings but did express Shareholder's surprise at the Valuation Analysis.

9.      On May 20, 2020, Shareholder mailed notice of appearance to this Court which was subsequently filed on May 26, 2020. (Docket No. 158)

10.     On May 26, 2020, Shareholder sent correspondence (the "May 26 Correspondence") via email to counsel for the Debtors and certain creditors (the Ad Hoc Group") which was subsequently filed by the Court (Docket No. 168) communicating (i) some of Shareholder's concerns regarding the proposed Plan, Disclosure Statement and Valuation Analysis, and (ii) a request for the Debtors and certain creditors to provide Shareholder specific information regarding the Plan, the Valuation Analysis and certain events leading up to the Bankruptcy filing.

11.     On May 28, 2020 at approximately 2:00 pm central time, Debtors' counsel contacted Shareholder to discuss Shareholder's May 26, 2020 Correspondence (the "May 28 Debtors' Counsel Call"). Debtors' counsel committed to revert with a form confidentiality stipulation to facilitate the exchange of information. Debtors' counsel has not followed up with Shareholder regarding a form confidentiality stipulation nor the need for one based on Shareholder's information request. [5]

---

[5] Shareholder questioned the need for a confidentiality stipulation. Shareholder requested that Debtors' counsel review Shareholder's information requests and

12. On June 4, 2020 at 4:00 pm central time, Shareholder held a "courtesy call" between Shareholder and Debtors' counsel, including representatives from Kirkland & Ellis and Jackson Walker. Shareholder provided an overview of its objection and asked as to the status of Shareholder's information request. Regarding the latter, Debtors' counsel indicated they were still gathering the information.[6]

## OBJECTION

### I. THE BANKRUPTCY FILING, PLAN OF REORGANIZATION, DISCLOSURE STATEMENT AND VALUATION ANALYSIS ARE IN BAD FAITH

13. The fundamental underpinnings of the Bankruptcy Code include the requirements that a plan "not discriminate unfairly" and that it be "fair and equitable." The Plan put forth by Debtors and supported under the RSA fails both measures.

#### A. The Valuation Analysis is Not Credible and is in Bad Faith

14. To confirm a plan, a reorganized debtors' valuation is key to: (i) whether the debtors' assets are of sufficient value such that the plan is feasible under

---

explain to Shareholder what information, if any, Debtors' believed to be "confidential".

[6] Shareholder intends submit the requests made in the May 26 Correspondence as well as those contained herein, among others, in a formal discovery motion.

section 1129(a)11; (ii) whether a plan is "fair and equitable"[7] under section 1129(b); and (iii) whether a debtor has demonstrated that creditors and equity interests are receiving more than they would if the debtor were liquidated in a Chapter 7 proceeding under section 1129(a)(7)(A)(ii). Full disclosure of the Debtors' assets and their value is fundamental to evaluation of a proposed plan. *See, e.g. Krystal Cadillac-Oldsmobile GMC Truck*, 337 F.3d at 321-322.

15. Here, the Debtors have provided minimal information about a few assets and no information about – ***and, ascribed absolutely no value to*** –many other assets. Significantly, the stakeholders have not been provided with the details of the Valuation Analysis of Centerview Partners rather a generalized description that is provided in Exhibit D to the Disclosure Statement (the "Valuation Analysis").

16. Ultra is now, essentially, a single asset company with a concentrated asset position in the Green River Basin in Wyoming. The size, scale and composition of the natural gas reserve base are the core asset of the business. In its marketing materials selling the Plan to the Term Loan Lenders (the "Term Loan Lender Presentation" attached hereto as **Exhibit 2**), Ultra describes itself as "the

[7] *In re Campbell*, 89 B.R. 187, 188 (Bankr N.D. Fla 1988) ("Establishing that a plan is fair and equitable with respect to a class places additional burdens on both the Court and the debtor since such requires valuations of property and income streams.")

largest acreage holder in Pinedale," a 60 Tcfe natural gas field. And while Ultra currently operates ~2,260 producing wells, it still has "more than 4,000 remaining drilling locations within boundary of core development." That is, less than half of the Ultra's resources in the field have been developed. In the current natural gas price environment, Ultra also discloses in the First Term Lenders Presentation that more than 1,700 drilling locations are economically viable.[8] Ultra's most recent investor presentations indicate each well is expected to achieve 3-4 Bcfe EUR. The simple math (1,700 drilling locations times 3-4 Bcfe per well) suggests this represents approximately 5-7 Tcfe of hydrocarbons that are economically viable in the current natural gas price environment. And while this opportunity is modestly described as "option value" by the Debtors, ***absolutely no value*** has been ascribed to this massive and very real asset base.

17. One does not need significant valuation experience – or perhaps, any at all – to understand that the Valuation Analysis is not credible. A simple comparison of other similar valuations of the same asset base over time demonstrates that the Valuation Analysis is not credible. To this end, the chart below compares the valuation of the proved developed producing ("PDP") reserve base through two lenses: i) the independent NSAI reserve report provided in each Form 10-K, and ii)

[8] Shareholder understands these to be vertical drilling locations. The figure does not include horizontal drilling locations.

the borrowing base redetermination performed by the RBL lenders and discussed in Ultra's public filings:

18. One can clearly see that both the NSAI reserve report (for PDP only reserves) and the RBL redeterminations proximate to each of the 2016 and 2020 bankruptcies are very similar. That is, the NSAI reserve report valuation in both periods is ~$1.7 billion and the RBL redetermination approximates $1.1-$1.2 billion.

19. By contrast, in the 2016 Bankruptcy, billions of dollars of value were ascribed to the undeveloped asset base. Meanwhile, the Valuation Analysis further discounts the value of Ultra to achieve a valuation beneath the Term Loan claims. Through its own admission in the First Term Lender Presentation, the assets are significant, economic and part of the go forward plan of the Debtors – yet, absolutely no value is ascribed to these assets. ***If the Debtors and the Ad Hoc Group truly***

***believe that the value of the proved undeveloped reserves is zero, then these assets should be distributed to the alleged (according to Debtors and its Plan) worthless class of stakeholders, i.e. the common stock owners.***[9]

20. In the May 26 Correspondence, Shareholder has requested essential information to perform due diligence on the Valuation Analysis. Shareholder has over 20 years of experience reviewing oil & gas company business plans and performing valuation analysis and has the ability to diligence the business plan and valuation in an efficient and expeditious manner. Shareholder believes the Valuation Analysis is simply not credible and will not withstand cross-examination by Shareholder.[10] Centerview and the Debtors should withdraw the Valuation Analysis.

21. Regarding the liquidation analysis, the Disclosure Statement states "[t]here is presently no market for the Debtors' undeveloped reserves and mineral leases, and we do not believe such assets would have a market during the projected liquidation period." Shareholder requests Debtors provide information

---

[9] Shareholder is prepared to form a standalone company with management team to manage the proven undeveloped reserve assets.

[10] Shareholder had a telephone call with the Centerview banker responsible for the Ultra engagement on December 4, 2019. In that conversation, the Centerview representative described a view on valuation very different than what is presented in the Disclosure Statement.

demonstrating that the proven undeveloped properties of the Debtors have been properly marketed and that there is no market for the asset.

22. By contrast in its liquidation analysis[11] in the 2016 Bankruptcy, "Debtors assume that the Trustee would pursue a prudent, prompt, and broad marketing of the assets over a six month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures." There has been no broad marketing of the proved undeveloped properties,[12] rather the substantial value of these assets is ignored.

### B. The Conduct of the Debtors Leading up to the Bankruptcy Filing is in Bad Faith

23. The timeline of events leading up to the bankruptcy raises concerns about the Debtors' behavior and conduct during this process. The triggering event that started Ultra on the path to the Bankruptcy filing was a going concern qualifier in Ultra's annual audit. The going concern qualifier was not disclosed until April 14, 2020, over 6 weeks after the audit should have been completed and filed.

[11] 2016 Bankruptcy (Case No. 16-32202) valuation analysis filing (Docket No. 1098-3).

[12] If there has, Shareholder requests evidence of such broad marketing.

24. Historically, Ultra has filed its Form 10-K, inclusive of Ernest & Young's audit opinion, in the last week of February or first week in March, for example:

| Fiscal Year | 10-K Filing Date |
|---|---|
| 2013 | 2/25/2014 |
| 2014 | 2/24/2015 |
| 2015 | 2/29/2016 |
| 2016 | 2/22/2017 |
| 2017 | 2/28/2018 |
| 2018 | 3/8/2019 |

25. In a Form 8-K filing on March 5, 2020, Ultra disclosed that the company "and its advisors recently engaged in negotiations with certain third party holders of the Company's long-term debt … the [c]ompany provided certain confidential information to such third party debtholders' advisors." So, rather than completing the audit and filing the Form 10-K, the Debtors apparently starts the process of preparing for the Bankruptcy. It is noteworthy that the first week in March is precisely when concern regarding the COVID-19 global pandemic is starting to take hold in the U.S. At this point, the equity markets are in the midst of a correction having sold off ~10%. But these market events should not affect the completion of the audit nor the filing of the Form 10-K. The audit should have been

nearly complete by this time. Any potential going concern qualifier would have been known to the company and its accounting staff.

26. In a Form 8-K filing on March 12, 2020, Ultra announced it had put in place new employment agreements with certain executives, including the CEO, CFO and CAO of the company.[13] Each of the executives who were awarded employment agreements were also given a one-time bonus. It is difficult to understand how a board of directors could take such action, especially with the CEO and financial staff of the company, when a critical priority of their job – the completion of the audit and filing of the Form 10-K – was not complete.

27. On March 31, 2020, Ultra filed a Notification of Late Filing on Form 12b-25, indicating that it would be "unable to file its Form 10-K within the prescribed time period." Ultra disclosed in the filing that the reasons were related to its liability management efforts and active discussions with debtholders. There is no disclosure of any going concern qualifier even though it must have been known at this point given the audit would typically be complete in February.

28. Finally, on April 15, 2020, Ultra disclosed in a Form 8-K the going concern qualifier.

---

[13] Some of these executives already had employment agreements in place raising the question, why is their urgency to reload the employment agreements.

29. It appears that rather than disclosing the going concern qualifier and filing its Form 10-K – requirements of a public company – the Debtors was instituting executive bonuses, employment agreements, and negotiating its pre-packaged bankruptcy with debtors, including the structuring of new management incentive plans and broad releases. While Ultra's disclosure indicates that the going concern qualifier was a triggering event for the Plan, it appears that the going concern qualifier may, in fact, have been the scapegoat to facilitate the Plan.

30. On the May 28 Debtors Counsel Call, the Kirkland partner concurred with Shareholder that this was the first time he had seen a going concern qualifier as an event of default. Typically, when Shareholder sees such anomalies and unique circumstances, it is cause for investigation.[14]

### C. The Restructuring Support Agreement and Plan of Reorganization are in Bad Faith

31. "To confirm a plan of reorganization, chapter 11 generally requires a vote of all holders of claims or interests impaired by that plan. See 11 U.S.C. 1126,

---

[14] Shareholder has requested information regarding the audit process in its May 26 Correspondence. The Kirkland representative specifically inquired about this request on the May 28 Debtor Counsel Call and Shareholder explained the concerns discussed herein. The Kirkland representative indicated the request may be more difficult given certain privilege issues. Shareholder, in his experience with public company Form 10-K filings, expects that any initial communication with auditors about such an issue would be between Ultra's Chief Accounting Officer and the auditor. The existence of an attorney (to create privilege) on such early communications would only be a red flag.

1129(a)(8). This voting requirement has exceptions, however, including one that allows a bankruptcy court to designate (in effect, to disregard) the votes of 'any entity whose acceptance or rejection of such plan was not in good faith.'" (*In re DBSD*, 624 F. 3d at 101)

32.     On the May 28 Debtors Counsel Call, when Shareholder expressed concerns regarding the Plan, Disclosure Statement and Valuation Analysis, a Kirkland & Ellis litigation partner asked Shareholder why, if the Plan and Valuation Analysis are so wrong, would it be overwhelmingly supported by the Second Lien Note Claims when that class would be significantly impaired.[15] (the "Kirkland Question")  Shareholder responded, "tell me who the second lien holders are, and I'll tell you why they are supportive of the plan." The Kirkland representative did not identify any second lien holders to the Shareholder on the call.[16]

---

[15] According to the Disclosure Statement, the Second Lien Notes Claims are expected to receive recoveries of 4%, including 2.5% (subject to dilution) of the New Interests and Makewhole Instruments evidencing entitlement to 45% of any proceeds received in the Makewhole Litigation, the latter being unusual consideration.

[16] It is noteworthy in the Disclosure Statement that on each of the 59 signatory pages for the creditors in support of the RSA there exists a table entitled "Aggregate Amounts Beneficially Owned or Managed on Account of:". However, the figures for each creditor have been redacted.  This information should not be redacted, and Debtor should immediately file the unredacted signatory pages for the RSA containing the amounts of each security owned by each creditor.

33. Shareholder understood why Citadel supported the RSA. Shareholder referenced the Verified Statement of the Consenting Term Lenders (the "Verified Statement") (Docket No. 129) and described to Debtors' counsel Citadel's support as a large holder of Second Lien Notes. Citadel, according to the Verified Statement owns ~39% of the Term Loan and ~31% of the Second Lien Notes.[17] As Shareholder explained to counsel, it does not matter to Citadel if the value goes into the right pocket (Term Loan recovery) or into the left pocket (Second Lien Notes recovery), it is still the same pair of pants. With an ~100% equity distribution of New Interests to certain creditors, Citadel ownership of New Interests accretes to a higher interest level the more New Interests are funneled towards the Term Loan claims by nature of Citadel's higher percentage ownership interest in the Term Loan vis-a-vis Second Lien Notes (i.e. ~39% to ~31%). In this circumstance, with a higher percentage ownership in the Term Loan position (relative to its Second Lien Notes position) and priority in the claims, Citadel would prefer as low a valuation as possible to avoid New Interests being distributed to other claims.

[17] Shareholder has correspondence from a former Term Loan holder suggesting significant claims may have been bought and sold amongst various hedge fund investors in the days, weeks and/or months leading up to the Petition Date. Shareholder is requesting those creditors supporting the RSA disclose all transactions in Debtor securities since June 30, 2019.

34. Citadel is incentivized to "impair" both the First Lien Term Loan claims and the Second Lien Notes claims to cram-down the other classes. The answer for the Ad Hoc Group on valuation was obvious – the valuation needed to be less than $973 million (the amount of the First Lien Term Loan Claims) to achieve this objective – not surprisingly the Valuation Analysis came to this very conclusion – a valuation of $900 million.

35. However, it is not Citadel alone. The ownership of Citadel, Bain Capital, Oaktree Capital Management and Goldman Sachs (the "Second Lien Blocking Group") represent 58.8% of the Term Loan and 48.9% of the Second Lien Notes classes. That is, these four institutions create an effective blocking position by nature of their ownership in the Second Lien Notes. Goldman, for its part, is further conflicted by its position in the RBL.

36. It appears Second Lien Blocking Group may have used their positions in the Term Loan and Second Lien Notes "as levers to bend the bankruptcy process toward [their] own strategic objective" of acquiring the debtor and "not toward protecting [their] claim." (*In re DBSD*, 624 F. 3d at 104) ***There is authority holding that these votes and classes should be ignored in the confirmation process.***

## II. THE DISCLOSURE STATEMENT LACKS INFORMATION CRITICAL TO AN UNDERSTANDING OF THE PROPOSED PLAN.

### A. Applicable Law Requires Disclosure of All Details Necessary to Make an Informed Judgement.

37. A disclosure statement must contain, at a minimum, adequate information concerning "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *In re Beltrami Enters., Inc.* 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) (internal quotation and citation omitted). While a number of courts have provided a list of the type of information that should be addressed by a disclosure statement. Rather than recite the laundry list of information that courts have suggested for inclusion in a disclosure statement, I will address some of the most basic information NOT adequately or accurately addressed in the Debtors' Disclosure Statement. These material factors that were NOT adequately or accurately addressed (with accompanying commentary) in the Debtors' plan include, among other things:

- The circumstances that gave rise to the filing of the bankruptcy petition;
- a complete description of the available assets and their value;
- the anticipated future of the debtor with accompanying financial projections;
- the condition or performance of the debtor while in Chapter 11 [or in recent months as the case may be with Ultra];
- Any financial information, valuations or pro forma projections that would be relevant to the creditors' determinations of whether to accept or reject the plan.

38. Here, the Disclosure Statement lacks the information necessary for creditors and interest holders to make an informed decision about the proposed Plan,

including such basic information as: (i) an accurate and complete explanation of the circumstances that gave rise to the bankruptcy filing, (ii) an accurate and complete listing of the amount, nature and value of the Debtors' assets; (iii) information about Ultra's recent financial performance in these turbulent times that allegedly led to the bankruptcy; (iv) financial projections that reflect any simple economic reality of an oil & gas company consistent with the description of the go-forward plan for Ultra as a "consolidator" in the Rockies; and (v) financial information, valuations or pro forma projections that may have been utilized by the Debtors and its advisors in strategic alternatives discussions described in the Disclosure Statement.

39.     Rather than providing a clear, consistent and coherent plan for the Debtors, the Disclosure Statement provides financial projections and valuations untethered to management's proposed go-forward business strategy with New Interest owners. Until the Debtors revise the Disclosure Statement to include a complete and accurate description of all of the necessary information, it cannot be approved.

   **i)     The Disclosure Statement Fails to Accurately Address Events Leading to Ultra's Bankruptcy**

40.     The Disclosure Statement seems to focus on the "initial spread of COVID-19" and an "oil price dispute between Saudi Arabia and Russia in the first quarter of 2020" and the resulting effects on WTI crude oil prices as the events that led to the bankruptcy. This is misleading. While these events have certainly been

unfortunate and unexpected, the Debtors ignore the simple fact that the financial performance of Ultra is principally tied to natural gas prices and ***not*** WTI crude oil prices.    In its own Form 10-K, Ultra reported that natural gas comprised approximately 96% or production and 96% of total proved reserves as of December 31, 2019.  Therefore, it is the natural gas prices that matter to Ultra and not WTI crude oil prices.

41.    In focusing on crude oil prices, the Debtors attempts to distract and mislead this Court and stakeholders from the underlying natural gas fundamentals that have resulted from the disruptive events in early 2020.  That is, the drop in WTI crude oil prices has created sharp cuts in capex for US oil producers and significant shut-ins of oil wells with associated gas production.  While, the cuts in capex were not initially reflected in the oil rig count in late-March, the oil rig count has dropped in April and May.  This implies that the bulk of the declines in oil and associate gas production will take place later this year and into 2021.  Which is to say, the sharp declines in WTI oil prices as a result of the events described in the Disclosure Statement have actually made for a much more constructive environment for natural gas prices.  In fact, following the initial shocks to global financial markets (including commodity markets), natural gas prices have improved relative to their pre-pandemic levels.

42. The events in the first half of 2020 are certainly unfortunate. Market dislocations were significant, but that does not justify the actions taken by the Debtors and certain creditors to unfairly seize the assets of the company.

43. The Disclosure Statement suggests "that filing chapter 11 presented the best option to right-size its balance sheet" and the bankruptcy is positioned as a "balance sheet restructuring to ensure the long-term viability of [Utlra's] business." However, it is important to understand that the die had been cast years ago regarding the Debtors' highly leverage balance sheet.

44. In 2018, Ultra's management and its board undertook a strategic shift to a horizontal drilling program that performed below expectations. While Shareholder is, and continues to be, an advocate of a horizontal drilling program in the Pinedale field,[18] the execution of the program was a failure. It was this failed business plan of the board and poor execution by management that put Ultra on its path to an over leveraged balance sheet. Instead of "demonstrat[ing] disciplined decision making,"[19] the company, lead by its hedge fund Chairman, doubled down

[18] Demonstrating Shareholder's belief in Ultra and its horizontal program, on May 21, 2018 Shareholder took the unusual steps of flying to Denver, at Shareholder's sole expense, to meet with the Ultra CEO and offer Shareholder's services as CFO of Ultra or in an advisory capacity.

[19] One of management's key selling points on the first page of the Term Loan Lender Presentation.

on a failing horizontal drilling execution strategy. Ultra was forced to abandon the horizontal program in late 2018 following its failed execution.

45. Below are the trading levels for the Debtors' unsecured notes during the failed execution and subsequent abandonment of the horizontal program (i.e. 1/1/2018 – 6/30/2019)[20]:

46. As depicted above, the unsecured bonds traded down from par value to ~10% of par value as insiders ran the company into the ground. Rather than be held accountable, insiders are attempting to reset their position with the Plan (including up to 7% of the equity in the form of a management incentive plan) and release themselves of any liability for their actions since the 2016 Bankruptcy – Ultra

[20] Source: Finra market data. Price charts each represent the time period January 1, 2018 – June 30, 2019, the period of Ultra's execution and evaluation of its horizontal well program.

insiders want a "do over". The Disclosure Statement describes the in-court process as the "best opportunity to achieve a value-maximizing restructuring transaction" which is a true statement only for certain insiders and the Ad Hoc Group.

47. The Ad Hoc Group and management clearly understand the dynamics at play in the commodity markets, i.e. the constructive natural gas market fundamentals resulting from reductions in oil drilling and associated natural gas production in the face of a global pandemic. Filing for bankruptcy was an opportunistic strike aimed at attempting to steal the company under the cover of the crisis. Recent events have had catastrophic effects for many individuals, companies, industries and nations – but not Ultra. This type of predatory behavior should not go unpunished by this Court.

**ii) The Disclosure Statement Fails to Provide Financial Projections Consistent with the Stated Future Operating Plan of the Debtors**

48. The Term Loan Lender Presentation provides insight into what management and the Ad Hoc Committee believe the opportunity is at Ultra. However, it is untethered from the Plan being instituted and the associated financial projections and Valuation Analysis put forth by the Debtors and its advisors.

49. The financial projections provided in Exhibit C to the Disclosure Statement provides forecasted natural gas and oil volumes for operated production based on PDP production streams only. But the marketing presentation to the Term

Loan Lenders is ripe with discussions about "drilling inventories" as well as the Debtors being a "Rockies consolidator" and able to "build positions in  other basins through M&A" at "PDP PV20+" with "option value".

50.     While the Debtors is positioning a post-emergence Ultra as a "Rockies consolidator" and touting a "significant undeveloped inventory" it has not provided any financial projections that match management's plan post-emergence.   The inconsistencies make the financial projections not credible.   Subsequently, the valuation analysis becomes a "garbage in, garbage out" exercise.

51.     The business plan and financial projections should be revised for a more realistic view into how a low-cost natural gas producer would operate and earn return for its stakeholders.  It is simply not credible for management to promote that a post-emergence, unleveraged Ultra would simply produce out its existing PDP production, be debt-free while accumulating cash and not reinvest into PDP 20%-25%+ return opportunities.

**iii)     The Disclosure Statement Fails to Provide Any Meaningful Market Valuation Information or Information Regarding An Appropriate Market Check**

52.     While the Disclosure Statement describes in generalizations that "[Ultra] then decided to retain a certain advisor to assist with evaluating other strategic alternatives," there are no details about any such market check. Shareholder spoke with Debtors' strategic alternatives advisor on November 11,

2020.  Debtors' advisor left the impression with Shareholder that the undertaking was anything but a market check as marketing materials had not even been prepared by the company nor the advisor.  The process had no strategic focus and did not appear geared toward achieving any apparent financial objective.  It certainly was not a market check.

53.    Shareholder has requested to review the information from the strategic alternatives process.  With over 20 years' experience running similar processes, Shareholder will be able to determine very quickly if a market check has been undertaken.

## III.    SHAREHOLER IS REQUESTING 20 BUSINESS DAYS LEAVE FROM THIS COURT TO FILE AN ALTERNATIVE RESTRUCTURING FOR CONFIRMATION.

54.    Shareholder agrees that a prolonged stay in bankruptcy does not serve the interests of the Debtors nor its stakeholders.  Shareholder believes the bones of a "balance sheet restructuring" are in place with the current Plan.  With some modest alterations to the Plan and a legitimate valuation analysis, Shareholder believes it can submit a modified plan (the "Alternative Restructuring") within fifteen business days of this Court delivering such an Order.  Votes would be solicited for ALL eligible and proper voting classes, including the equity interests.  Following are Shareholder's requirements to submit an Alternative Plan to this Court:

- Full cooperation of management of the Debtors to provide Shareholder with the necessary operating, financial and technical information to prepare an alternative business plan including revised forecast financials and a valuation analysis;
- Full cooperation of Debtors counsel to prepare an amended disclosure statement, plan of reorganization documentation and related documentation. The structure of these documents is in place because the Alternative Restructuring is fundamentally similar to the current proposed Plan, and Shareholder would simply need to work with counsel to blackline the existing documentation;
- It may be timely that this Court and the U.S. Trustee appoint an equity committee to consider the Alternative Restructuring;

55. Shareholder believes Debtors, Debtors' management, Debtors' board of directors and Debtors' advisors, among others, have a fiduciary duty to cooperate with Shareholder on an Alternative Restructuring.

56. An Alternative Restructuring would be based on the following principles, many of which are identical to the structure in place in the proposed Plan:

- Full equitization of the balance sheet including each and every class, with the exception of the Second Lien Notes Claims and RBL, to be discussed separately below. Pending a legitimate valuation, Shareholder would expect to see full recoveries in each creditor class;
- Second Lien Note Claims would receive the full $242 million Makewhole Litigation assets at par value, with any remaining claim amounts to be satisfied with equity. The Second Lien Note Claims have demonstrated a desire for this asset and it is time the creditors stop wasting the time and resources of Ultra, and this Court, on the Makewhole Litigation;[21]

[21] Shareholder believes this Court will be pleasantly surprised how quickly the Makewhole Litigation would resolve itself once the hedge funds start negotiating

- Subject to further diligence, Shareholder believes that the REX and Pinedale LGS Lease Agreement do not need to be rejected. This would make the adversarial proceedings related to these contracts moot;

- Shareholder, through existing relationships, with the assistance of Debtors, would arrange for a new RBL facility to replace in full the existing RBL facility. With a recently established borrowing base of $1.075 billion and no other debt on post-emergence Ultra, Shareholder is confident that a $250 million facility would be achievable. As such, there would be no need for a rights offerings or other capital raising activity thereby simplifying the conditions precedent to emergence date. Shareholder has initiated discussions with two global lending institutions regarding a new RBL.[22]

57.    Shareholder's Alternative Restructuring will dramatically simply the Bankruptcy process. Having worked on over $300 billion in announced transactions, Shareholder has significant experience drafting, structuring, and finalizing the required documentation. In this case, much of the documentation is already in place, it just needs to be simplified.

58.    Shareholder does not intend to attempt to litigate the potential bad faith or ethical issues identified in this Objection at this time. Those issues should be investigated and dealt with by those with a fiduciary duty to Debtors and/or, perhaps, the U.S. Trustee. While Shareholder would expect that the Ad Hoc Group, and potentially others, will look to slow down the process in light of the assertions herein,

---

settlement with each other, or as in the case with Avenue Capital, negotiating with itself.

[22] To the extent that a DIP is required to replace the existing DIP, Shareholder has initiated discussions with a DIP provider to achieve such objective.

Shareholder's intent is to expedite an Alternative Restructuring of the Debtors as soon as feasible and resolve this improper bankruptcy.

## RESERVATION OF RIGHTS

59. In addition to the objections asserted and relief requested herein, Shareholder expressly reserves all of its rights to assert additional objections to the Plan, Disclosure Statement and Valuation Analysis at the hearing.

60. To the extent any objection, in whole or in part, contained herein is deemed to be an objection to the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, the Shareholder reserves its rights to assert such objection, as well as any other objections, to the confirmation of the Plan. Furthermore, to the extent that Shareholder is generally impacted in any way by the contents of any supplements or amendments to the Disclosure Statement or the Plan that may be filed after any Disclosure Statement or Plan confirmation objection deadline, Shareholder reserves its right to object hereto. The Shareholder reserves the right to raise further and other objections to the Disclosure Statement or any amendment thereto prior to or at the hearing thereon in the event the Shareholder's objections raised herein are not resolved prior to such hearing.

## CONCLUSION

**WHEREFORE**, based on the foregoing, the Shareholder respectfully requests that the Court enter an order (i) denying approval of the Disclosure Statement, (ii) denying confirmation of the Plan, (iii) granting 20 business days leave for Shareholder to file an Alternative Restructuring with the full cooperation of Debtors and its advisors and (iv) granting such other and further relief as the Court deems just and proper.

LOUIS C. TALARICO, III

________________________________

80 Pascal Ln
Austin, Texas 78746
(512) 291-6038
*Appearing Pro Se*

EXHIBIT 1

ULTRA
UP
PETROLEUM
INVESTOR PRESENTATION
December 2019

# FORWARD LOOKING STATEMENTS & RISK FACTORS



**Forward-Looking Statements and Reserve Estimates**

This presentation contains "forward-looking statements" within the meaning of the federal securities laws, including statements about our business strategies and plans, plans for future drilling and resource development, prospective levels of capital expenditures and production and operating costs, and estimates of future results. Any statement in this presentation, including any opinions, forecasts, projections or other statements, other than statements of historical fact, are forward-looking statements. Although we believe the expectations reflected in such forward-looking statements are reasonable, we can give no assurance such expectations are correct, and actual results may differ materially from those projected. In addition, this presentation includes information about our proved reserves. The Securities and Exchange Commission ("SEC") permits oil and gas companies, in their filings with the SEC, to disclose only proved, probable and possible oil and gas reserves that meet the SEC's definitions for such terms. This presentation also includes information about oil and gas quantity estimates that are not permitted to be disclosed in SEC filings, including terms or designations such as "estimated ultimate recovery" or "EUR" or "resource" or "resource potential" or other terms bearing similar or related descriptions. These types of estimates do not represent and are not intended to represent any category of reserves based on SEC definitions, do not comply with guidelines established by the American Institute of Certified Public Accountants regarding forecasts of oil and gas reserves estimates, are, by their nature, more speculative than estimates of proved, probable and possible reserves disclosed in SEC filings, and, accordingly, are subject to substantially greater uncertainty of being actually realized. Actual volumes or quantities of oil and gas that may be ultimately recovered will likely differ substantially from such estimates. Factors affecting such ultimate recovery include the scope of our actual drilling program, which will be directly affected by the availability of capital, drilling and production costs, commodity prices, availability of drilling services and equipment, lease expirations, transportation constraints, regulatory approvals, field spacing rules, and actual drilling, completion and production results as well as other factors. These estimates may change significantly as the development of properties provides additional data. This presentation also includes estimates of values attributable to the locations on which such oil and gas quantity estimates are based. The estimates of value set forth in this presentation were calculated based on the assumptions and methodologies set forth in this presentation, which differ materially from the assumptions and methodologies oil and gas companies are required to use in calculating PV-10 values of proved reserves disclosed in SEC filings. As a result, the estimates of values included in this presentation do not represent and are not intended to represent the "PV-10" value that would be attributable to such items if such items were calculated based on applicable SEC requirements.

**Risk Factors**

Certain risks and uncertainties inherent in our operating businesses as well as certain on-going risks related to our operational and financial results are set forth in our filings with the SEC, particularly in the section entitled "Risk Factors" included in our most recently-filed Annual Report on Form 10-K, our most recently-filed Quarterly Reports on Form 10-Q, and from time to time in other filings we make with the SEC. Some of the risks and uncertainties related to our business include, but are not limited to, our ability to decrease our leverage or fixed costs, increased competition, the timing and extent of changes in prices for oil and gas, particularly in the areas where we own properties, conduct operations, and market our production, as well as the timing and extent of our success in discovering, developing, producing and estimating oil and gas reserves, including from any horizontal wells we drill in the future, the timing and cost of our future production and development activities, our ability to successfully monetize the properties we are marketing, weather and government regulation, and the availability and cost of oil field services, personnel and equipment.

Investors are encouraged to review and consider the risk factors set forth in our historical and future SEC filings, as well as any set forth in this presentation, in connection with a review and consideration of this presentation. Our SEC filings are available directly from the Company – please send any requests to Ultra Petroleum Corp. at 116 Inverness Drive East, Suite 400, Englewood, CO 80112 (Attention: Investor Relations). Our SEC filings are also available from the SEC on their website at www.sec.gov.

**Non-GAAP Measures**

Net Debt, Adjusted EBITDA, Free Cash Flow, EBITDA Cash Costs and proved developed Coverage Metrics are financial measures not presented in accordance with generally accepted accounting principles ("GAAP"). The reconciliation of these non-GAAP financial measures to the most directly comparable GAAP measures can be found on slide 21-22 in the appendix to this presentation.

# COMPANY OVERVIEW

## MARKET SNAPSHOT

| | |
|---|---|
| OTCQX Symbol | UPLC |
| Market Capitalization @ 11/29/19, $ million | $45 |
| Net Debt (1) @ 9/30/19, $ million | $1,988 |
| Enterprise Value, $ million | $2,033 |

## PRODUCTION & RESERVES

| | |
|---|---|
| 3Q19 Production, Bcfe | 60.2 |
| SEC Proved Reserves(2), Bcfe | 3,063 |
| SEC Proved Developed Reserves, Bcfe | 2,351 |
| SEC Proved Developed PV-10, $ billion | $2.3 |

## ACREAGE

| | |
|---|---|
| Net Acreage — Wyoming | ~83,000 |
| % Operated | 92% |
| % HBP | 86% |
| Operated Producing Wells | ~2,240 |
| Future Drilling Locations | 4,000+ |

(1) Net Debt is calculated as face value of debt less cash. Net Debt is a non-GAAP financial measure; see slide 22 for a reconciliation of this measure to the most directly comparable GAAP measure.
(2) YE18 proved reserves includes an operated PUD program of vertical development for 3 years with 3 rigs.



# 3Q19 ULTRA HIGHLIGHTS

- Production averaged 654 MMcfe/d, at high end of guidance
- Adjusted EBITDA[1] totaled $98 MM
- Total capital investment was $56.4 MM, reflecting improved DC&E costs and reduced activity
- Controllable Cash Costs[2] of $0.40 per Mcfe

- Successful DC&E cost reduction of approximately 12% to $2.8 MM per well
- 7 successful 2-string wellbores of 8 attempted in 3Q19
- Drilling has been suspended as of mid-September
- Reduced full year capital investment program to $240 - $250 MM

- Achieved positive Free Cash Flow[1] of $5 MM in 3Q19
- Amended the RBL Credit Facility to eliminate all maintenance financial covenants and established the fall borrowing base at $1.175 billion with unanimous approval from our RBL lenders
- RBL Credit Facility balance outstanding at end of quarter of $64 MM

(1) Adjusted EBITDA and Free Cash Flow are non-GAAP financial measures; see slide 21 to this presentation for a reconciliation of these measures to the most directly comparable GAAP measure.
(2) Controllable Cash Cost is defined as LOE and Cash G&A combined

# 3Q19 RESULTS

## Controllable Cash Costs Performance Drives Strong EBITDA Result

**3Q19 Results**

| | Guidance | Actual |
|---|---|---|
| Production, MMcfe/d | **635 – 655** | **654** |
| | $/Mcfe | $/Mcfe |
| Lease Operating Expense | **0.27 – 0.31** | **0.30** |
| Facility Lease Expense | **0.10 - 0.12** | **0.11** |
| Production Taxes[1] | **0.24 – 0.30** | **0.24** |
| Gathering Fees (gross)<br>Gathering Fees (net)[2] | **0.31 – 0.35**<br>**0.27 - 0.31** | **0.33**<br>**0.29** |
| Transportation | **0.00 - 0.00** | **0.00** |
| Cash G&A[3] | **0.07 – 0.10** | **0.10** |
| DD&A | **0.85 – 0.90** | **0.82** |
| Cash Interest | **0.58 - 0.63** | **0.60** |
| Total Expenses, with Gross Gathering Fees | | **$2.50** |
| EBITDA Cash Costs[4], with Net Gathering Fees | | **$1.04** |

**Controllable Cash Costs**

| | | |
|---|---|---|
| Lease Operating Expense and Cash G&A ($/Mcfe) | **0.34 – 0.41** | **0.40** |

**3Q19 Adjusted EBITDA[4]**

| | Actual |
|---|---|
| Revenue, incl. hedges, $/Mcfe | $2.67 |
| EBITDA Cash Costs[4], $/Mcfe | ($1.04) |
| Adjusted EBITDA[4], $/Mcfe | $1.63 |
| Production, Bcfe | 60.2 |
| **Adjusted EBITDA[4]** | **$98 million** |

Notes:

(1) 3Q19 Production Taxes based on physical sales with average realized prices of $2.04 per Mcf and $58.33 per Bbl

(2) Net Gathering Fees include proceeds from liquids processing

(3) Cash G&A excludes stock compensation and other non cash items

(4) Adjusted EBITDA and EBITDA Cash Costs are non-GAAP financial measures; see slides 21 and 22 to this presentation for a reconciliation of these measures to the most directly comparable GAAP measures



# CONTROLLABLE CASH COST PERFORMANCE

## Continuous Drive to Appropriately Manage Controllable Cash Costs

ULTRA
UP
PETROLEUM

Controllable Cash Costs per Mcfe
$0.45
$0.40
$0.35
$0.30
$0.25
$0.20
$0.15
$0.10
$0.05
$0.00
$0.35
$0.34
$0.40
Q1
Q1
Q2
Q2
Q3
Q3
Guidance
Actuals

- Focused on continuously improving controllable cash costs with a long-term view of the future to drive favorable EBITDA margins
- Controllable Cash Costs
  - 3Q19 Actuals were $0.40 / Mcfe
  - Full-Year Guidance at $0.37 - $0.41 / Mcfe

- Effective cost management focused on LOE and G&A is evidenced by our performance compared to gas weighted peers

OPEX & Cash G&A per Mcfe
$1.80
$1.60
$1.40
$1.20
$1.00
$0.80
$0.60
$0.40
$0.20
$-
Median: $0.36
Peer
Peer
Peer
Ultra
Peer
Peer
Peer
Peer
Peer

Note: Full-year 2018 data. Peer group includes: AR, CHK, COG, EQT, GPOR, QEP, RRC, and SWN

Ultra Petroleum Corp. OTCQX: **UPLC**

6

# MANAGEMENT FOCUS ON EXECUTION

## Strategic 2019 Objectives

1. Continue to strengthen the balance sheet and enhance financial flexibility
2. Maintain strong operating cash flow
3. Disciplined deployment of capital with focus on investment returns in current commodity pricing environment
4. Optimize base production and operating margins, concentrating on run time and lease operating expenses
5. Enhance value of future drilling inventory through reduced well costs and improved return potential
6. Continued horizontal resource validation

## Operational Execution is The Key

**Development of Top Tier Gas Asset**

- ~83,000 net acres (92% operated)
- Over 4,000 vertical locations within boundary of core development

**Low Controllable Cash Costs**

- Estimated annual EBITDA cash costs below $1.15 per Mcfe
- Combined LOE and Cash G&A of approximately $0.40 per Mcfe

**Manage Pace of Development**

- Suspended drilling in Sept'19 due to low price environment
- Demonstrated ability to lower D&C well costs

**Expansion of Margin**

- YTD Adjusted EBITDA Margins of ~60%
- Increased gas pricing and reduced costs create margin expansion

# RESPONSIBLE MANAGEMENT OF CAPITAL PROGRAM FOCUSED ON INVESTMENT RETURNS

## Free Cash Flow generation model can be used to repay debt or grow cash balance

- Durable borrowing base given the nature of low-decline, long-lived PDP reserve base
- Reduced capital expenditures drives increased Free Cash Flow generation

Data points are 12-month strip as of the 1st of each month



# LOW-DECLINE, LONG-LIVED ASSET BASE

## Substantial and Durable Production Base From More Than 3,300 Wells

**Ultra has produced more than 3.5 Tcf of gas and 26.5 million barrels of oil over its 22-year track record in the Pinedale**

### Ultra Net Production – Projected PDP Decline for 2020 of 19%

MMcfed

800
700
600
500
400
300
200
100
0

1/2015 1/2016 1/2017 1/2018 1/2019 1/2020

2015
2016
2017
2018
2019
2020
Pre 2015 Onlines
19% Decline

### Estimated Annual Decline Rates

# WELL COSTS & 2-STRING WELLBORE DESIGNS
## Focus on Technical and Design Improvements Drive Cost Trends Lower



**Drilling Optimization and Focus on 2-String Design:**

- 7 successful 2-string wellbores of 8 attempted in 3Q19

- 16 total successful 2-string wells drilled YTD for an average cost of $2.6 MM

- Improvement in F&D costs of ~ 6%, net of reduced 2-string EUR

- Average savings on successful 2-string wells of $500K, a 16% reduction

- Reservoir characterization project can enhance value of 2-string wells







# VERTICAL WELL PROGRAM

## Improved Well Costs Drive Future Improvement in DC&E Economics

ULTRA
UP
PETROLEUM

### 3Q19 Average IP = 5.8 MMcfe/d

EUR: 3.5 Bcfe
EUR: 4.5 Bcfe
EUR: 2.9 Bcfe
3Q19
1Q17 through 2Q19
Average Cumulative Production, MMcf
Days on Production
0
100
200
300
400
500
0
50
100
150

### Vertical Well Economics

**HHUB - ROX = $2.25/MMBtu**

| Capex ($MM) \ EUR Bcfe | 3.0 | 3.5 | 4.0 |
|---|---|---|---|
| $3.1 | 5% | 10% | 15% |
| $2.9 | 7% | 12% | 18% |
| $2.7 | 9% | 15% | 21% |
| $2.5 | 12% | 18% | 26% |

**HHUB - ROX = $2.50/MMBtu**

| Capex ($MM) \ EUR Bcfe | 3.0 | 3.5 | 4.0 |
|---|---|---|---|
| $3.1 | 8% | 14% | 20% |
| $2.9 | 11% | 17% | 24% |
| $2.7 | 13% | 20% | 28% |
| $2.5 | 16% | 25% | 33% |

**HHUB - ROX = $2.75/MMBtu**

| Capex ($MM) \ EUR Bcfe | 3.0 | 3.5 | 4.0 |
|---|---|---|---|
| $3.1 | 12% | 18% | 26% |
| $2.9 | 14% | 22% | 30% |
| $2.7 | 18% | 26% | 35% |
| $2.5 | 22% | 31% | 42% |

**HHUB - ROX = $3.00/MMBtu**

| Capex ($MM) \ EUR Bcfe | 3.0 | 3.5 | 4.0 |
|---|---|---|---|
| $3.1 | 15% | 23% | 31% |
| $2.9 | 19% | 27% | 37% |
| $2.7 | 22% | 32% | 43% |
| $2.5 | 27% | 38% | 52% |

Note: Assumes $60 per Bbl WTI oil price

# HORIZONTAL PROJECT UPDATE

## Advancing Pinedale Reservoir Characterization to Optimize Horizontal Opportunity

ULTRA
UP
PETROLEUM

**1H19 Results**

- Successfully integrated 3D seismic inversion data for predicting Lower Lance reservoir distribution
- Integrated existing HZ wells into earth model and history matched production to predict pre-drill HZ well performance

**2H19 Planned Activity**

- Building inventory of high-graded HZ well locations, to provide opportunity and optionality for field appraisal and extension
- Implementing workflow field wide, over 200-square miles; models also inform optimal well placement and design for vertical development

**Future**

- Apply new workflows across Pinedale to further quantify extension of commercial resource from HZ wells and vertical inventory (all zones)
- Refine inversion to identify higher net-to-gross areas in the Mesaverde and Lower Lance
- Leverage expertise beyond Pinedale

Depth Structure Model
Sandstone Probability Model

# FALL 2019 BORROWING BASE AT $1.175 BILLION

## Fifth Amendment to the Credit Facility Executed in September

BORROWING BASE ESTABLISHED AT $1.175 BILLION

- Semi-annual redetermination, prepared consistently, based on mid-year reserves as prepared by Netherland Sewell & Associates, Inc. under SEC reserve recognition criteria, and run at bank price deck
- Credit Facility commitment established at $200 million from durable PDP reserves underpinned by low decline rates
- Commitment amount automatically reduces to $120 million in February 2020

POSITIVE FREE CASH FLOW OBJECTIVES

- Repayment of indebtedness
- Capital investments of $5 million per quarter beginning in 2020
- Preserves drilling locations for more constructive future natural gas price environment

PATHWAY TO PURSUE CAPITAL STRUCTURE IMPROVEMENTS

- Recent amendment eliminates all financial maintenance covenants in the credit agreement
- More flexible hedging requirements
- Allows for the repurchase of indebtedness providing the outstanding RBL balance is at zero, that a sufficient cash reserve exists, and the 1st Lien proforma leverage is <3.0x; subject to other Term Loan and 2nd Lien Indenture terms



# SEPTEMBER 30, 2019 – DEBT MATURITIES

## Strong Coverage Metrics and No Near-Term Maturities

ULTRA
UP
PETROLEUM

| Cumulative Coverage Ratios[1] | | |
|---|---|---|
| | Committed Borrowings | Outstanding Borrowings |
| 1st Lien Debt | 1.95x | 2.20x |
| 2nd Lien Notes | 1.30x | 1.41x |
| 2022 Notes | 1.20x | 1.29x |
| 2025 Notes | 1.07x | 1.14x |

RBL ($200 MM Commitment)
• Outstanding: $64 MM
• Maturity: April 2022
1st Lien Term Loan
• Outstanding: $971 MM
• Maturity: April 2024(2)
2nd Lien Notes
• Outstanding: $581 MM
• Maturity: July 2024
2022 Notes
• Outstanding: $150 MM
• Maturity: April 2022
2025 Notes
• Outstanding: $225 MM
• Maturity: April 2025
No Near-Term Maturities
2019
2020
2021
2022
2023
2024
2025

Notes:
(1) Coverage ratios are calculated based on year-end 2018 SEC proved developed reserves and debt commitments and balances as of September 30, 2019.
(2) 1st Lien Term Loan amortizes at a rate of 0.25% per quarter commencing June 2019.

# HEDGE SUMMARY

## As of December 6, 2019

### Henry Hub Gas Volumes Hedged[1,2]

### Oil Volumes Hedged

Bbl/d

Average Price: $/Bbl

| | 4Q19 | 1Q20 | 2Q20 | 3Q20 | 4Q20 | 1Q21 |
|---|---|---|---|---|---|---|
| Average Price | $59.60 | $60.42 | $60.33 | $60.00 | | |

(Axis: 0, 1,000, 2,000, 3,000, 4,000)

### NWROX Basis Hedged

### Q4 2019 Pricing with NYMEX & NWROX Hedges[3]

| | |
|---|---|
| Henry Hub Hedges ($/MMBtu) | $2.77 |
| NWROX Basis Hedges | ($0.45) |
| Price per MMBtu | $2.32 |
| BTU Factor | x1.07 |
| Gas Hedge Realization per Mcf | $2.48 |
| WTI Swap | $59.60 |
| ***Realized Price per Mcfe**** | ***$2.85*** |

*Price per Mcfe based on 95% natural gas / 5% condensate mix.

(1) Average prices for 2019 periods reflects swap pricing. Refer to the appendix on slide 23 for additional details on pricing and volume.
(2) Put pricing reflects the inclusion of the deferred premium of ($0.125), ($0.114) and ($0.190) for 2Q20, 3Q20 and 4Q20 respectively.
(3) For collars and deferred puts, the price used to calculate the average realized price for hedged volumes utilizes strip price as of 12/6/2019 if above a floor or below a ceiling.

# PINEDALE INFRASTRUCTURE OVERVIEW

## Opal Provides Multiple Take Away Options and Prices at a Premium

ULTRA UP PETROLEUM

- Realized price at a premium of $0.03 - $0.04 to Opal pool (NWROX)
- Opal provides multiple take away options and premium prices
- Ultra sells gas at NWROX basis location
- NWROX strength relative to CIG
  - ~$0.58 stronger than CIG in Q4 2019
  - Historical CIG pressure has been driven by tight take away from DJ basin
  - NWROX trading into more stable western demand region and less susceptible to general weather risk than CIG
- Full-year 2019 NWROX at 99% of Henry Hub pricing
- Development of Permian / Delaware natural gas pipelines relieves bid pressure against Rockies gas deliveries

**NW Rockies vs. CIG vs. Dominion South**
**(as a % of Henry Hub)**

# 2019 FULL-YEAR CAPITAL PLAN AND GUIDANCE

| Capital Program = $240 - $250 MM (1) | |
|---|---|
| Pinedale Operated Verticals | $205 - $210 MM |
| Pinedale Non Operated Verticals | $18 - $22 MM |
| Corporate Other | $17 - $18 MM |

| 2019 Production Guidance | |
|---|---|
| Full Year 2019, Bcfe | 239 – 241 |
| 4Q19, MMcfe/d | 590 – 610 |

| Full Year 2019 Budgeted Activity Summary | |
|---|---|
| Operated Vertical Wells, Gross / Net | 71 / 70.3 |
| Non Operated Vertical Wells, Gross / Net | 22 / 7.3 |

| 2019 Expenses (per Mcfe) | 4Q 2019 | FY 2019 |
|---|---|---|
| Lease Operating Expense | $0.32 - 0.36 | $0.28 - 0.30 |
| Facility Lease Expense | $0.10 – 0.12 | $0.10 - 0.12 |
| Production Taxes(2)(3) | $0.25 - 0.29 | $0.31 - 0.33 |
| Gathering Fees, gross<br>Gathering Fees, net | $0.31 - 0.35<br>$0.27 - 0.31 | $0.32 - 0.34<br>$0.28 - 0.30 |
| Transportation Charges | $0.03 - 0.05 | $0.00 - 0.02 |
| Cash G&A(4) | $0.10 - 0.14 | $0.09 - 0.11 |
| DD&A | $0.81 - 0.85 | $0.84 - 0.86 |
| Cash Interest Expense(5) | $0.63 - 0.67 | $0.60 - 0.62 |

(1) Capital Program reflects transition from three to zero rig program.
(2) Production taxes estimated for 4Q 2019 are based on projected forward NYMEX prices for the remainder of the year and realized prices for the periods reported to date per Bbl, less gathering fees.
(3) Production taxes estimated for FY 2019 are based on projected forward NYMEX prices for the remainder of the year and realized prices for the periods reported to date per Bbl, less gathering fees.
(4) Includes estimated severance costs for early retirement and staff reductions in conjunction with reduced drilling activity.
(5) Cash interest expense represents total interest expense excluding the amortization of deferred financing costs, issuance premium and PIK interest.

# 2020 AND FUTURE – PDP MODEL GENERATES SUBSTANTIAL FREE CASH FLOW



- Production outlook under a PDP decline case
  - 2020 Preliminary Guidance of 182 – 192 Bcfe
  - Predictable 2021 and 2022 production model by applying estimated annual year 2 and year 3 decline rates of 16% and 12%, respectively

- Capital expenditure of $5 million per quarter beginning in 2020
- REX firm transport commitment – Monitor and enhance value with optionality to alternate markets and periodic capacity releases
- LGS lease commitments are a fixed annual obligation
- Cash Margins remain robust
  - Low controllable cash cost for LOE and G&A
  - Production taxes are variable at approximately 10 - 11% of gross revenues, excluding derivatives
  - Gathering fees are variable, and are incurred at a per Mcf rate
  - Total cash interest expense shrinks as debt is reduced

- $240 million of potential make whole recovery

# UPSIDE AND OPTIONALITY FOR ULTRA
## Generating Free Cash Flow in Third & Fourth Quarters 2019



**Management of Base Production and Operating Costs:**
- Low LOE and G&A expense maintains strong operating margin greater than 50%
- 55,000 BWPD capacity water management system owned by company provides for low water expenses

**Reduction in Vertical Well Costs:**
- Long track record of implementing new technology to reduce costs and cycle times
- Recent success in design changes for wellbore construction and completion fluids provide additional cost reduction opportunities
- Successful cost reduction of 12% in 3Q19 to approximately $2.8 MM per well benefits future well economics

**Expand Resource with Horizontal Development:**
- Horizontal program has verified productive resource beyond the vertical boundary
- Incremental data and analysis demonstrating ability to reduce uncertainty and unlocking future activity

**Continued Improvement to Balance Sheet:**
- Up to $240 million of potential make whole recovery
  - In November 2019, the Fifth Circuit Court of Appeal's en banc review affirmed its reversal of the primary issue in Ultra's appeal
  - The case has been remanded to the Bankruptcy Court for further consideration of issues not initially ruled upon that were raised by Ultra

**Improved Gas Price Realizations Generate Significant Increase to Drillable Inventory Locations and Cash Flow:**
- Can be achieved in the form of HHUB or NW Rockies basis improvements, or both
- With improved well costs of $2.8 MM vertical inventory increases from 1,336 to 1,925 with price improvement from $2.50 to $2.75/MMBtu Opal
- With 182 – 192 BCFE of annual production, a $0.25/MMBtu improvement generates approximately $35 million of additional cash flow on an unhedged basis



ULTRA UP PETROLEUM
APPENDIX

# RECONCILIATION OF ADJUSTED EBITDA, ADJUSTED EBITDA PER MCFE AND FREE CASH FLOW

**Reconciliation of Earnings Before Interest, Taxes, Depletion and Amortization (unaudited)**
**All amounts expressed in US$000's**

The following table reconciles net income (loss) as derived from the Company's financial information with earnings before interest, taxes, depletion, and amortization and certain other non-recurring or non-cash charges (Adjusted EBITDA)(1) and to Free Cash Flow(2), as defined below:

| | For the Quarter Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **Net income** | **$ 11,513** | **$ 18,563** | **$ 109,294** | **$ 45,502** |
| Interest expense | 32,372 | 38,382 | 98,074 | 111,934 |
| Depletion and depreciation | 49,581 | 49,672 | 157,003 | 151,954 |
| Unrealized (gain) loss on commodity derivatives | 6,570 | 11,018 | (75,957) | 72,557 |
| Deferred gain on sale of liquids gathering system | — | (2,638) | — | (7,915) |
| Stock compensation expense | 750 | 1,424 | 2,271 | 11,547 |
| Debt exchange expenses | — | — | 1,822 | — |
| Taxes | — | — | (169) | 442 |
| Other expenses | 8,896 | 3,422 | 26,621 | 4,275 |
| Legal proceeding recoveries | (11,828) | — | (13,467) | — |
| **Adjusted EBITDA (1)** | **$ 97,854** | **$ 119,843** | **$ 305,492** | **$ 390,296** |
| Capital and PP&E expenditures, net of proceeds received | (56,413) | (22,492) | (233,578) | (275,847) |
| Cash interest expense | (36,403) | (35,558) | (109,647) | (103,601) |
| **Free cash flow (2)** | **$ 5,038** | **$ 61,793** | **$ (37,733)** | **$ 10,848** |
| **Production (Mcfe)** | **60,159** | **67,534** | **184,853** | **210,731** |
| **Adjusted EBITDA per Mcfe** | **1.63** | **$ 1.77** | **$ 1.65** | **$ 1.85** |

(1) Earnings before interest, taxes, depletion and amortization (Adjusted EBITDA) is defined as Net income (loss) adjusted to exclude interest, taxes, depletion and amortization and certain other non-recurring or non-cash charges. Management believes that the non-GAAP measure of Adjusted EBITDA is useful as an indicator of an oil and gas exploration and production Company's ability to internally fund exploration and development activities and to service or incur additional debt. Adjusted EBITDA should not be considered in isolation or as a substitute for net cash provided by operating activities prepared in accordance with GAAP.

(2) Free Cash Flow defined as Adjusted EBITDA less capital expenditures and cash interest

# RECONCILIATION OF EBITDA CASH COSTS AND NET DEBT

## Reconciliation of EBITDA Cash Costs(1)

| | For the Quarter ended September 30, 2019 | |
|---|---|---|
| **Total production (MMcfe)** | **60,159** | |
| | **('000)** | **($ / Mcfe)** |
| Lease operating expense | $ 17,914 | $ 0.30 |
| Facility lease expense | $ 6,640 | $ 0.11 |
| Production taxes | $ 14,726 | $ 0.24 |
| Gathering fees | $ 19,827 | $ 0.33 |
| Less: Other revenues | (2,255) | (0.04) |
| Gathering fees, net | $ 17,572 | 0.29 |
| General and administrative expenses | $ 6,595 | $ 0.11 |
| Less: Stock compensation expense | (750) | (0.01) |
| Cash G&A | $ 5,845 | $ 0.10 |
| **EBITDA Cash Cost/Mcfe** | | **$ 1.04** |

## Reconciliation of Net Debt(2) as of September 30, 2019

| | (thousands) |
|---|---|
| Total Debt | |
| Revolving Credit Facility | $ 64,000 |
| Term Loan | $ 971,194 |
| Second Lien Notes | $ 580,960 |
| 2022 Senior Unsecured Notes | $ 150,439 |
| 2025 Senior Unsecured Notes | $ 225,000 |
| Total Face Value of Indebtedness | $ 1,991,593 |
| Less: Cash | $ 3,365 |
| **Net Debt** | **$ 1,988,228** |

(1) EBITDA cash costs include lease operating expense, facility lease expense, production taxes, gathering fees, net, transportation (if any) and cash G&A.
(2) Net Debt is calculated as face value of debt less cash.

# SUMMARY OF THE HEDGES IN PLACE

## As of December 6, 2019

| | 2019 | 2020 | | | | 2021 | |
|---|---|---|---|---|---|---|---|
| | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| **Natural Gas Swaps:** | | | | | | | |
| Volume (MMbtu/d) | 318,424 | 260,220 | - | - | - | - | - |
| NYMEX ($/MMBtu) | $ 2.76 | $ 2.76 | $ - | $ - | $ - | $ - | $ - |
| **Natural Gas Collars:** | | | | | | | |
| Volume (MMbtu/d) | 5,054 | 36,374 | 236,000 | 175,000 | 215,000 | 80,000 | |
| NYMEX Floor ($/MMBtu) | $ 2.90 | $ 2.76 | $ 2.32 | $ 2.41 | 2.41 | $ 2.46 | |
| NYMEX Ceiling ($/MMBtu) | $ 3.15 | $ 3.19 | $ 2.83 | $ 2.84 | 2.90 | $ 3.05 | |
| **Natual Gas Puts:** | | | | | | | |
| Volume (MMbtu/d) | - | - | 35,593 | 80,000 | 30,000 | - | - |
| NYMEX Put Price ($/MMBtu) | $ - | $ - | $ 2.28 | $ 2.29 | $ 2.26 | $ - | $ - |
| **Oil Swaps:** | | | | | | | |
| Volume (Bbl/d) | 3,500 | 2,500 | 1,500 | 1,000 | - | - | - |
| NYMEX ($/Bbl) | $ 59.60 | $ 60.42 | $ 60.33 | $ 60.00 | $ - | $ - | $ - |
| **Natural Gas Basis Swap Contracts *:** | | | | | | | |
| NW Rockies Volume (MMBtu/d) | 343,206 | 301,374 | - | - | - | - | - |
| Price Differentials ($MMBtu) | $ (0.45) | $ (0.07) | $ - | $ - | $ - | $ - | $ - |

* Represents swap contracts that fix the basis differentials for natual gas sold at or near Opal, Wyoming

# EXHIBIT 2



Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# FORWARD LOOKING STATEMENTS & RISK FACTORS

ULTRA
UP
PETROLEUM

**Forward-Looking Statements and Reserve Estimates**

This presentation contains "forward-looking statements" within the meaning of the federal securities laws, including statements about our business strategies and plans, plans for future drilling and resource development, prospective levels of capital expenditures and production and operating costs, and estimates of future results. Any statement in this presentation, including any opinions, forecasts, projections or other statements, other than statements of historical fact, are forward-looking statements. Although we believe the expectations reflected in such forward-looking statements are reasonable, we can give no assurance such expectations are correct, and actual results may differ materially from those projected. In addition, this presentation includes information about our proved reserves. The Securities and Exchange Commission ("SEC") permits oil and gas companies, in their filings with the SEC, to disclose only proved, probable and possible oil and gas reserves that meet the SEC's definitions for such terms. This presentation also includes information about oil and gas quantity estimates that are not permitted to be disclosed in SEC filings, including terms or designations such as "estimated ultimate recovery" or "EUR" or "resource" or "resource potential" or other terms bearing similar or related descriptions. These types of estimates do not represent and are not intended to represent any category of reserves based on SEC definitions, do not comply with guidelines established by the American Institute of Certified Public Accountants regarding forecasts of oil and gas reserves estimates, are, by their nature, more speculative than estimates of proved, probable and possible reserves disclosed in SEC filings, and, accordingly, are subject to substantially greater uncertainty of being actually realized. Actual volumes or quantities of oil and gas that may be ultimately recovered will likely differ substantially from such estimates. Factors affecting such ultimate recovery include the scope of our actual drilling program, which will be directly affected by the availability of capital, drilling and production costs, commodity prices, availability of drilling services and equipment, lease expirations, transportation constraints, regulatory approvals, field spacing rules, and actual drilling, completion and production results as well as other factors. These estimates may change significantly as the development of properties provides additional data. This presentation also includes estimates of values attributable to the locations on which such oil and gas quantity estimates are based. The estimates of value set forth in this presentation were calculated based on the assumptions and methodologies set forth in this presentation, which differ materially from the assumptions and methodologies oil and gas companies are required to use in calculating PV-10 values of proved reserves disclosed in SEC filings. As a result, the estimates of values included in this presentation do not represent and are not intended to represent the "PV-10" value that would be attributable to such items if such items were calculated based on applicable SEC requirements.

**Risk Factors**

Certain risks and uncertainties inherent in our operating businesses as well as certain on-going risks related to our operational and financial results are set forth in our filings with the SEC, particularly in the section entitled "Risk Factors" included in our most recently-filed Annual Report on Form 10-K, our most recently-filed Quarterly Reports on Form 10-Q, and from time to time in other filings we make with the SEC. Some of the risks and uncertainties related to our business include, but are not limited to, our ability to decrease our leverage or fixed costs, redeterminations in the Company's borrowing base under its Credit Facility, increased competition, the timing and extent of changes in prices for oil and gas, particularly in the areas where we own properties, conduct operations, and market our production, as well as the timing and extent of our success in discovering, developing, producing and estimating oil and gas reserves, including from any horizontal wells we drill in the future, the timing and cost of our future production and development activities, our ability to successfully monetize the properties we are marketing, weather and government regulation, and the availability and cost of oil field services, personnel and equipment.

Investors are encouraged to review and consider the risk factors set forth in our historical and future SEC filings, as well as any set forth in this presentation, in connection with a review and consideration of this presentation. Our SEC filings are available directly from the Company – please send any requests to Ultra Petroleum Corp. at 116 Inverness Drive East, Suite 400, Englewood, CO 80112 (Attention: Investor Relations). Our SEC filings are also available from the SEC on their website at www.sec.gov.

**Non-GAAP Measures**

Net Debt, Adjusted EBITDA, Free Cash Flow, EBITDA Cash Costs and proved developed Coverage Metrics are financial measures not presented in accordance with generally accepted accounting principles ("GAAP"). The reconciliation of these non-GAAP financial measures to the most directly comparable GAAP measures can be found on slides 39-40 in the appendix to this presentation.

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# INDEX OF TOPICS



**Executive Summary**

**Asset Overview**

**Business Performance**

**Liability Management Situation Update & Restructuring Construct**

**Pro Forma Forecast**

Source:  Ultra Petroleum Form 8K dated May 14, 2020.



Source:  Ultra Petroleum Form 8K dated May 14, 2020.



*Privileged & Confidential*

# SITUATION OVERVIEW

- After a careful evaluation of the available alternatives, Ultra Petroleum ("Ultra", "UPLC" or the "Company") has begun preparations for a chapter 11 filing
  - Pressure on crude oil prices as a result of Saudi Arabia's price cuts and COVID-19's demand impact, to both natural gas and crude oil, exacerbated concerns around future borrowing base redeterminations
- Qualified audit opinion was issued in conjunction with the filing of the Company's Form 10-K on April 15th and Ultra elected not to make its Senior Unsecured Notes interest payment that was due April 15th
  - Both events are defaults subject to a 30-day grace period and Ultra is considering a filing date prior to May 15th
- Ultra has engaged with select Term Loan lenders and existing RBL lenders to provide DIP and post-emergence RBL commitments, respectively
- Significant deleveraging could unlock a path forward that is unique to Ultra
  - Management team that has demonstrated disciplined decision making competency
  - Highly qualified, professional organization with a proven foundation to generate free cash flow
  - Well positioned to serve as the Rockies consolidator and/or consider development diversification opportunities

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# ULTRA HIGHLIGHTS

ULTRA
UP
PETROLEUM

1. One of the Top Natural Gas Fields in the U.S.
2. Significant PDP Production Base
3. Low Cost Leader with Opportunity to Expand Margins
4. Ability to Flex Development Program in Response to Price Environment
5. Seasoned Management Team Willing to Emphasize Capital Discipline

Source: Ultra Petroleum Form 8K dated May 14, 2020.



Source:  Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# PINEDALE OVERVIEW

## One of The Top Gas Fields In The U.S.

ULTRA
UP
PETROLEUM

**Asset Highlights -**

- Current net total production -
  - Gas: ~510 MMcf/day
  - Oil: ~3,400 Bbl/day
- ~83,000 net acres with 92% operated
- Current gross operated production -
  - Operated producing wells: ~2,260
  - Gas: ~640 MMcf/day
  - Oil: ~4,250 Bbl/day
- More than 4,000 remaining drilling locations within boundary of core development
- Significant take-away capacity from Opal (NWROX basis) to multiple end-market destinations

**Ultra's History In the Basin -**

- 22-year track record in the basin
- The largest acreage holder in Pinedale

Pinedale Field
Legend
Ultra Operated
Non-Op (PEPO)
Jonah Energy

Ultra Petroleum Corp. OTCQX: UPLC – Confidential and Proprietary

8

Source: Ultra Petroleum Form 8K dated May 14, 2020.



# LOW-DECLINE, LONG-LIVED ASSET BASE

## Substantial and Durable Production Base From More Than 3,300 Wells

**Ultra has produced more than 3.5 Tcf of gas and 26.5 million barrels of oil over its 22-year track record in the Pinedale**

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# 2019 WELL COSTS & 2-STRING WELLBORE DESIGNS

## Focus on Technical and Design Improvements Drive Cost Trends Lower

**2019 Drilling Optimization and Focus on 2-String Design -**

- 7 successful 2-string wellbores of 8 attempted in Q3
- 16 total successful 2-string wells drilled for an average cost of $2.6 MM
- Net improvement in F&D costs of approximately 7%, net of reduced 2-string EUR
- Average savings on successful 2-string wells of ~$500K compared to our budget of $3.1 MM per vertical well, a 16% reduction
- Reservoir characterization project can increase precision on placement of 2-string wells

Ultra Petroleum Corp. OTCQX: UPLC – Confidential and Proprietary 10

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# ADVANCED RESERVOIR CHARACTERIZATION

**Leveraging Technology and Proven Workflows to Enhance Vertical & Horizontal Inventory Analysis**

**2H19 - Results**

- Completed advanced structural study
- Validation of the south Pinedale geo-cellular model to Hz well results
- West flank HZ well IP > 25 MMcfed, 2.1 Bcf and 16,000 Bbls oil (2.2 Bcfe) in 4 months (Jonah Energy)(1)

**1H20 – Implementation of models**

- Vertical well enhancements –
  - Upgrade depletion models for inventory refinement
  - Inform strategic mono-bore well design applications
- Horizontal well enhancement – Catalog high-productivity / low risk location inventory

**2H20 – Leverage industry leading toolkits in preparation for full-field seismic inversion for central/northern Pinedale earth models**

(1) Source: Wyoming Oil and Gas Conservation Commission (WOGCC)

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# PINEDALE INFRASTRUCTURE OVERVIEW

## Opal Provides Multiple Take Away Options



### General Market Dynamics -

- Opal provides multiple take away options and premium prices

- 2019 full-year basis at Opal was 98% of HHUB; driven by increased demand and reduced supply in the west

- Development of Permian / Delaware natural gas pipelines relieves bid pressure against Rockies gas deliveries

### Ultra Focused -

- Ultra has successfully renegotiated midstream contracts for gathering and processing together with a gas purchase contract to enhance value

- Reduced REX firm transport liability through proactive execution of capacity release agreements covering December 2019 - October 2020



Ultra Petroleum Corp. OTCQX: UPLC – Confidential and Proprietary

12

Source:  Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# OPAL (NWROX) PRICES AT A PREMIUM TO OTHER HUBS

**NW Rockies vs. CIG vs. Dominion South**
(as a % of Henry Hub)

- Meaningful improvement of NWROX Basis over the course of 2019 resulting in the full-year 2019 NWROX pricing being at 98% of Henry Hub
- Ultra's realized price at a premium of $0.08 - $0.09 to Opal pool (NWROX), including recently upgraded purchase contract
- NWROX strength relative to CIG
  - ~$0.58 stronger than CIG in forth quarter
  - Historical CIG pricing pressure has been driven by tight take away from the DJ basin
  - NWROX trading into more stable western demand region and less susceptible to general weather risk than CIG
- Potential REX value drivers -
  - Continued DJ Basin development
  - Multiple counterparties expressing interest in capacity releases
  - High degree of flow flexibility on Ultra contract to flow bi-directionally in Zone 1 and 2 of REX

Source: Ultra Petroleum Form 8K dated May 14, 2020.



Source:  Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# FOCUSED ON EXECUTION

ULTRA
UP
PETROLEUM

## Strategic Objectives

1. Enhance the value of the asset and the enterprise
2. Maintain strong operating cash flow and generate free cash flow
3. Disciplined capital investment execution
4. Optimize base production with continued emphasis on run times and lease operating expenses
5. Enhance value of drilling inventory through reduced well costs and enhanced sub surface analysis

**Operational Execution is The Key**

**Development of Top Tier Gas Asset**
- ~83,000 net acres (92% operated)
- Over 4,000 vertical locations within boundary of core development

**Low Cost Leadership**
- Estimated annual EBITDA cash costs in the top quartile of peers
- 1Q20 Forecast combined LOE and cash G&A of ~$0.53 per Mcfe

**Manage Pace of Development**
- Demonstrated ability to flex program up or down quickly in response to price environment

**Expansion of Margin**
- 1Q20 Forecast Adjusted EBITDA Margins of ~55%
- Increased gas pricing and reduced costs will create margin expansion

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# FULL YEAR AND 4Q19 ULTRA HIGHLIGHTS







- 4Q19 Production averaged 602 MMcfe/d and FY19 production was 240.2 Bcfe
- Successfully lowered D&C costs to $2.8 MM per well
- Delivered on the ability to successfully drill utilizing the new 2-string well design
- 4Q19 Adjusted EBITDA(1) of $100.6 MM




- 4Q19 Controllable Cash Cost(2) of $0.44 per Mcfe of production
- Enhanced and restructured midstream in the 4th quarter of 2019 together with gas purchase agreement in order to prospectively boost net margin by $0.03 - $0.04 per Mcfe
- Released REX capacity for December 2019 – October 2020; tranche 1 from Dec. 2019 to March 2020, and tranche 2 from April 2020 to Oct. 2020, reducing the REX exposure by 44% and 68%, respectively




- Disciplined deployment of capital and industry-leading decision to suspend drilling in low price environment in order to pivot to a free cash flow model
- Achieved positive Free Cash Flow(1) of $56.4 MM in 4Q19
- Delivered on debt reduction plan through execution of free cash flow model

(1) Adjusted EBITDA and Free Cash Flow are non-GAAP financial measures; see slide 39 to this presentation for a reconciliation of these measures to the most directly comparable GAAP measure.
(2) Controllable Cash Cost is defined as the combination of LOE and Cash G&A.



Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# 4Q19 RESULTS

## Low Operating Costs and Opal Price Premium Drives Strong EBITDA

| 4Q19 Results | | |
|---|---|---|
| | Guidance | Actual |
| Production, MMcfe/d | 590 – 610 | 602 |
| | $/Mcfe | $/Mcfe |
| Lease Operating Expense | 0.32 – 0.36 | 0.35 |
| Facility Lease Expense | 0.10 – 0.12 | 0.10 |
| Production Taxes(1) | 0.25 – 0.29 | 0.33 |
| Gathering Fees (gross)<br>Gathering Fees (net)(2) | 0.31 – 0.35<br>0.27 – 0.31 | 0.33<br>0.31 |
| Transportation | 0.03 - 0.05 | 0.03 |
| Cash G&A(3) | 0.10 – 0.14 | 0.09 |
| DD&A | 0.81 – 0.85 | 0.85 |
| Cash Interest | 0.63 – 0.67 | 0.65 |
| Total Expenses, with Gross Gathering Fees | | $2.73 |
| EBITDA Cash Costs(4), with Net Gathering Fees | | $1.21 |

| Controllable Cash Costs | | |
|---|---|---|
| Lease Operating Expense and Cash G&A ($/Mcfe) | 0.42 – 0.50 | 0.44 |

| 4Q19 Adjusted EBITDA(4) | |
|---|---|
| | Actual |
| Revenue, incl. hedges, $/Mcfe | $3.03 |
| EBITDA Cash Costs(4), $/Mcfe | ($1.21) |
| Adjusted EBITDA(4), $/Mcfe | $1.82 |
| Production, Bcfe | 55.4 |
| **Adjusted EBITDA(4)** | **$100.6 million** |

Notes:

(1) 4Q19 Production Taxes based on physical sales with average realized prices of $2.78 per Mcf and $58.27 per Bbl

(2) Net Gathering Fees include proceeds from liquids processing. The Company renegotiated certain midstream and marketing agreements in the fourth quarter of 2019. The effect of these renegotiated agreements removes a processing credit previously applied to net gathering expenses and provides for an incremental uplift in realized gas prices. The net effect is an increase to cash margin by $0.03 - $0.04 per MMBtu

(3) Cash G&A excludes stock compensation and other non cash items

(4) Adjusted EBITDA and EBITDA Cash Costs are non-GAAP financial measures; see slides 39 and 40 to this presentation for a reconciliation of these measures to the most directly comparable GAAP measures

Ultra Petroleum Corp. OTCQX: UPLC – Confidential and Proprietary 17

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# CONTROLLABLE CASH COST PERFORMANCE

## Consistent Low-Cost Producer of Low-Decline Conventional Gas Assets in Pinedale

**Controllable Cash Costs(1) per Mcfe**

| | Guidance | Actual |
|---|---|---|
| First Quarter 2019 | $0.33 - $0.40 | $0.35 |
| Second Quarter 2019 | $0.33 - $0.40 | $0.34 |
| Third Quarter 2019 | $0.34 - $0.41 | $0.40 |
| Fourth Quarter 2019 | $0.42 - $0.50 | $0.44 |
| | | |
| Full-year 2019 | $0.37 - $0.41 | $0.39 |

- Predictable cost performance continues to rank among the best in peer group
- 4Q19 Controllable Cash Costs of $0.44 / Mcfe at low end of guidance driven by -
  - Reductions in headcount and associated compensation expense
  - Reductions in water handling costs
  - Robust run time over 2019
- Unit cost increases driven by PDP model and decreased production in Q3 and Q4
- 40% / 60% split between fixed and variable LOE based on 2019 monthly average

(1) Controllable Cash Cost is defined as the combination of LOE and Cash G&A

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# 1Q20 FORECAST

ULTRA
UP
PETROLEUM

## Low Operating Costs and Opal Price Premium Drives Strong EBITDA

| 1Q20 Forecast | | |
|---|---|---|
| | Guidance | Forecast |
| Production, MMcfe/d | | 554 |
| | $/Mcfe | $/Mcfe |
| Lease Operating Expense | 0.34 – 0.39 | 0.38 |
| Facility Lease Expense | 0.10 – 0.13 | 0.11 |
| Production Taxes[1] | 0.25 – 0.31 | 0.28 |
| Gathering Fees (gross)<br>Gathering Fees (net)[2] | 0.32 – 0.36<br>0.31 – 0.35 | 0.33<br>0.32 |
| Transportation | 0.06 - 0.10 | 0.08 |
| Cash G&A[3] | 0.14 – 0.19 | 0.15 |
| DD&A | 0.82 – 0.88 | 0.94 |
| Cash Interest | 0.65 – 0.70 | 0.69 |
| Total Expenses, with Gross Gathering Fees | | $2.96 |
| EBITDA Cash Costs[4], with Net Gathering Fees | | $1.32 |

| Controllable Cash Costs | | |
|---|---|---|
| Lease Operating Expense and Cash G&A ($/Mcfe) | 0.48 – 0.58 | 0.53 |

| 1Q20 Forecast Adjusted EBITDA[4] | |
|---|---|
| | Actual |
| Revenue, incl. hedges, $/Mcfe | $2.90 |
| EBITDA Cash Costs[4], $/Mcfe | ($1.32) |
| Adjusted EBITDA[4], $/Mcfe | $1.58 |
| Production, Bcfe | 50.4 |
| **Adjusted EBITDA[4]** | **$79.8 million** |

Notes:

(1) 1Q20 Production Taxes based on physical sales with average realized prices of $2.36 per Mcf and $47.05 per Bbl

(2) Net Gathering Fees include proceeds from liquids processing. The Company renegotiated certain midstream and marketing agreements in the fourth quarter of 2019. The effect of these renegotiated agreements removes a processing credit previously applied to net gathering expenses and provides for an incremental uplift in realized gas prices. The net effect is an increase to cash margin by $0.03 - $0.04 per MMBtu.

(3) Cash G&A excludes stock compensation and other non cash items

(4) Adjusted EBITDA and EBITDA Cash Costs exclude the impact of restructuring related costs and are non-GAAP financial measures; see slides 39 and 40 to this presentation for a reconciliation of these measures to the most directly comparable GAAP measures; Per unit EBITDA cash costs may not foot to reconciliation due to rounding

Source: Ultra Petroleum Form 8K dated May 14, 2020.



*Privileged & Confidential*

# PROVED RESERVES SUMMARY

Based on March 31, 2020 Reserve Report

ULTRA
UP
PETROLEUM

Proved Reserve Volumes (MMcfe)(1)
100% Proved Developed
1,766,239
Pre-Tax PV-10% Value ($MM)(2)(3)(4)
$ 1,217

**PDP Value Scenarios**

| | Mar. 31[2] Reserves | Apr. 16 Strip[5] Sensitivity | Apr. 16 Strip[5] +20% Sensitivity |
|---|---|---|---|
| **HHUB** *($/MMBtu)* | $2.30 | $2.42 | $2.90 |
| **Realized**[6] *($/Mcf)* | $2.07 | $1.99 | $2.51 |
| **PV-0** | $1,907 | $1,628 | $2,406 |
| **PV-10** | $1,217 | $1,046 | $1,453 |
| **PV-15** | $1,024 | $877 | $1,207 |
| **PV-20** | $888 | $756 | $1,036 |

Note: Dollars in millions unless otherwise noted.
1) Commodity mix of 96% gas and 4% liquids.
2) Utilizing SEC criteria – the comparable calculated average prices utilized in the preparation of the reserves as of March 31, 2020 were $2.07 per Mcf and $55.35 per Bbl and basis is determined by TTM results.
3) Includes $347MM of asset retirement obligations and $10MM of capital costs.
4) 10% Operated and 90% Non-Operated. 3% Horizontal and 97% Vertical.
5) Prices for HHUB, condensate and basis represent production weighted averages assuming strip pricing for the first five years and flat pricing thereafter.
6) Realized prices apply regional market differentials along with appropriate adjustments for quality, marketing contracts, energy content, basis adjustments and transportation charges.

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# COVID-19 BUSINESS CONTINUITY UPDATE

## May 2020 Status Update

- Pinedale Field Operations is essentially status quo with minimal production interruptions
- Office-based personnel in Pinedale and Denver continue work-from-home protocol-March 16th to May 30th. We are planning for a phased Return to Office beginning June 1st
- No employees have tested positive as of May 11th
- While all "stay at home" mandates have been cancelled, Colorado employees are encouraged to continue to work from home if possible. Wyoming's restrictions are set to expire May 15th with no update yet published
- Sublette County, WY has three confirmed cases of COVID-19
- Daily meetings among advisors, leadership and teams using Zoom video and audio conference calls

Ultra Petroleum Corp. OTCQX: UPLC – Confidential and Proprietary 21

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# 2020 PRODUCTION FORECAST

ULTRA
UP
PETROLEUM

Average Daily Net Production (MMcfe/d)

Actual
2020 Midpoint Forecast
3-Rig
2-Rig
1-Rig
PDP Only
800
700
600
500
400
300
200
100
–
Jan-19
Apr-19
Jul-19
Oct-19
Jan-20
Apr-20
Jul-20
Oct-20

| Average Daily Production | Mmcfe/d |
|---|---|
| March | 546 |
| Q1 2020 | 554 |

| Total Production | Bcfe |
|---|---|
| 2020 Production Forecast | 182-192 |
| Q1 2020 | 50.4 |

Ultra Petroleum Corp. OTCQX: UPLC – Confidential and Proprietary 22

Source: Ultra Petroleum Form 8K dated May 14, 2020.

22

*Privileged & Confidential*

# TOTAL GROSS LOE TRENDING DOWN SINCE 2Q19

## Unit LOE Costs ($/Mcfe) Will Trend Higher in 2020 With Declining Production

- While the production decline has caused an upward trend in Mcfe costs, the trend on gross LOE costs is downward and has been driven by cost saving and efficiency enhancements
- Variable costs reduced with PDP decline and aggressive management of chemical, water disposal and consumable costs
- Workover activity -
  - Currently running 1 workover rig
  - Workover priority high graded to economically viable projects
- LGS debottlenecking project completed in September lowering future variable water costs to nil from high point of $450 K per month
- Sep-19 peak includes seasonal prep for winterization

Ultra Petroleum Corp. OTCQX: UPLC – Confidential and Proprietary

23

Source: Ultra Petroleum Form 8K dated May 14, 2020.



Source:  Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# RECENT EVENTS



- Ultra filed its 10-K on April 15th with a going concern qualification from Ernst & Young LLP, the Company's independent auditor
- The going concern qualification is a default under the RBL and Term Loan and results in an Event of Default if not remedied within 30 days
- On April 15, 2020, Ultra elected not to make the ~$13 MM semi-annual interest payment on its Senior Unsecured Notes and has elected to utilize the 30-day grace period that ends on May 14, 2020
- Liquidity planning as of April 15, 2020 –
  - Cash balance of $15.2 MM ($14.6 MM attributed to $15 MM anti-cash hoarding threshold)
  - RBL balance of $52.7 MM plus $10.2 MM of undrawn LCs outstanding
  - As a result of the defaults, effective April 15, Ultra no longer has access to draw on the revolver
  - Cash on hand and revenue receipts to be collected in April will provide adequate liquidity for the business through the anticipated chapter 11 filing date
  - All hedges either settled or monetized for a total of $19.3 MM in May
- On April 4, 2020, Ultra received an unsolicited indication of interest ("IoI") letter from a bidder for a sale of substantially all of its assets; the proposed value reflected by this IoI was too low for Ultra to deem such a sale to be an attractive or competitive alternative

Source:  Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

ULTRA UP PETROLEUM

# EXIT FINANCING CONSIDERATIONS

## Ultra recommends pursuing an Exit RBL Facility of $100-150 MM

- Ultra forecasts that ~$50 MM will be needed at emergence to fund repayment of outstanding amounts under the DIP and other closing costs
- Ultra believes that funding with an Exit RBL Facility would be the most efficient form of financing -
  - Ultra's continued PDP model post-emergence will provide ability to repay amounts that are drawn at exit within 6-12 months
  - An Exit RBL Facility is a low cost option, especially considering the size of Ultra's borrowing base relative to its RBL need (Ultra currently operates comfortably with $100 MM facility)
  - Typical for E&Ps to emerge from bankruptcy with an RBL facility
- The Exit RBL Facility would also be used to support -
  - In-month liquidity needs
  - Hedging capacity without having CSA margin risk
  - LC requirements
  - The potential restart of drilling activity should commodity prices and investment returns warrant capital investment
  - NAV / share accretive transaction funding
- In-month liquidity needs are driven by the timing of the Company's revenue -
  - Ultra generally collects receipts around the 25th of every month; a net deficit grows each month up until receipts are collected
  - Needs are increased in months during which production tax payments and interest on any takeback debt may be due
  - Ultra forecasts maximum in-month liquidity needs of ~$45 MM[(1)] before accounting for interest payments (if applicable) and operating cushion

(1) Does not consider LC capacity requirements.

Ultra Petroleum Corp. OTCQX: UPLC – Confidential and Proprietary 26

Source: Ultra Petroleum Form 8K dated May 14, 2020.



Source:  Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# POST-EMERGENCE BUSINESS PLAN OPPORTUNITIES

- Continued optimization of PDP in Pinedale and generate significant cash flow –
  - Strong, sustainable PDP-only business through low-cost leadership
  - Ability to generate sufficient operating margins in low gas price environment
- Consolidate Rockies PDP Natural Gas –
  - G&A & LOE synergy
  - Opportunities to double in size within basin
  - Increased scale provides opportunities to optimize midstream assets and/or contracts
- Opportunistically build positions in other basins through M&A to diversify and build inventory –
  - PDP PV20+ natural gas acquisitions with option value on undrilled inventory
  - Oil production and development inventory
- With improved and sustained commodity price and investment returns, option to resume drilling –
  - Modest drilling program in Pinedale can deliver 25%+ return
  - Develop strong, return-based inventory acquired in potential consolidation efforts with the benefit of a high-graded look across more than one asset/basin/product

Pro-Forma Ultra is best-suited to be the Rockies Consolidator -

- Track record of operational excellence
- Low-cost leader
- Long-term success with Federal lands subject to rigorous regulatory and environmental framework
- Strong, experienced teams and leadership

Ultra Petroleum Corp. OTCQX: UPLC – Confidential and Proprietary 28

Source: Ultra Petroleum Form 8K dated May 14, 2020.

***Privileged & Confidential***

# PRO FORMA ANNUAL FORECAST

ULTRA
UP
PETROLEUM

## Summary

| *$ Thousands*<br>*Pricing - Futures on 04/16/20* | 2020<br>Forecast | 2021<br>Forecast | 2022<br>Forecast | 2023<br>Forecast | 2024<br>Forecast |
|---|---|---|---|---|---|
| Oil Liquids Volume (Mbbls) | 1,204 | 972 | 846 | 753 | 682 |
| Natural Gas Volume (MMcf) | 179,710 | 149,521 | 130,174 | 115,907 | 104,856 |
| Total Equivalent Volume (MMcfe) | 186,933 | 155,352 | 135,251 | 120,427 | 108,945 |
| *Daily Volumes (MMcfe/day)* | *511* | *426* | *371* | *330* | *298* |
| ***NYMEX:*** | | | | | |
| Oil Price / bbl | $ 33.17 | $ 35.53 | $ 38.11 | $ 40.19 | $ 42.11 |
| Gas Price / mmbtu | $ 2.06 | $ 2.60 | $ 2.45 | $ 2.42 | $ 2.41 |
| Basis Price / mmbtu | $ (0.18) | $ (0.35) | $ (0.32) | $ (0.32) | $ (0.31) |
| ***Realized:*** | | | | | |
| Oil Price / bbl | $ 33.93 | $ 36.03 | $ 38.62 | $ 40.72 | $ 42.64 |
| Gas Price / mmbtu | $ 2.06 | $ 2.48 | $ 2.35 | $ 2.31 | $ 2.31 |
| Oil Revenue | $ 40,853 | $ 35,019 | $ 32,676 | $ 30,675 | $ 29,059 |
| Natural Gas Revenue | 369,961 | 370,998 | 305,935 | 268,062 | 242,620 |
| Processing Revenue and Other | (5,328) | (9,970) | (7,715) | (6,435) | (5,593) |
| **Total Revenues (Excluding Hedges)** | **$ 405,485** | **$ 396,048** | **$ 330,896** | **$ 292,302** | **$ 266,086** |
| Realized Hedge Gains / (Losses) | 43,654 | – | – | – | – |
| **Total Revenues (Including Hedges)** | **$ 449,139** | **$ 396,048** | **$ 330,896** | **$ 292,302** | **$ 266,086** |
| Severance / Production Taxes | $ 42,290 | $ 42,821 | $ 35,481 | $ 31,259 | $ 28,451 |
| Lease and Facility Operating Costs | 88,427 | 70,786 | 69,647 | 68,807 | 68,157 |
| Gathering / Transport / Other | 67,003 | 52,127 | 45,378 | 40,400 | 36,544 |
| **Total Operating Expense** | **$ 197,720** | **$ 165,733** | **$ 150,506** | **$ 140,466** | **$ 133,152** |
| G&A | 30,420 | 31,048 | 30,499 | 30,499 | 30,499 |
| **EBITDA** | **$ 220,999** | **$ 199,266** | **$ 149,891** | **$ 121,337** | **$ 102,435** |
| DC&E and Other Capital | 20,577 | 8,055 | 8,055 | 8,055 | 8,055 |
| Change in NWC | 26,757 | 13,559 | (3,428) | (4,233) | (2,721) |
| **Pre-Tax Unlevered Free Cash Flow[1]** | **$ 173,666** | **$ 177,652** | **$ 145,264** | **$ 117,515** | **$ 97,101** |

## Assumptions

- PDP only production forecast
- Pricing based on forward strip as of 4/16/20 for HHUB, WTI and NWROX
  - NWROX basis reflects 3 months of actuals and strip for all additional periods
- Operating costs projected to be relatively consistent with Q1 2020 guidance per Mcfe, subject to PDP blowdown drift impacts on fixed costs
  - LOE generally fixed
  - Variable production taxes, gathering and NPI expenses generally will increase per $/Mcfe
- Assumes REX contract is rejected in Q2 '20
- Assumes LGS rejection with final rent expense payment made in May
  - Trucking costs assumed to be approximately equal to rent expense through September
  - 2020 capex includes ~$11 MM of capex related to LGS rejection and subsequent tie-in to Company owned liquid gathering system

(1) Excludes current estimate for expenses associated with the restructuring of ~$57 MM in 2020. Current estimate is the result of various assumptions that are subject to change.

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# SIGNIFICANT UNDEVELOPED INVENTORY

## Significant Operated Vertical Well Inventory at Higher Prices




### Cumulative Operated Vertical Locations vs. Opal Gas Prices




Large inventory of economic wells available in a more supportive price environment

### PV-10 Op. Inventory Sensitivity

| Opal Price ($/MMBtu) | Development Density | | |
|---|---|---|---|
| | 10-Acre | 5-Acre | Total |
| $2.25 | 638 | 491 | 1,129 |
| $2.50 | 828 | 925 | 1,753 |
| $2.75 | 978 | 1,417 | 2,395 |
| $3.00 | 1,121 | 1,836 | 2,957 |
| $3.25 | 1,257 | 2,174 | 3,431 |

Note: Location counts assume a $2.8mm/well DC&E cost for Pinedale wells and $2.1mm/well for Jonah wells. Inventory includes a mix of 5, and 10-acre spaced wells.



Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# PINEDALE DEVELOPMENT CRITERIA AND OUTPUTS

- Sustained improvement of natural gas prices required to yield acceptable economic return profile and resumption of drilling
- Permitting and BLM development criteria and process are firmly established
- Core technical talent to restart the drilling program within the organization
- Existing infrastructure available to recommence drilling
- Drill Rig Program assumptions –
  - Approximately 3 wells drilled per month per rig
  - Each rig represents ~ $100 MM annual capital commitment
- 1-Rig Program –
  - Reduces decline by approximately one-half
  - Continues to result in FCF generation in the current price environment
- 2-Rig Program –
  - Effectively a maintenance capital case
  - At current pricing – results in a balanced cash flow result
  - At $2.50 Opal pricing, generates FCF

Source: Ultra Petroleum Form 8K dated May 14, 2020.



Source:  Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# SUMMARY OF SELECT MIDSTREAM AGREEMENTS

## REX Firm Transportation Agreement

- Rockies Express Pipeline LLC ("REX") provides natural gas transportation services to Ultra
- Volume commitment of 200,000 dth per day until 12/31/2026
- Negotiated reservation rate paid by Ultra -
  - $11.17204 / dth per month
  - ~$0.367 / dth per day[1]
- Ultra has posted a letter of credit equal to 3 months of reservation charges (~$6.7 MM)
- Short term capacity release to Occidental Petroleum
  - Ultra has released the full 200,000 dth per day from April 2020 through October 2020 at a rate of $0.25 / dth per day

## Pinedale Corridor, LP Liquid Gathering System ("LGS") Lease Agreement

- Pinedale Corridor, LP is operated by Ultra and owned by CorEnergy, a publicly traded REIT (NYSE: CORR)
- System consists of pipelines and four central gathering facilities that handle condensate and water production in the Pinedale field
- Ultra sold LGS to CORR in 2012 under a 15-year, triple net lease (2012-2027)
- Current lease rate is $1,844,748 per month
  - Escalates at the lesser of CPI or 2% / year
- Current volume using the Corridor system is 32,500 BPD associated with 468 MMSCFD gross (315 MMSCFD net) natural gas production
- Total field production is 46,700 BPD associated with 664 MMSCFD gross (462 MMSCFD net) natural gas production

1) Based on an average month calculation of 365 days per year distributed evenly over twelve months.

Source: Ultra Petroleum Form 8K dated May 14, 2020.



Source:  Ultra Petroleum Form 8K dated May 14, 2020.



Privileged & Confidential
REORGANIZATION TAX FRAMEWORK

ULTRA
UP
PETROLEUM

NOTE: ALL COMMENTS REGARDING TAXATION ARE GENERAL AND THERE ARE NUMEROUS NUANCES TO THE TAX CODE THAT EXIST. ADDITIONAL DISCUSSIONS MAY OCCUR WITH ADVISORS AND THE COMPANY AND ITS ADVISORS TO EXPLORE DETAILED QUESTIONS FURTHER. SEE DISCLOSURES FROM 10-K FOR ADDITIONAL INFORMATION ABOUT THE COMPANY'S CURRENT TAX ATTRIBUTES

- Consistent with disclosure in the Form 10-K, the Company currently has significant tax attributes, including the following larger items –
  - NOL carryforward of ~ $2.3 B; Although the Company's prior restructuring in 2017 resulted in a Section 382 limitation on the NOL, the Company's historic tax position is that this limitation will not ultimately impose a meaningful limitation on those pre-change NOLs
  - § 163(j) interest deduction carryforward of ~ $80 MM after the additional deduction for 50% of ATI instead of 30% due to the CARES Act
  - Tax basis in oil & gas assets and equipment - ~ $1.45 B
- Cancelation of Debt ("COD") Income –
  - In Chapter 11, the COD discharge is totally excluded from the calculation of taxable income without regard to its insolvency
  - However, when COD amounts are excluded from gross income certain tax attributes are reduced based on codified ordering rules – NOLs, general business credits, basis of assets (subject to certain complexities related to consolidated tax groups and an election to reduce tax basis in depreciable property before other attributes)
  - While the COD attribute reduction rules are complex, and the final results of any COD attribute reduction cannot be known with certainty until after a restructuring is consummated, in light of Ultra's significant NOLs, the Company currently expects that Ultra's attribute reduction will be limited to NOLs and not other attributes
- Post-Reorganization, the value of these remaining attributes are impacted by the change of control event and elections made with respect to the year of filing the Chapter 11 restructuring –
  - The Company does not currently expect tax basis in its oil & gas assets of ~$1.45 B to be reduced as a result of the Chapter 11 process
  - Chapter 11 bankruptcy will allow the COD income to be eliminated with the NOL
  - Future NOL availability is directly related to which Chapter 11 bankruptcy exemption election selected by the Company -
    - § 382(l)(5) – If the Company qualifies and does not elect out of its application, the 382 rules would not limit remaining post transaction "old" NOLs – **subject to there NOT being a future ownership change within two years of the transaction and to the existing 382 limitation on pre-2017 NOLs; In addition, under section 382(l)(5), these NOLs will be reduced by certain deductions with respect to interest that was accrued but not paid over the last 3 years**
    - § 382(l)(6) – If the Company is not eligible for 382(l)(5), or elects not to utilize § 382(l)(5) due to not wanting the future ownership change restrictions, the traditional 382 limitation rules will apply and future availability of remaining "old" NOLs will be significantly limited
    - Creditors' counsel will have to make the determinations around § 382(l)(5) qualifications

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# FUTURE CASH TAX ESTIMATION



**NOTE:  ALL COMMENTS REGARDING TAXATION ARE GENERAL AND THERE ARE NUMEROUS NUANCES TO THE TAX CODE THAT EXIST. ADDITIONAL DISCUSSIONS MAY OCCUR WITH ADVISORS AND THE COMPANY AND ITS ADVISORS TO EXPLORE DETAILED QUESTIONS FURTHER.  SEE DISCLOSURES FROM 10-K FOR ADDITIONAL INFORMATION ABOUT THE COMPANY'S CURRENT TAX ATTRIBUTES**

- If section 382(l)(6) were to apply, subject to certain technical aspects of the application of the so-called "built-in gain" rules, the Company currently expects to be able to utilize approximately $8 MM per year of NOL
- Significant basis in net oil & gas properties remains and is not expected to be subject to a limitation under Section 382; which through tax DD&A will largely generate adequate deductions to reduce estimated future cash taxes
- Take back debt considerations -
  - Generally any interest on take back debt is not of value to the Company due to –
    - DD&A generally creates a tax loss in early years after transaction
    - If in a taxable income situation, the interest deduction is limited to 30% of adjusted taxable income in later years
  - **The Company believes that income tax considerations should not be a significant factor in the decision to issue takeback debt in any restructuring of the Company since the interest expense deduction is not expected to shield cash taxes over the immediate projection period**
- Make whole considerations -
  - Make whole recovery event is largely sheltered from cash tax impacts by resulting DD&A expense from tax basis of property attributes
  - The timing of any make whole settlement may impact cash tax result
  - Generally, resolution and recognition in 2020 prior to the consummation of a restructuring transaction is preferable to later periods in terms of cash taxation
  - Potential tax planning opportunities are being further explored
- Future restoration of even a 1-rig drilling program would effectively eliminate cash taxation concerns in the foreseeable future by deferring the recognition of current taxable income

Source:  Ultra Petroleum Form 8K dated May 14, 2020.



Source:  Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# 2020 G&A FORECAST DETAIL

| G&A Forecast Summary | 2020 Forecast |
|---|---|
| Total Operations & Corp. G&A | $59 |
| Production LOE | (21) |
| **G&A Pre-COPAS & Capitalized G&A** | **$38** |
| COPAS Recovery | (4) |
| Capitalized G&A | (3) |
| **Net Cash G&A Expense** | **$30** |

Note: Dollars in millions. Figures do not tie due to rounding.

## G&A Forecast Overview

- Total Operations and Corporate G&A include all cost costs prior to reclassifying certain costs into production and capitalized G&A
- G&A that is categorized as Production LOE includes -
  - Costs associated with Pinedale-based personnel, including salaries, wages, rent and office utilities
  - Certain production related tasks performed out of the corporate office that are in direct support of operations
    - Includes certain EHS functions, regulatory reporting, production engineering and monitoring and direct reservoir monitoring among others
- Capitalized G&A is subject to increase in the event drilling is restarted

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# RECONCILIATION OF ADJUSTED EBITDA, ADJUSTED EBITDA PER MCFE AND FREE CASH FLOW

**Reconciliation of Earnings Before Interest, Taxes, Depletion and Amortization (unaudited)**
**All amounts expressed in US$000's**

The following table reconciles net income (loss) as derived from the Company's financial information with earnings before interest, taxes, depletion, and amortization and certain other non-recurring or non-cash charges (Adjusted EBITDA)(1) and to Free Cash Flow(2), as defined below:

| | For the Year Ended December 31, | | For the Quarter Ended December 31, | | For the Quarter Ended March 31, | |
|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 | 2020 Forecast | 2019 |
| **Net income (loss)** | $ 107,988 | $ 85,207 | $ (1,305) | $ 39,705 | TBD | $ 40,674 |
| Ceiling test impairment of oil & gas properties | — | — | — | — | TBD | — |
| **Net income (loss) before ceiling test impairment of oil & gas properties** | $ 107,988 | $ 85,207 | $ (1,305) | $ 39,705 | $ 24,950 | $ 40,674 |
| Interest expense | 129,398 | 148,316 | 31,322 | 36,382 | 30,398 | 33,327 |
| Depletion and depreciation | 204,227 | 204,255 | 47,224 | 52,301 | 47,284 | 51,653 |
| Contract settlement (income) expense, net | (13,468) | (12,656) | — | (15,331) | — | — |
| Unrealized (gain) loss on commodity derivatives | (54,282) | 59,799 | 21,674 | (12,758) | (27,945) | (14,292) |
| Deferred gain on sale of liquids gathering system | — | (10,553) | — | (2,638) | — | — |
| Stock compensation expense | 2,571 | 11,824 | 300 | 278 | 1,180 | 841 |
| Taxes | (1,050) | 442 | (881) | — | — | (27) |
| Debt exchange expenses | — | 8,272 | — | 8,272 | — | 1,822 |
| Other operating expenses, net | 28,889 | 9,118 | 2,269 | 4,555 | 3,438 | 684 |
| Legal proceeding recoveries | — | — | — | — | (2,011) | — |
| Restructuring and reorginization costs | — | — | — | — | 2,510 | — |
| **Adjusted EBITDA(1)** | $ 404,273 | $ 504,024 | $ 100,603 | $ 110,766 | $ 79,804 | $ 114,682 |
| Capital and PP&E expenditures, net of proceeds received | (241,636) | (374,387) | (8,058) | (90,312) | 818 | (92,563) |
| Cash interest expense | (145,339) | (137,812) | (36,146) | (34,211) | (34,669) | (36,500) |
| **Free cash flow(2)** | $ 17,298 | $ (8,175) | $ 56,399 | $ (13,757) | $ 45,953 | $ (14,381) |
| **Production (Mcfe)** | 240,219 | 275,058 | 55,366 | 64,327 | 50,455 | 62,196 |
| **Adjusted EBITDA per Mcfe** | $ 1.68 | $ 1.83 | $ 1.82 | $ 1.72 | $ 1.58 | $ 1.84 |

(1) Earnings before interest, taxes, depletion and amortization (Adjusted EBITDA) is defined as Net income (loss) adjusted to exclude restructuring and reorganization costs, interest, taxes, depletion and amortization and certain oth non-recurring or non-cash charges. Management believes that the non-GAAP measure of Adjusted EBITDA is useful as an indicator of an oil and gas exploration and production Company's ability to internally fund exploration and development activities and to service or incur additional debt. Adjusted EBITDA should not be considered in isolation or as a substitute for net cash provided by operating activities prepared in accordance with GAAP.

(2) Free Cash Flow defined as Adjusted EBITDA less capital expenditures and cash interest.

Source: Ultra Petroleum Form 8K dated May 14, 2020.

*Privileged & Confidential*

# RECONCILIATION OF EBITDA CASH COSTS AND NET DEBT

ULTRA
UP
PETROLEUM

### Reconciliation of EBITDA Cash Costs[1]

| | For the Quarter ended December 31, 2019 | | For the Quarter ended March 31, 2020 | |
|---|---|---|---|---|
| | *Actual* | | *Forecast* | |
| **Total production (MMcfe)** | **55,366** | | **50,455** | |
| | ('000) | ($ / Mcfe) | ('000) | ($ / Mcfe) |
| Lease operating expense | $ 19,581 | $ 0.35 | $ 19,411 | $ 0.38 |
| Facility lease expense | 5,640 | $ 0.10 | 5,463 | $ 0.11 |
| Production taxes | 18,114 | $ 0.33 | 13,922 | $ 0.28 |
| Gathering fees | 18,427 | $ 0.33 | 16,682 | $ 0.33 |
| Less: Other revenues | (1,343) | $ (0.02) | (221) | $ (0.00) |
| Gathering fees, net | 17,084 | $ 0.31 | 16,461 | $ 0.33 |
| Transportation | 1,303 | $ 0.03 | 3,894 | $ 0.08 |
| General and administrative expenses | 5,172 | $ 0.09 | 8,512 | $ 0.17 |
| Less: Stock compensation expense | (300) | $ (0.01) | (1,180) | $ (0.02) |
| Cash G&A | $ 4,872 | $ 0.09 | $ 7,332 | $ 0.15 |
| **EBITDA Cash Cost/Mcfe** | | **$ 1.21** | | **$ 1.32** |

### Reconciliation of Net Debt[2]

| *$ Thousands* | As of December 31, 2019 | As of March 31, 2020 |
|---|---|---|
| Total Debt | *Actual* | *Forecast* |
| Revolving Credit Facility | $ 64,700 | $ - |
| Term Loan | 968,756 | 966,319 |
| Second Lien Notes | 583,853 | 586,770 |
| 2022 Senior Unsecured Notes | 150,439 | 150,439 |
| 2025 Senior Unsecured Notes | 225,000 | 225,000 |
| Total Face Value of Indebtedness | 1,992,748 | 1,928,528 |
| Less: Cash | (1,664) | (6,571) |
| **Net Debt** | **$ 1,991,084** | **$ 1,921,957** |

(1) EBITDA cash costs include lease operating expense, facility lease expense, production taxes, net gathering fees, transportation and cash G&A.
(2) Net Debt is calculated as face value of debt less cash.

Source: Ultra Petroleum Form 8K dated May 14, 2020.