**EXHIBIT B**

**DR. RICHARD BERGIN AFFIDAVIT**

**Table of Contents**

Professional Background ................................................................................................. 5

Introduction and Scope of Assignment ........................................................................... 6

Summary of Opinions ...................................................................................................... 9

OPINION 1: ................................................................................................................... 12

There is a clear and substantial public interest benefitting natural gas producers and consumers to have a robust, stable network of interstate gas transportation pipelines.  Although pipelines are capital intensive projects and require significant upfront infrastructure investment, benefits include their ability to reliably and cost effectively deliver natural gas from the producer to the buyer, while also reducing regional supply/demand imbalances, lowering price risk and reducing price volatility. Large investments, particularly those involving infrastructure projects, require expectations of a return on investment which is dependent upon the predictability of cash flows and such return is attained through long term negotiated contracts with natural gas shippers. It is my opinion that rejection of transportation agreements by shippers jeopardizes the continued growth of the U.S. natural gas pipeline industry and the significant public benefits associated with it. ................................................................................................................................ 12

OPINION 2: ................................................................................................................... 20

FERC's regulatory regime for development and provision of services on interstate gas pipelines has crafted a workably competitive and efficient means for identifying public need for gas transportation and ensuring just and reasonable rates.  In the case of REX, following a rapid ramp up of production in the Niobrara-DJ basin from 2007 to 2010, the REX pipeline was found to serve the public convenience and necessity because REX alleviated a natural gas glut in the Rockies region. The REX pipeline allowed the natural gas to be effectively shipped to other undersupplied regions, reducing the volatility of the Opal Hub price and substantially decreasing the Opal/Henry Hub basis. Had the Opal basis price and its implied price discount to Henry Hub remained at its 2007 level during the following period of 2008 – 2019, and had Ultra continued to achieve realized prices of 6% above Opal, it would have realized significantly lower realized prices and earned $3.3 billion less than it actually did during the period. Ultra's financial projections through 2024 indicate that it expects the Opal basis risk to be negligible in the future. Its financial projections are linked to a Henry Hub futures price strip from May 7, 2020 and its projected revenue from natural gas sales imply realized prices coming in within 1%-2% of the Henry Hub price. The absence of Opal basis risk in Ultra's forecast is consistent with its future need to rely on REX to transport natural gas to other regions. .................................................... 20

OPINION 3: ................................................................................................................... 26

Ultra was a major beneficiary of the large investment made to build the REX pipeline, allowing it to increase production by 117%, from 109.2 Bcf in 2007 to 236.8 Bcf in 2011. In spite of the average daily Henry Hub price decreasing from $6.96 in 2007 to $3.99 in 2011, Ultra's operating profit increased from $302.5 million in 2007 to $773.5 million in 2011 due to its ability to dramatically increase drilling, ramp up production and transport a substantial portion of it through the REX pipeline to the Mid-Continent and the Midwest regions. ................................ 26

OPINION 4: ........................................................................................................................... 29

Ultra has leveraged the REX pipeline to execute a strategic plan aimed at more than doubling natural gas production while improving realized prices relative to Henry Hub and generating record profits. While commercial interest in the western portion of REX has recently been challenged given near-term price differences between Rockies and Mid-Con as well as Covid19 impacts, REX will continue to play an important market access role for Ultra's DJ gas because the pipeline allows gas to flow directly to the Midwest.  It is therefore likely that Ultra will require use of REX in the future to access markets in the Midwest. Moreover, Ultra transferred and will transfer a substantial portion of its transportation costs to other shippers through capacity release, while at the same time retaining the valuable option of the FTSA, allowing it to quickly resume production and shipping when demand for natural gas increases and the prices increases.  It follows that the REX contract gives Ultra considerable optionality, either to use the capacity for its own needs or to release its capacity at higher market rates than it does today. Ultra's attempt to reject the contract appears to be aimed at re-trading the contract to a lower rate and free-riding on a $5 billion pipeline investment after it has collected over $ 3.3 billion profit from having access to REX ................................................................................................................. 29

OPINION 5: ........................................................................................................................... 34

EIA forecasts a steady increase in the price of natural gas to $3.64 in 2026. Similarly, the forward curve of the Henry Hub/Opal basis indicates a steady expansion to $0.36 in 2026. Robust negotiated long-term contract volumes on several pipelines confirm that the economics of transporting natural gas on the REX will dramatically improve during the term of the FTSA and Ultra will resume using its firm capacity again in the very near future. Its attempts to reject the current contract appear to be merely an attempt to re-trade the contract to an even more favorable rate. 34

OPINION 6: ........................................................................................................................... 39

The economic benefit of the natural gas pipelines and the critical importance of the stability provided by negotiated rate agreements such as the FTSA are supported by recent motions to intervene and comments made by large utilities, including Con Edison, as well as other major interstate pipeline operators like Trans Canada, and the trade association for interstate pipelines, the Interstate Natural Gas Association of America ("INGAA"), in REX's FERC PDO proceeding in Docket No. RP20-822-000. ..................................................................................................... 39

Appendices and Exhibits

Appendix 1: Expert's Curriculum Vitae

**Professional Background**

1. My name is Dr.  Richard Bergin.  I co-lead AlixPartners' Global Energy and Process Industries Investigations, Disputes and Risk practice, with over 25 years' experience advising Fortune 500 oil and gas firms. My clients benefit from my expertise in serving in both advisory and senior executive roles, including valuing and operating over 600 oil & gas projects involved with exploration & production, refineries, pipeline, transportation and marketing operations around the world, including for BP, Chevron, ExxonMobil, Shell, Suncor, and Sunoco.  I regularly direct teams in the quantification of economic impacts, the assessment of loss causation, and the calculation of economic damages.

2. I have served as an economic expert in federal and state courts, ICSID, ICDR, ICC, AAA, and other alternative dispute resolution forums.

3. I specialize in the economics of exploration, production, refining, shipping & trading practices in physical, financial, and hybrid instruments, financial markets, credit risk, and large capital projects. In these matters, I have addressed issues such as economic damages, lost profits, supply & demand and price of oil & gas, network economics, ROIC, and valuation.

4. My experience covers reservoir engineering, frac drilling & completion, well performance, pipeline networks, refinery operations, solvency, valuation, and project economics. I have taught courses on economics, finance, and valuation at institutions and conferences, including at New York University and Harvard Business School.

5. I earned my Doctorate and MBA degrees with highest distinction from Harvard Business School, which I attended as a Fulbright Scholar.  I was also awarded a Bachelor's degree in Chemical Engineering with the University Medal (top graduate) from the University of Sydney.  My curriculum vitae, attached as Appendix 1 to this report, further describes my professional credentials.

6. I have also been assisted in this assignment by members of the professional staff at AlixPartners, and I have prepared this report in an independent and objective manner.

AlixPartners' fees for this engagement are not contingent upon my findings or any other action or event resulting from the use of this report.

## Introduction and Scope of Assignment

### A. *Introduction*

7.  In connection with its bankruptcy case, Ultra Resources ("Ultra") has filed a motion to reject (the "Rejection Motion") a contract for transportation of natural gas (the "FTSA") with Rockies Express Pipeline LLC ("REX") pursuant to section 365 of the Bankruptcy Code.

8.  In anticipation of Ultra's filing for bankruptcy, and pursuant to Rule 207(a)(2) of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission, REX had filed a Petition for Declaratory Order and Request for Expedited Action ("PDO") at the Federal Energy Regulatory Commission ("FERC" or the "Commission") in Docket No. RP20-822-000.

9.  Following its bankruptcy filing, Ultra commenced an adversary proceeding against the FERC brought pursuant to 28 U.S.C. § 2201, sections 105, 106(a), 362(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Federal Rules of Bankruptcy Procedure 7001(7), (9) and 7065, for declaratory judgment, a temporary restraining order, and preliminary and permanent injunctive relief.

10. In accordance with discussions at the hearing held at 10:30 am Central on May 29, 2020 (the "Hearing") in the U.S. Bankruptcy Court ("Bankruptcy Court") for the Southern District of Texas in Case No. 20-23631 (MI) concerning issues arising related to Ultra's Rejection Motion, REX withdrew the PDO effective June 2, 2020.

11. At the center of these proceedings is the FTSA, a negotiated rate firm transportation service agreement between Ultra and REX, Contract No. 949478, which was executed in 2017 and

provided for gas transportation services commencing on December 1, 2019 through December 31, 2026.[1] The FTSA provides for transportation of 200,000 dth/d of capacity at a rate of $11.17204 per dth/per month.[2] On November 27, 2019, Rockies Express filed with FERC revised tariff records, including a complete copy of the FTSA, to implement the new agreement and make it part of the Rockies Express Tariff.[3] FERC accepted the tariff records on December 17, 2019 with the requested effective date of December 1, 2019 for the FTSA. Filing at FERC made the FTSA a filed rate.[4]

12. The REX pipeline was built to serve as an outlet for natural gas produced in the Rocky Mountain West.[5] Ultra, a producer in the region, is one of the original "anchor" shippers on the REX system and has long taken the public position that it benefits from access to that system, which is very close to its production.[6] It began shipping natural gas via the REX pipeline under a 10-year negotiated rate transportation service agreement initiated in 2009 and providing for 200,000 dth/d capacity (the "Original Ultra Agreement").[7]

13. REX enabled natural gas producers in the Rockies region to sharply increase natural gas production in the regional basins and allow them to move the commodity from an oversupplied regional market to other undersupplied regions in the United States, and primarily the Mid-Continent and Midwest.

---

[1] Brief of Rockies Express Pipeline LLC In Connection With The Motion of Ultra Resources, Inc. For An Order Authorizing Rejection Of The Parties' Negotiated Rate Firm Transportation Agreement (Docket 7), ¶ 14.
[2] Brief of Rockies Express Pipeline LLC In Connection With The Motion of Ultra Resources, Inc. For An Order Authorizing Rejection Of The Parties' Negotiated Rate Firm Transportation Agreement (Docket 7), ¶ 14.
[3] Brief of Rockies Express Pipeline LLC In Connection With The Motion of Ultra Resources, Inc. For An Order Authorizing Rejection Of The Parties' Negotiated Rate Firm Transportation Agreement (Docket 7), ¶ 14.
[4] Brief of Rockies Express Pipeline LLC In Connection With The Motion of Ultra Resources, Inc. For An Order Authorizing Rejection Of The Parties' Negotiated Rate Firm Transportation Agreement (Docket 7), ¶ 14.
[5] Brief of Rockies Express Pipeline LLC In Connection With The Motion of Ultra Resources, Inc. For An Order Authorizing Rejection Of The Parties' Negotiated Rate Firm Transportation Agreement (Docket 7), ¶ 12.
[6] Brief of Rockies Express Pipeline LLC In Connection With The Motion of Ultra Resources, Inc. For An Order Authorizing Rejection Of The Parties' Negotiated Rate Firm Transportation Agreement (Docket 7), ¶ 12.
[7] Brief of Rockies Express Pipeline LLC In Connection With The Motion of Ultra Resources, Inc. For An Order Authorizing Rejection Of The Parties' Negotiated Rate Firm Transportation Agreement (Docket 7), ¶ 12.

### B. _Scope of Assignment_

14. AlixPartners has been engaged by Sidley Austin LLP ("Counsel") on behalf of REX to provide expert analysis on the economics of the natural gas market, the role pipelines play in the development and exploitation of natural gas resources, and the impact the REX pipeline has had in the past and is expected to have in the future. My opinions will be submitted along with this expert report and I will provide expert testimony, as necessary.

15. I reserve the right to amend and/or supplement this report based on ongoing discovery, as well as any additional facts or information that come to my attention, including any information, additional facts or analysis.

16. Documents, data, and other information that I relied upon are cited throughout this report. It is usual and customary for experts in my field to rely upon the types of materials reflected in my report.

### C. _Limitations and Restrictions_

17. The scope of my review has been limited to the documents and information described in the previous paragraph.  I have not held any discussions with anyone other than as noted in this report.  Should additional information become available, I reserve the right to amend, modify, and/or supplement my report and/or opinions accordingly.

**Summary of Opinions**

18. It is my view that rejection of the FTSA by Ultra would compromise the public interest that Congress wanted protected when it enacted the Natural Gas Act. In summary, I base this opinion on the following, which are each further explained in the following sections of this affidavit:

<u>**Opinion 1**</u>:

19. There is a clear and substantial public interest benefitting natural gas producers and consumers to have a robust, stable network of interstate gas transportation pipelines. Although pipelines are capital intensive projects and require significant upfront infrastructure investment, benefits include their ability to reliably and cost effectively deliver natural gas from the producer to the buyer, while also reducing regional supply/demand imbalances, lowering price risk and reducing price volatility. Large investments, particularly those involving infrastructure projects, require expectations of a return on investment which is dependent upon the predictability of cash flows and such return is attained through long term negotiated contracts with natural gas shippers. It is my opinion that rejection of transportation agreements by shippers jeopardizes the continued growth of the U.S. natural gas pipeline industry and the significant public benefits associated with it.

<u>**Opinion 2:**</u>

20. FERC's regulatory regime for development and provision of services on interstate gas pipelines has crafted a workably competitive and efficient means for identifying public need for gas transportation and ensuring just and reasonable rates. In the case of REX, following a rapid ramp up of production in the Niobrara-DJ basin from 2007 to 2010, the REX pipeline was found to serve the public convenience and necessity because REX alleviated a natural gas glut in the Rockies region. The REX pipeline allowed the natural gas to be effectively shipped to other undersupplied regions, reducing the volatility of the Opal Hub price and substantially decreasing the Opal/Henry Hub basis. Had the Opal basis price and its implied price discount to Henry Hub remained at its 2007 level during the following period of 2008 – 2019, and had Ultra continued to achieve realized prices of 6%

above Opal, it would have realized significantly lower realized prices and earned $3.3 billion less than it actually did during the period. Ultra's financial projections through 2024 indicate that it expects the Opal basis risk to be negligible in the future. Its financial projections are linked to a Henry Hub futures price strip from May 7, 2020 and its projected revenue from natural gas sales imply realized prices coming in within 1-2% of the Henry Hub price. The absence of Opal basis risk in Ultra's forecast is consistent with its future need to rely on REX to transport natural gas to other regions.

**Opinion 3:**

21. Ultra was a major beneficiary of the large investment made to build the REX pipeline, allowing it to increase production by 117%, from 109.2 Bcf in 2007 to 236.8 Bcf in 2011. In spite of the average daily Henry Hub price decreasing from $6.96 in 2007 to $3.99 in 2011, Ultra's operating profit increased from $302.5 million in 2007 to $773.5 million in 2011 due to its ability to dramatically increase drilling, ramping up production and transporting a substantial portion of it through the REX pipeline to the Mid-Continent and the Midwest regions.

**Opinion 4:**

22. Ultra has leveraged the REX pipeline to execute a strategic plan aimed at more than doubling natural gas production while improving realized prices relative to Henry Hub and generating record profits. While commercial interest in the western portion of REX has recently been challenged given near-term price differences between Rockies and Mid-Con as well as Covid19 impacts, REX will continue to play an important market access role for Ultra's DJ gas because the pipeline allows gas to flow directly to the Midwest.  It is therefore likely that Ultra will require use of REX in the future to access markets in the Midwest. Moreover, Ultra transferred and will transfer a substantial portion of its transportation costs to other shippers through capacity release, while at the same time retaining the valuable option of the FTSA, allowing it to quickly resume production and shipping when demand for natural gas increases and the prices increases.  It follows that the REX contract gives Ultra considerable optionality, either to use the capacity for its own needs or to release its capacity at higher market rates than it does today. Ultra's attempt to

reject the contract appears to be aimed at re-trading the contract to a lower rate and free-riding on a $5 billion pipeline investment after it has collected over $ 3 billion profit from having access to REX.

**Opinion 5:**

23. EIA forecasts a steady increase in the price of natural gas to $3.64 in 2026. Similarly, the forward curve of the Henry Hub/Opal basis indicates a steady expansion to $0.36 in 2026. Robust negotiated long-term contract volumes on several pipelines confirm that the economics of transporting natural gas on the REX will dramatically improve during the term of the FTSA and Ultra will resume using its firm capacity again in the very near future. Its attempts to reject the current contract appear to be merely an attempt to re-trade the contract to an even more favorable rate.

**Opinion 6:**

24. The economic benefit of the natural gas pipelines and the critical importance of the stability provided by negotiated rate agreements such as the FTSA are supported by recent motions to intervene and comments made by large utilities, including Con Edison, as well as other major interstate pipeline operators like Trans Canada, and the trade association for interstate pipelines, the Interstate Natural Gas Association of America ("INGAA"), in REX's FERC PDO proceeding in Docket No. RP20-822-000.

**OPINION 1:**

**There is a clear and substantial public interest benefitting natural gas producers and consumers to have a robust, stable network of interstate gas transportation pipelines. Although pipelines are capital intensive projects and require significant upfront infrastructure investment, benefits include their ability to reliably and cost effectively deliver natural gas from the producer to the buyer, while also reducing regional supply/demand imbalances, lowering price risk and reducing price volatility. Large investments, particularly those involving infrastructure projects, require expectations of a return on investment which is dependent upon the predictability of cash flows and such return is attained through long term negotiated contracts with natural gas shippers. It is my opinion that rejection of transportation agreements by shippers jeopardizes the continued growth of the U.S. natural gas pipeline industry and the significant public benefits associated with it.**

25. Over the past twenty years, the natural gas sector in the United States gained from technological advancements in horizontal drilling and hydraulic fracturing that have enabled the economic extraction of natural gas from shale formations. This technology development has, in turn, unlocked new, significant, geographically diverse natural gas resources, as well as crude oil supplies. As a result, in 2012, the United States became the world's largest producer of oil & gas.[8] It has had and will likely continue to have significant consequences for the broader economy. This development led to the profitable growth of numerous U.S. oil & gas firms with successful drilling and shipping operations across the lower 48 states. The impact of abundant, low-cost natural gas is particularly important to the electric power sector.

---

[8] EIA, <https://www.eia.gov/todayinenergy/detail.php?id=36292>

26. The U.S. natural gas market was in a persistent deficit, characterized by consumption outpacing production, during the 2003 – 2013 period, as shown in Figure 1 below. The deficit increased from 2.3 Tcf in 2003 to 3.0 Tcf in 2005, before starting a gradual decline due to the ramp up of shale gas production.

**Figure 1: U.S. Natural Gas Production, Consumption, and Balance[9]**



27. Net imports increased from 3.3 Tcf in 2003 to 3.8 Tcf in 2007 as Henry Hub prices increased from $5.47 in 2003 to $8.88 in 2008, as shown in Figure 2 below. With the increase in natural gas shale production, a dramatic change in the natural gas market took place in the following five years. By 2012, U.S. natural gas deficit had shrunk to only 0.3

---

[9] Natural Gas Consumption By End Use, EIA <https://www.eia.gov/dnav/ng/ng_cons_sum_dcu_nus_m.htm>;
Natural Gas Gross Withdrawals and Production, EIA
<https://www.eia.gov/dnav/ng/ng_prod_sum_a_EPG0_FPD_mmcf_m.htm>.

Tcf in 2012 and net imports decreased to 1.5 Tcf, posting declines of 90% and 60%, respectively, from the observed 2007-08 peak levels. The balancing of the natural market and decreased reliance on imports caused the Henry Hub price to decline to $2.76 in 2012, a 69% decline from the 2008 peak.

**Figure 2: U.S. Natural Gas Market Balance, Trade, and Price**[10]



28. The dramatic increase in natural gas production and the associated decline in natural gas prices has led to a large increase in the share of electricity generation by natural gas, from

---

[10] U.S. Natural Gas Imports by Country, EIA <https://www.eia.gov/dnav/ng/ng_move_impc_s1_m.htm>; U.S. Natural Gas Exports and Re-Exports by Country, EIA <https://www.eia.gov/dnav/ng/ng_move_expc_s1_m.htm>; Natural Gas Spot and Futures Prices (NYMEX), EIA <https://www.eia.gov/dnav/ng/ng_pri_fut_s1_d.htm>.

around 16% in 2000 to 40% in 2020, as shown in Figure 3 below. Contemporaneously, share of coal has decreased from around 54% in 2000 to 22% in 2020.

**Figure 3: U.S. Electricity Generation by Fuel (billion kWh)[11]**



29. Increased reliance on inexpensive and domestically produced natural gas for electricity generation has in turn led to a moderation in electricity price increases. As shown in Figure 4 below, during the period of natural gas deficits and high prices, residential prices rose from 8.2 cents/kWh in 2000 to 11.3 cents/kWh in 2008, resulting in an annual price increase of 4% from 2000 to 2008. Following the shale boom and the associated decline in natural gas prices, residential electricity prices increased from 11.5 cents/kWh in 2009 to 12.7 cents/kWh in 2020, resulting in annual price increase of only 1%, thus trailing the country's inflation rate.

---

[11] EIA Monthly Energy Review <https://www.eia.gov/electricity/data.php>; EIA Electric Power Monthly <https://www.eia.gov/electricity/monthly/>; EIA Annual Energy Outlook <https://www.eia.gov/outlooks/aeo/>.

Commercial and industrial electricity prices have experienced even slower price growth over the same period.

**Figure 4: U.S. Historical and Projected Electricity Prices (cents per kWh)[12]**



30. As all developments above have been driven by a dramatic increase in natural gas production, the latter has been enabled by large investments in pipeline infrastructure. As shown in Figure 6, EIA estimates that, between 2004 and 2020, the natural gas industry spent about $92 billion expanding the natural gas pipeline network, adding over 193 Bcf/d capacity. Between 2008 and 2013, pipeline capacity additions totaled more than 58 Bcf/d with investment of $30 billion. Approximately 15 percent of this investment was dedicated

---

[12] EIA Annual Energy Outlook <https://www.eia.gov/outlooks/aeo/tables_ref.php>; EIA Monthly Energy Review <https://www.eia.gov/electricity/data.php>; EIA Electric Power Monthly <https://www.eia.gov/electricity/monthly/>.

to completing the Rockies Express Pipeline (REX), linking production fields in Wyoming to markets as far east as Ohio.

**Figure 6: US Natural Gas Pipeline Capacity v. Investment[13]**



31. REX is one of the United States' largest pipelines, consisting of three sections running through eight states from Colorado to Ohio, and serves energy markets across a vast segment of North America. It is approximately 1,700 miles long and taps major supply basins in Rocky Mountain and Appalachian regions. REX – Entrega (Zone 1) is a 328-mile pipeline going from Meeker Hub in Rio Blanco County, CO, to Cheyenne Hub in Weld County, CO, and has been in service since February of 2007.[14] REX – West (Zone 2) is a 714-mile pipeline going from Weld County, CO, to Audrain County, MO, and has been in

---

[13] EIA <https://www.eia.gov/naturalgas/data.php#pipelines>
[14] Tallgrass Energy GP, LP, SEC Filing 8-K, April 28, 2016, p. 4; EIA <https://www.eia.gov/naturalgas/data.php#pipelines>.

service since May of 2008.[15] REX – East (Zone 3) is a 643-mile pipeline going from Audrain County, MO, to Clarington in Monroe County, OH and has been in service since June of 2009.[16] REX has long haul west-to-east capacity of 1.8 Bcf/d and west-to-east capacity of 2.6 Bcf/d and cost over US$5 billion.[17]

32. The massive investment in natural gas pipeline infrastructure is only possible in the context of predictability of the stream of cash flows that are required to yield an appropriate return on investment. As a result, pipelines rely on long-term negotiated contracts for a large share of their revenue. As shown in Figure 7, analyzing contracts of six large pipelines, I observe that the median pipeline sampled had 63% of contracts expiring in 2025 or later. When expanding the horizon to 10 years, I observe that the median pipeline sampled had 44% of contracts expiring in 2030 or later. Without these long-term commitments, pipeline investment would be unviable and would prevent or reverse the developments observed above and the benefits the public has received. It is for this reason that rejection of negotiated contracts has a profound impact on pipeline investment and the public interest that it serves.

**Figure 7: Percentage of subscriber contracts by expiration year[18]**



---

[15] Tallgrass Energy GP, LP, SEC Filing 8-K, April 28, 2016, p. 4; EIA <https://www.eia.gov/naturalgas/data.php#pipelines>.
[16] Tallgrass Energy GP, LP, SEC Filing 8-K, April 28, 2016, p. 4; EIA <https://www.eia.gov/naturalgas/data.php#pipelines>.
[17] <https://www.tallgrassenergy.com/Operations_REX.aspx>; <https://www.eia.gov/naturalgas/data.php#pipelines>.
[18] S&P Global (https://platform.marketintelligence.spglobal.com/)



**OPINION 2:**

**FERC's regulatory regime for development and provision of services on interstate gas pipelines has crafted a workably competitive and efficient means for identifying public need for gas transportation and ensuring just and reasonable rates.  In the case of REX, following a rapid ramp up of production in the Niobrara-DJ basin from 2007 to 2010, the REX pipeline was found to serve the public convenience and necessity because REX alleviated a natural gas glut in the Rockies region. The REX pipeline allowed the natural gas to be effectively shipped to other undersupplied regions, reducing the volatility of the Opal Hub price and substantially decreasing the Opal/Henry Hub basis. Had the Opal basis price and its implied price discount to Henry Hub remained at its 2007 level during the following period of 2008 – 2019, and had Ultra continued to achieve realized prices of 6% above Opal, it would have realized significantly lower realized prices and earned $3.3 billion less than it actually did during the period. Ultra's financial projections through 2024 indicate that it expects the Opal basis risk to be negligible in the future. Its financial projections are linked to a Henry Hub futures price strip from May 7, 2020 and its projected revenue from natural gas sales imply realized prices coming in within 1%-2% of the Henry Hub price. The absence of Opal basis risk in Ultra's forecast is consistent with its future need to rely on REX to transport natural gas to other regions.**

33. A key constraint on the natural gas market is that the links between supply and demand centers are fundamentally limited by the capacity and extent of the pipeline transmission network. Insufficient transmission capacity results in the emergence of bottlenecks and network congestion, with systematic and measurable effects on transportation costs. Increased transportation costs drive apart natural gas spot prices from regional hubs, resulting in reduced market integration and negative welfare effects. An example of this is the large increase in gas shipped from Wyoming and the reduction in the Opal-Henry Hub price differential following the construction of REX.

34. The Niobrara-DJ basin is a shale formation rich in crude oil and natural gas and located in Northeast Colorado and Southeast Wyoming. It spans several areas of the Rocky Mountains, including the Powder River in Wyoming and parts of Northwest Colorado. The Niobrara within the Denver-Julesburg (DJ) Basin represents a combination of two basins in one.[19]

35. The DJ Basin has been an important source of natural gas exploration and production in the US. The Wattenberg Field, which is located primarily in Southwest Weld County, Colorado, was discovered in 1970, and was one of the 15 largest proven gas fields in 2009. The majority of production from the Wattenberg has come from vertical drilling in the Niobrara/Codell formations, and the Muddy J Sandstone, which is a tight sands play that lies several hundred feet below the Codell.[20]

36. EOG Resources kicked off the trend toward horizontal drilling in the Niobrara DJ in October 2009, with its Jake well at the Hereford Ranch Field in Weld County. Much of the horizontal drilling for the Niobrara and the Codell that has occurred since has been in the Wattenberg Field in Weld County, Colorado, and to a lesser extent in and around the Silo Field in Southeast Wyoming. These have been the most heavily targeted areas in part because many companies already held acreage in those areas, and also because those regions have existing infrastructure.[21]

37. As shown in Figure 8 below, natural gas production in the Niobrara basin has undergone a large increase from 3.4 Bcf/d in January 2007 to 5.7 Bcf/d in November 2019. However, 100% of the production increase is accounted for during the 2007 – 2009 period when production increased from 3.4 Bcf/d to 4.8 Bcf/d and 2018 – 2019 period when production increased from 4.8 Bcf/d to 5.4 Bcf/d.

---

[19] NGI - Natural Gas Intelligence. <https://www.naturalgasintel.com/niobraradjinfo>
[20] NGI – Natural Gas Intelligence <https://www.naturalgasintel.com/niobraradjinfo>
[21] NGI – Natural Gas Intelligence <https://www.naturalgasintel.com/niobraradjinfo>

**Figure 8: Natural Gas Production in the Niobrara Basin[22]**



38. The spike in production volumes starting in 2007 caused the regional Rockies market to be oversupplied during the 2007 – 2008 period, leading to volatility in the Opal Hub price and a large and increasing Opal/Henry Hub differential (basis). As shown in Figure 9 below, Henry Hub price increased from $6.72 in 2006 to $6.96 in 2007, while Opal price decreased from $5.41 in 2006 to $4.08 in 2007. As a result, the HH – Opal basis increased from $1.31 in 2006 to $2.88 in 2007.

---

[22] EIA Drilling Productivity Report <https://www.eia.gov/petroleum/drilling/>

**Figure 9: Daily Average Natural Gas Prices – Henry Hub v. Opal[23]**



39. As zones 2 and 3 of the Rockies pipeline started operations in 2008, natural gas from the oversupplied Rockies was shipped to the Mid-Continent and Midwest regions, allowing for the Opal price to recover relative to Henry Hub. The Henry Hub/Opal basis decreased from $2.30 in 2008, $0.80 in 2009, to $0.40 in 2010. This boosted natural gas prices (relative to Henry Hub) Rockies producers realized during this period, which explains the high utilization of 80%+ the West-East segment of the REX pipeline experienced during 2009 – 2012, which is shown in Figure 10. In spite of the decline of Henry Hub price and the compression of Henry Hub/Opal basis to near zero starting in 2012, REX utilization on the West-East segment remained above 55% through 2015.

40. The REX-driven fundamental improvement in pricing and profitability for the Rockies shippers in general, and Ultra in particular, is observed in Figure 11. I observed that in 2002 – 2007, Ultra's realized natural gas prices were approximately 6% above Opal's price while Opal's price discount relative to Henry Hub was 41%[24] Had the Opal basis price and its implied price discount to Henry Hub remained at its 2007 level during the following

---

[23] Refinitiv Eikon.

[24] Based on Henry Hub average price of $6.96 and Opal average price of $4.08 in 2007.

period of 2008 – 2019, and had Ultra continued to achieve realized prices of 6% above Opal, it would have realized significantly lower realized prices and earned $3.3 billion less than it actually did during the period.

**Figure 10: REX Average Daily Throughput from West to East[25]**



**Figure 11: Revenue Attributable to Narrowing HH/Opal Basis Price[26]**



---

[25] Tallgrass Energy - REX Daily Throughput Data
[26] Refinitiv Eikon; Ultra Petroleum 10-K filings, 2004 – 2019.

41. Ultra's Chapter 11 Disclosure Statement dated May 15, 2020 indicates that it expects the Opal basis risk to be negligible in the future. Its financial projections are linked to a Henry Hub futures price strip from May 7, 2020.[27] Ultra's projected revenue from natural gas sales imply realized prices coming in within 1%-2% of the Henry Hub price.[28] The absence of Opal basis risk indicated in the forecast is consistent with Ultra's future need to rely on pipelines in general and REX specifically to transport natural gas in other regions. Even if Ultra does not use the REX pipeline, it benefits from this pricing if its gas is priced in basin referenced to the Henry Hub benchmark price and transported by a third party.

42. Ultra's assertion that it will not need the REX pipeline in the future is contradicted by its own forecasts which clearly indicate that it will need and intends to use it at least through 2024. Further, its attempted rejection of the negotiated contract risks setting an example which, if followed by other shippers, poses a threat to the viability of future investments in pipeline infrastructure. Such a negative development could reverse most if not all of the benefits, such as reduction in basis risk, which pipelines such as REX have helped deliver to the market over the last decade.

---

[27] Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of Ultra Petroleum and its Debtor Affiliates, dated May 15, 2020, pp. 418-422.

[28] Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of Ultra Petroleum and its Debtor Affiliates, dated May 15, 2020, pp. 418-422.

**OPINION 3:**

**Ultra was a major beneficiary of the large investment made to build the REX pipeline, allowing it to increase production by 117%, from 109.2 Bcf in 2007 to 236.8 Bcf in 2011. In spite of the average daily Henry Hub price decreasing from $6.96 in 2007 to $3.99 in 2011, Ultra's operating profit increased from $302.5 million in 2007 to $773.5 million in 2011 due to its ability to dramatically increase drilling, ramp up production and transport a substantial portion of it through the REX pipeline to the Mid-Continent and the Midwest regions.**

43. With its realized natural gas prices closely tracking the Opal benchmark, Ultra and other producers in the region were unable to fully capitalize on the Henry Hub price spike in 2005 – 2007 due to a relatively oversupplied regional market and their inability to transport natural gas to regions experiencing higher prices. As discussed in the previous section, this led to the Henry Hub/Opal basis widening with Ultra's realized prices experienced a similar widening differential with Henry Hub. As shown in Figure 12 below, while Henry Hub price increased from $5.90 in 2004 to $6.96 in 2007, Ultra's realized price decreased from $5.13 in 2004 to $4.66 in 2007.

**Figure 12: Ultra Petroleum Realized Natural Gas Prices**[29]



---

[29] Refinitiv Eikon, Ultra Petroleum 10-K filings, 2004 – 2019.

44. Given the relatively undeveloped transportation infrastructure, Ultra's increase in production from 43.7 Bcf in 2004 to 109.2 Bcf in 2007 led to an increase in operating income from $170.9 million in 2004 to $302.5 million in 2007, as shown in Figure 13 below. Ultra's missed opportunity can be observed by looking at the increase of operating income by only 77% in the context of production increase of 154% and Henry Hub's price increase of 19%. The disproportionately low increase in Operating Income reflects Ultra's realized prices decreasing contemporaneous with Henry Hub's strong increase.

**Figure 13: Ultra Petroleum – Sales and Operating Income v. Natural Gas Production[30]**



45. As REX pipeline's Mid-Continent and Midwest segments were constructed and became operational in 2008 and 2009, Ultra's production ramped up further. The ability to reliably and cost effectively transport the gas to other regions improved Opal's price performance relative to Henry Hub and the basis reduced. As a result, Ultra's production increased from 109 Bcf to 236 Bcf while operating income increased from $302.5 million to $773.5 million despite Henry Hub price dropping from $6.96 to $3.99. During that same period,

---

[30] Ultra Petroleum 10-K filings, 2004 - 2019.

as shown in Figure 13 below, Ultra was able to transport large quantities of natural gas to zones 2 and 3 of the REX pipeline and its realized prices decreased from $4.66 to $4.15, a fraction of the decrease observed in the Henry Hub price. In addition, the price transparency of the natural gas forward market allowed Ultra to lock in the price and margin of future production. Availability of the REX pipeline allowed Ultra to more than double production and experience a realized price drop of only 10% at a time when Henry Hub price declined by 40%.

46. As discussed in para 40 of this report and shown in Figure 11, had the Opal basis price and its implied price discount to Henry Hub remained at its 2007 level during the following period of 2008 – 2019, and had Ultra continued to achieve realized prices of 6% above Opal, it would have realized significantly lower realized prices and earned $3.3 billion less than it actually did during the period.

**OPINION 4:**

**Ultra has leveraged the REX pipeline to execute a strategic plan aimed at more than doubling natural gas production while improving realized prices relative to Henry Hub and generating record profits. While commercial interest in the western portion of REX has recently been challenged given near-term price differences between Rockies and Mid-Con as well as Covid19 impacts, REX will continue to play an important market access role for Ultra's DJ gas because the pipeline allows gas to flow directly to the Midwest. It is therefore likely that Ultra will require use of REX in the future to access markets in the Midwest. Moreover, Ultra transferred and will transfer a substantial portion of its transportation costs to other shippers through capacity release, while at the same time retaining the valuable option of the FTSA, allowing it to quickly resume production and shipping when demand for natural gas increases and the prices increases. It follows that the REX contract gives Ultra considerable optionality, either to use the capacity for its own needs or to release its capacity at higher market rates than it does today. Ultra's attempt to reject the contract appears to be aimed at re-trading the contract to a lower rate and free-riding on a $5 billion pipeline investment after it has collected over $ 3.3 billion profit from having access to REX.**

47. As shown in the previous section of my affidavit, access to the REX pipeline correlates with large increases in Ultra's production, favorable trends in realized natural gas prices relative to Henry Hub, and ultimately a significant increase of operating income. Ultra's management has been quite emphatic attributing their success to the access to the Midwest and Eastern markets which was enabled by the REX pipeline. As early as 2004, Ultra recognized the impact natural gas pipeline capacity additions would have on its business:

> *"...the Company saw significant basis differentials for its Wyoming production, versus the "Henry Hub" pricing reference point in south Louisiana. As a result, during that time period, the Company realized prices that were significantly lower than those received by companies with production in other regions of the U.S. Since the second quarter of 2003, generally speaking, the Company has enjoyed, and expects to enjoy, improved basis differentials for its Wyoming natural gas*

*production, due to significant increases in pipeline capacity to transport production from the Rockies production areas to markets in the West (Kern River Pipeline – in service May 2003) and the Midwestern U.S. (Cheyenne Plains Pipeline — in service February 2005)."*[31]

48. Management also understood that their ambitions of massive ramp up in production would only be possible with the addition of significant takeaway capacity, which could be provided by a major pipeline such as the REX leading to their signing on as an anchor shipper in 2005. In their 2005 10-K they noted:

*"Because production exceeds local demand for natural gas, the Rocky Mountain Region is usually a net-exporter of natural gas. Historically, natural gas production in southwest Wyoming has sold at a discount relative to other U.S. natural gas production sources or market areas"*[32]

*"The Company agreed to become an anchor shipper on the proposed Rockies Express Pipeline project, sponsored by subsidiaries of Kinder Morgan and Sempra Energy."*[33]

49. In its 2007 10-K filing, Ultra's management noted the pipeline bottleneck was having a very negative impact on their business:

*"Continued robust growth in natural gas production from natural gas fields in Wyoming, Colorado and Utah during 2007, coupled with a nearly 100% utilization of existing natural gas pipeline export capacity, caused natural gas prices in the Rocky Mountain Region to decrease dramatically during the second and third quarters of 2007."*[34]

50. During the 2008 to 2011 period, Ultra's management recognized that the REX pipeline had fundamentally improved its operating and financial performance:

*"With the first segment of the Rockies Express Pipeline, LLC ("REX") operational during 2008 (as discussed below), a substantial portion of the*

---

[31] Ultra Petroleum Corp., SEC 10-K filing dated March 16, 2005, p. 6.
[32] Ultra Petroleum Corp., SEC 10-K filing dated March 31, 2006, p. 8.
[33] Ultra Petroleum Corp., SEC 10-K filing dated March 31, 2006, p. 8.
[34] Ultra Petroleum Corp., SEC 10-K filing dated February 26, 2008, p. 8.

*Company's revenues are determined by market prices in the midwestern and eastern regions of the United States."*[35]

*This trend of smaller basis differentials and improved wellhead prices in Wyoming following significant pipeline expansions has continued with the initiation of service on the REX West pipeline in early 2008. The prices for the Company's Wyoming natural gas production were substantially improved on both a relative (locational basis adjusted) and real (net price) basis during the first half of 2008."*[36]

*"With the completion of the Rockies Express Pipeline, LLC ("REX") during 2009, a substantial portion of the Company's revenues are now determined by natural gas market prices in the Midwestern and Eastern regions of the United States."*[37]

*"During the first quarter of 2009, the Company entered into agreements to secure an additional capacity of 50 MMmBtu per day on the REX pipeline system, beginning in January 2012 through December 2018. This additional capacity will provide the Company with the ability to move additional volumes from its producing wells in Wyoming to markets in the eastern U.S."*[38]

*"The Inside FERC First of Month Index for Northwest Pipeline — Rocky Mountains basis was generally wide since 2006 but narrowed during the latter portion of 2009 and has continued to narrow during 2011, primarily as a result of the completion of the REX pipeline into Ohio, as well as additional export capacity out of the Rocky Mountain region in general."*[39]

51. REX natural gas flow data confirms Ultra's use of the REX pipeline. As shown in Figure 14 below, while utilization during the 2008 – 2011 period was over 80%, it remained at around 60% even after Henry Hub prices fell to $2.79 in 2012 and the Henry Hub/Opal basis was under 10 cents.

**Figure 14: Ultra Petroleum throughput and utilization of REX pipeline**[40]

---

[35] Ultra Petroleum Corp., SEC 10-K filing dated February 23, 2009, p. 7.
[36] Ultra Petroleum Corp., SEC 10-K filing dated February 23, 2009, p. 8.
[37] Ultra Petroleum Corp., SEC 10-K filing dated February 26, 2010, p. 9.
[38] Ultra Petroleum Corp., SEC 10-K filing dated February 26, 2010, p. 10.
[39] Ultra Petroleum Corp., SEC 10-K filing dated February 17, 2012, p. 10.
[40] Tallgrass Energy - REX Daily Throughput Data



52. In 2020, the US natural gas market was generally oversupplied, which led to Henry Hub and most regional prices reaching decade lows and remaining at depressed levels. The negative price trends were further exacerbated by the reduced demand from the Covid19 virus. It is unsurprising that Ultra has not used the REX pipeline since the December 1, 2019 service commencement date of the FTSA; they have reported massive reduction in their drilling activity due to weakness in the natural gas markets. However, this is only a short-term phenomenon and even during this time, the FTSA capacity is not without value. In fact, Ultra has temporarily released its capacity under the FTSA to another replacement shipper with that replacement shipper paying a rate of $0.25 of Ultra's $0.37 transportation charge that Ultra owes to the pipeline per dth per day.[41] REX's web page indicates there is an active market for capacity transfers which explains Ultra's ability to transfer most of the cost associated with the reserved capacity.[42]

53. With an active capacity transfer market and West-East spreads projected to go higher as I show in the next section of the report, Ultra's contract with REX provides valuable

---

[41] Complaint For Declaratory Judgment, Ex Parte Temporary Restraining Order, And Preliminary And Permanent Injunction, ¶ 23.
[42] <https://pipeline.tallgrassenergylp.com/Pages/TransCR.aspx?pipeline=501>

optionality. In exchange for about $10 million a year of pipeline costs not transferred to the replacement shipper, Ultra retains the option value in a contract that can deliver significant profits should market dynamics change and should the basis differentials widen again. Therefore, it is my opinion that Ultra will need to use the REX pipeline again in the near future, which indicates that its attempt to reject the current contract may be attributable to its intention to re-trade the deal at a lower transportation cost per dth. This amounts to an attempt to free-ride on a $5 billion world-class pipeline investment after the latter has helped Ultra generate over $3.3 billion in revenue and operating income. Success in doing so would endanger future pipeline investment and all public interest benefits that pipeline investments generate.

**OPINION 5:**

**EIA forecasts a steady increase in the price of natural gas to $3.64 in 2026. Similarly, the forward curve of the Henry Hub/Opal basis indicates a steady expansion to $0.36 in 2026. Robust negotiated long-term contract volumes on several pipelines confirm that the economics of transporting natural gas on the REX will dramatically improve during the term of the FTSA and Ultra will resume using its firm capacity again in the very near future. Its attempts to reject the current contract appear to be merely an attempt to re-trade the contract to an even more favorable rate.**

54. The strong outlook for natural gas and basis spreads, and the fact large natural gas producers continue to subscribe to the REX and other regional pipelines during the next six years increases the likelihood that Ultra will need to re-subscribe to capacity on REX in the near future following its re-emergence from bankruptcy. It is my opinion that its attempts to reject the current contract are an attempt to simply re-trade the deal to an even more favorable rate.

55. As shown in Figure 15 below, EIA forecasts an increase in Henry Hub price to $2.62 in 2021 and $3.64 in 2026. Similarly, the forward curve of the Henry Hub/Opal basis is in contango with differentials increasing from $0.10 currently to $0.36 in 2026. The gradual expansion of the spread across the curve is consistent with Ultra's ability to release the capacity to Occidental for $0.25 through October 2020.[43] This implies that the economics of transporting natural gas on the REX will dramatically improve during the duration of Ultra's contract with REX with shippers from the Rockies region substantially increasing transport volumes through 2026. It also follows that Ultra is likely to be able to release the capacity at increasing rates if it needs to beyond October 2020.

---

[43] Complaint For Declaratory Judgment, Ex Parte Temporary Restraining Order, And Preliminary And Permanent Injunction, ¶ 23.

**Figure 15: Natural Gas Prices from Forwards and Forecast**[44]



56. Analysis of long-term negotiated contracts in several natural gas pipelines implies robust long-term demand for natural gas, which supports dramatically improved economic fundamentals implied by the EIA forecast and the basis forward curves. Figures 16 through 18 indicate robust natural gas demand through at least 2026 as implied from negotiated contract volumes on the REX, CIG, and Northern Natural Gas pipelines.

---

[44] EIA Annual Energy Outlook < https://www.eia.gov/outlooks/aeo/data/browser/#/?id=1-AEO2020&cases=ref2020&sourcekey=0>, S&P Global <https://platform.marketintelligence.spglobal.com/>

**Figure 16: REX Pipeline Long-Term Contracts[45]**



[45] S&P Global <https://platform.marketintelligence.spglobal.com/>

**Figure 17: Colorado Interstate Gas Pipeline Long-Term Contracts**[46]



[46] S&P Global <https://platform.marketintelligence.spglobal.com/>

**Figure 18: Northern Natural Gas Pipeline Long-Term Contracts**[47]



57. The strong outlook for natural gas and basis spreads, and the fact large natural gas producers continue to subscribe to the REX and other regional pipelines during the next 6 years increases the likelihood that Ultra will need to re-subscribe to capacity on REX in the near future following its re-emergence from bankruptcy. It is my opinion that its attempts to reject the current contract are an attempt to simply re-trade the deal to an even more favorable rate.

---

[47] S&P Global <https://platform.marketintelligence.spglobal.com/>

**OPINION 6:**

**The economic benefit of the natural gas pipelines and the critical importance of the stability provided by negotiated rate agreements such as the FTSA are supported by recent motions to intervene and comments made by large utilities, including Con Edison, as well as other major interstate pipeline operators like Trans Canada, and the trade association for interstate pipelines, the Interstate Natural Gas Association of America ("INGAA"), in REX's FERC PDO proceeding in Docket No. RP20-822-000.**

58. Recent motions to intervene and comments made by large utilities and other organizations support the importance of natural gas pipelines and the long term negotiated rate contracts they rely upon to the health of the U.S. natural gas market and benefits consumers and producers have received and will continue to receive.

59. Interstate Natural Gas Association of America ("INGAA") provides the following comments on FERC's attempts to promote competition and consumer benefits via development of natural gas pipelines:

> *"Through a series of landmark rulemakings, the Commission fundamentally changed the regulatory scheme to create competition for interstate natural gas pipeline transportation services."* [48]

> *"The Commission has taken a pro-competitive approach to the certification of new interstate pipeline facilities which has led to pipeline-on-pipeline competition for new and existing customers and lower rates for natural gas consumers."* [49]

> *"This buildout has also resulted in increased competition between pipelines to gain access to new supply and markets. With the advent of the boom in shale gas production, the Commission certificate policy has facilitated the construction of needed infrastructure that has allowed an abundant source of new inexpensive supply to be brought to markets throughout the country. This policy has produced tremendous economic benefits, not only to natural gas consumers and businesses, but to the U.S. economy as a whole."* [50]

---

[48] Motion To Intervene And Comments Of The Interstate Natural Gas Association of America, p. 3.
[49] Motion To Intervene And Comments Of The Interstate Natural Gas Association of America, p. 4.
[50] Motion To Intervene And Comments Of The Interstate Natural Gas Association of America, p. 5.

60. INGAA emphasizes that negotiated rate contracts are paramount to the success of FERC's pro-competitive policy with regard to pipelines:

> *"A critical component of the success of FERC's pro-competitive policy on infrastructure is the certainty of contractual arrangements and rates supporting pipeline construction."[51]*

> *"The construction of pipeline, storage and LNG facilities is capital intensive. Over the last twenty years, project developers and shippers have relied primarily on negotiated rate contracts that include a fixed rate or rate formula that will continue in effect regardless of changes in the pipeline's maximum recourse tariff rate. These negotiated rate agreements provide rate certainty for both the project developer and shippers that is needed to support investment in pipeline infrastructure."[52]*

> *"These contracts also provide the basis for many of the Commission's "public interest" determinations when it certificates new pipeline infrastructure."[53]*

61. Further, INGAA posits that rejection of these negotiated rate contracts threatens project developers and undermines the Public Interest:

> *"The benefits to the public interest that FERC's policies have achieved may be threatened if shippers, such as Ultra, are allowed to upend a filed rate without an appropriate public interest review by FERC by abrogating natural gas transportation contracts through a rejection of the contracts in bankruptcy proceedings."[54]*

> *"Pipelines, other project developers, and financial institutions may be discouraged from constructing or financing these capital-intensive projects if the reliability of the contracts and associated filed rate protection can be dismantled in bankruptcy courts throughout the country."[55]*

---

[51] Motion To Intervene And Comments Of The Interstate Natural Gas Association of America, p. 5.
[52] Motion To Intervene And Comments Of The Interstate Natural Gas Association of America, p. 5.
[53] Motion To Intervene And Comments Of The Interstate Natural Gas Association of America, p. 5.
[54] Motion To Intervene And Comments Of The Interstate Natural Gas Association of America, p. 6.
[55] Motion To Intervene And Comments Of The Interstate Natural Gas Association of America, p. 6.

62. Con Edison holds a similar position with regard to rejection of negotiated rate contracts and impacts on future investment:

> *"In particular, cessation of performance of a Commission-jurisdictional agreement, like the TSAs, raises several public interest concerns, including the potential impacts on the reliability of the natural gas system, the continued availability of the affected natural gas facilities, the effect on continuing investments in natural gas pipelines, and issues surrounding natural gas prices that balance both consumer and investor interests."*[56]

> *"Moreover, the jurisdictional issues raised in this gas pipeline proceeding are not limited to the natural gas industry; they also impact the electric industry, as evidenced by the NextEra case."*[57]

> *"the Supreme Court has emphasized the importance of the preservation of contract stability and development of adequate power supplies under the FPA, noting that "contract stability ultimately benefits consumers" and is a "key factor fostering stability in the electricity market[] to the long run benefit of consumers."*[58]

> *"The Supreme Court has also explained that failure to protect rate stability and contract sanctity "can have a chilling effect on investments and a seller's willingness to enter into long-term contracts, and this, in turn, can harm consumers in the long run.""*[59]

---

[56] Motion To Intervene And Comments Of Consolidated Edison Transmission, p. 8.
[57] Motion To Intervene And Comments Of Consolidated Edison Transmission, p. 8.
[58] Motion To Intervene And Comments Of Consolidated Edison Transmission, p. 9.
[59] Motion To Intervene And Comments Of Consolidated Edison Transmission, p. 9.

\*\*\*\*\*

My report, with supporting schedules, figures, tables, and exhibits, is contained herein, and presents my opinion and the bases and reasons thereof.  The schedules, figures, tables, and exhibits are an integral part of this report and support the opinions contained herein.  To the extent any additional information is produced by either party, I reserve the right to incorporate such additional information into my report and/or my testimony.

Respectfully submitted,

*Richard J Bergin*

Dr. Richard J. Bergin,

AlixPartners LLP

Commonwealth of Massachusetts

County of Norfolk

On this 8th day of June 2020, before me, the undersigned notary public, personally appeared Dr. Richard J. Bergin, proved to me through satisfactory evidence of identification, which were MA Driver's License, to be the person who signed the preceding or attached document in my presence.

(seal)

Notary Public Signature

CHRISTINE A. LANE
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires On
May 18, 2025



## Dr. Richard J. Bergin

Managing Director
rbergin@alixpartners.com
+1 617 447 7617

Rich co-leads our Global Energy Investigations, Disputes and Risk practice with over 25 years' experience advising Fortune 500 oil and gas firms. He has experience valuing and operating over 600 oil & gas projects, including exploration & production, refineries, transportation and marketing operations around the world, including for BP, Chevron, Exxon Mobil, Shell, and Sunoco.

He has testified as an expert witness in trials, arbitrations, and before government agencies, including federal civil, bankruptcy, and criminal courts, state courts, ICC, ICSID, AAA hearings, and other alternative dispute resolution forums.

Rich specializes in the economics of exploration, production, refining, shipping & trading practices in physical, financial, and hybrid instruments, financial markets, credit risk, and large capital projects. In these matters, he has addressed issues such as economic damages, lost profits, supply & demand and price of oil & gas, network economics, ROIC, and valuation.

His experience covers reservoir engineering, frac drilling & completion, well performance, pipeline networks, refinery operations, solvency, trading, valuation, and project economics.

He has taught programs on economics, finance, and valuation at New York University and Harvard Business School.

Rich's Doctorate and MBA were awarded with highest distinction from Harvard Business School, which he attended as a Fulbright Scholar. He received a chemical engineering degree from the University of Sydney, awarded with the university medal.

### RELEVANT EXPERIENCE

- Deep experience in the oil & gas industry. Worked for Shell as a Chemical Engineer for five years in exploration & production, trading, transportation, and refining roles.

- Testifying economic expert for BP in ICDR-AAA international arbitration, valuing the oil & gas business and quantifying the economic damages.

- *In re Amaranth Natural Gas Commodities Litigation (SDNY)*: Testifying economic expert for a hedge fund in a class action case alleging manipulation of the natural gas market.

- Testifying expert for SemCrude in Delaware district court, assessing the nature of oil and gas trading strategies employed.

- Testifying economic expert for an Integrated Oil & Gas company for two cases in district court alleging monopolization and collusion.

- Testifying economic expert for Suncor in UNCITRAL arbitration valuing the firm's Oil & Gas operations.

- Testifying economic expert for an oil & gas firm valuing oil & gas operations producing over one billion barrels of crude oil and 20 trillion cubic feet of natural gas.

- Testifying economic expert for a global steel firm, valuing the firm and calculating economic damages.

- Testifying economic expert for Vitol in Houston state court. Valued the firm, including world's largest trading oil & gas book, six refineries, pipeline network, marketing, and a retail network of thousands of petrol stations.

**RICHARD BERGIN**

# Oil & Gas industry experience

*Worked as a chemical engineer for Shell holding four positions:*

- *Senior Refinery Process Engineer.* Improved plant operations for the Crude Distillation Unit (CDU) and Catalytic Cracking Unit (CCU). Responsibilities included designing, building, and operating new projects for the CDU and CCU. For example, Rich directed the design and installation of a $100 million CCU fluidized bed reactor.

- *Economics Director.* Calculated monthly financial statements, scheduled refinery and built a global supply and demand model to estimate the future price of oil, gas, and downstream products. Managed transportation, purchase, and distribution of oil and oil products.

- *Senior Exploration & Production Manager.* Led projects improving the exploration, production and risk assessments of projects around the world, including the $12 billion North West Shelf project, a joint venture between six major international oil & gas companies. The North Rankin gas production platform discovered, drilled, and serviced 25 offshore production wells in the North Rankin and Perseus fields. Gas transmission network included production, liquification, shipping, and domestic networks.

- *Senior Trading and Transportation Manager.* Supervised the trading of spot, futures, and options positions in oil and natural gas. Shell buys and sells more than five million barrels per day of oil and 12 billion cubic feet per day of natural gas. Managed oil and gas pipeline supply and storage operation and agreements.

- *In re Amaranth Natural Gas Commodities Litigation (S.D.N.Y.):* Served as economic expert on behalf of the joint defense group in a class action lawsuit alleging the trading of natural gas futures created an artificial price. Provided analyses on how NYMEX and ICE market prices are influenced by changes in fundamental economics of supply and demand, and analyzed trading strategies of the hedge fund in question.

- Engagement manager for McKinsey & Co for four years. Led projects in a variety of the industries, including oil & gas. For example, for an international oil & gas firm, advised on the valuation of several oil & gas companies, acquisition, and the integration of the refining and retail network from another major oil & gas firm.

- *In re SemCrude LP, et al. (Bankr. D. Del):* Submitted trial testimony, deposition testimony, and an expert report on behalf of the Official Committee of Unsecured Creditors and Litigation Trust for SemGroup, a multi-billion-dollar oil & gas firm, who owned a large gas pipeline network. Quantified the loss and provided analysis on the nature of sales and trading strategies employed, as well as daily valuations of company's aggregated trading book and physical positions. Deposition in January 2013. Trial in April 2013.

- *UNCITRAL international arbitration (Toronto, Canada)*: Testifying economic expert for a leading oil & gas firm in UNCITRAL arbitration, submitted an expert report and testimony valuing the oil & gas business including their refinery, pipeline and transportation business and quantifying the loss suffered. (Engaged by claimant, expert and consultant.) Testified in August 2018.

# Selected Commercial Disputes

- Goradia Family Interests et. al. v. Sunoco et. al. (Tex. Dist.): Testifying expert on behalf of Sunoco, analyzing market and pricing dynamics in the acetone, phenol, and BPA industries, valuing the acetone, phenol and BPA plants, calculating the economic damages. Deposition in February 2020.

- *Leticia B. Loya v. Miguel A. Loya* (Tex. Dist.)*: Submitted two deposition testimonies and expert report on the valuation of Vitol, the world's largest independent trading firm, owner of six refineries, numerous pipelines, and a retail network of thousands of petrol stations. Depositions in June 2010.*

- *Laura S. Lehman vs. Transbay Joint Powers Authority et al.; Langan Engineering and Environmental Services, Inc. vs. Millennium Tower Association; and Does 1-100, (Cal. Super. Ct., S.F. Cty.), No. CGC-16-553758.* Economic expert for Langan, the construction firm involved with the Millennium Tower. The US$600 million project was designed by Handel Architects and engineered by DeSimone Consulting Engineers. At 645 feet, it is the tallest concrete structure in San Francisco, the fourth tallest building in San Francisco overall. In May 2016, residents were informed the main tower was both sinking and tilting, resulting in several class action lawsuits concerning repair costs and whether the tilt had been withheld from buyers. Determined the fair market value of certain assets and calculated quantum damages. Deposition in January 2019.

- AT Engine Controls, Ltd. v. Goodrich Corporation and Goodrich Pump & Engine Control Systems, Inc. (D. Conn.): Submitted deposition testimony and an expert report analyzing the opposing expert's estimate of ATEC's alleged lost sales and GPECS' unjust enrichment. At issue was the alleged theft of trade secrets and a contract dispute relating to a helicopter engine control the firms had agreed to jointly develop, and related economic damages. Deposition in July 2014.

- *Confidential investigation*: Economic expert for a large gas and electric utility, regarding damages from the delay and acceleration issues in an investigation over alleged fraud in the protracted Engineering, Procurement, and Construction (EPC) cost charges of an electric power plant, which is more than two years behind schedule and more than $5 billion over budget.

- *Ellipsis, Inc. v. Color Works, Inc. (W.D. Tenn.):* Submitted trial testimony before Judge Diane K. Vescovo and an expert report calculating the volume of cell phone face plates that Ellipsis would have sold but-for the alleged actions of The Color Works. Successfully rebutted the plaintiff's economic expert by evaluating his methodology, assumptions and conclusions. Trial in December 2005.

- *Haemonetics Corp. v. Baxter Healthcare Corp., et al (D. Mass.):* Submitted trial testimony, deposition testimony, and an expert report analyzing Haemonetics' alleged lost profits and reasonable royalty of a medical device and providing an alternative calculation in a patent infringement suit. Deposition in October 2008. Trials in January and May 2009.

AlixPartners

# International Arbitration Experience

- *BP Products North America v. NARL Refining (ICDR-AAA) No. 01-15-0006-0192:* Testifying economic expert for a major oil & gas company. Submitted expert report valuing the refinery and pipeline operations, quantified economic damages to the downstream business. Testified in December, 2016.

- *UNCITRAL international arbitration (Toronto, Canada)*: Testifying economic expert for a leading oil & gas firm in UNCITRAL arbitration, submitted an expert report and testimony valuing the oil & gas business including their refinery and transportation business and quantifying the loss suffered. (Engaged by claimant, expert and consultant.) Testified in August 2018.

- *ICDR-AAA International Arbitration.* Testifying economic expert, valuing the steel business and quantifying economic damages. Valuation included forecast revenue, capital and operating expense for the steel pipe and Oil Country Tubular Good (OCTG) business. (Engaged by respondent, expert and consultant.) Submitted expert report, rebuttal report and trial testimony in July 2019.

- *ICSID international arbitration (Washington, DC):* Economic valuation and quantum expert in an investment arbitration against a sovereign country; the claim on behalf of a telecom firm was filed over the country's alleged indirect expropriation of a telecom network. Performed economic market and pricing analysis, including forecast revenue and financials; Quantum valued using the DCF and comparable company valuation analyses. (Engaged by claimant, expert and consultant.)

- *ICC international arbitration (Quebec, Canada):* Submitted an expert report for a global petrochemical firm analyzing the pricing dynamics in the petrochemicals industry and rebutting the opposing expert; specifically, utilizing econometric causation analyses, including the Granger test, demonstrated that the Asian prices Granger caused the North American prices for a specialty chemical. In addition, quantified economic damages.

- *FINRA Arbitration (New York, NY):* Submitted an expert report, expert testimony and rebuttal testimony for a pharmaceutical firm, calculating the fair market value of an oncology drug (a monoclonal antibody). Reviewed the prospects of the drug to determine if a delay in its product launch caused any economic damages and, if any, quantified those delay damages. Opinion included fair market value of the drug, royalties from likely future sales as well as changes in value of the license itself. (Engaged by Claimant, expert, and consultant). Testified in June and September 2011.

- *American Arbitration Association (New York, NY):* Submitted trial testimony, deposition testimony, and an expert report for the respondent, a major professional sports league, estimating the quantum damages and fair market value of a joint venture between a global media company and major professional sports league organization. (Engaged by respondent, expert and consultant.) Deposition in January 2009. Testified in March 2009.

- *LCIA arbitration (London, UK):* Testify*ing ex*pert quantifying the economic loss involved with the construction and operation of an offshore oil & gas facility and gas transmission network.

**AlixPartners**

4

# Selected Securities Experience

- *In re SemCrude LP, et al. (Bankr. D. Del):* Submitted trial testimony, deposition testimony, and an expert report on behalf of the Official Committee of Unsecured Creditors and Litigation Trust for SemGroup, a multi-billion-dollar oil & gas firm, who owned a large gas pipeline and trading network. Quantified the loss and provided analysis on the nature of sales and trading strategies employed, as well as daily valuations of company's aggregated trading book and physical positions. Deposition in January 2013. Trial in April 2013.

- *In re Amaranth Natural Gas Commodities Litigation (S.D.N.Y.):* Served as trading expert on behalf of the joint defense group for a hedge fund in a class action commodities manipulation lawsuit alleging the trading of natural gas futures on US futures exchange created an artificial price. Provided analyses on how NYMEX and ICE market prices are influenced by changes in fundamental economics of supply and demand, and analyzed trading strategies of the hedge fund in question.

- John Cumming et al v. *Fortress Investment Group LLC*, et al (Del. Ch.) C.A. No. 13007-VCS. Economic expert on behalf of Fortress Investment Group and the other defendants. Using event study analyses, as well as changes to equity analysts' financial models driven by revisions to revenue projections, assessed and opined on the economic materiality and magnitude of alleged fraudulent trading in relation to breach of fiduciary duty, material omissions and false statements.

- *SEC v. Manouchehr Moshayedi (C.D. Cal.):* Submitted a deposition testimony and an expert report on behalf of the SEC. Using event study analyses, as well as changes to equity analysts' financial models driven by revisions to revenue projections, assessed and opined on the economic materiality and magnitude of alleged insider trading in relation to material omissions and false statements made by a company executive. Deposition in July 2013.

- *Lynn Tilton and Patriarch Partners XV, LLC v. MBIA Inc. and MBIA Insurance Corp. (N.Y. Sup.):* Testifying economic expert for the defendant estimating the economic damages, if any, for an alleged fraudulent misrepresentation involving the collateral manager of a Collateral Loan Obligation (CLO) fund and the insurance company. Deposition in November 2017.

- *Confidential investigation*: Economic expert for a leading global power generation engineering company, regarding the appropriate valuation for power supply equipment in an investigation over alleged flawed design, construction, and operation of power plants, leading to cost overruns and delayed startup. The firm has helped customers deliver electricity from a wide spectrum of fuel sources, including gas, coal, nuclear, steam, solar and hydro power plants. The electric power plants are located in over 180 countries and worth over $100 Billion.

# Selected Securities Experience

- *In re Lehman Brothers Holdings Inc., et al. (Bankr. S.D.N.Y.)*: Led trading book valuation after Lehman's default on behalf of the Official Committee of Unsecured Creditors. Performed valuation analyses of a large complex derivatives portfolio. Performed Monte Carlo simulations to value financial instruments including single-name equity options and equity index options; foreign exchange, interest rate, and commodity derivatives; credit default swaps, collateralized debt obligations (CDOs), CDSs, first to default (FTD) baskets, mortgage-backed security (MBS), other structured credit products; and various loans.

- *Confidential investigation*: Assisted a preeminent bank, its investment advisory firm, and five defendants in the Wells stage of an SEC investigation regarding alleged improper financial advice, disclosures, and investor fraud related to complex securitized instruments that included loans, CDSs, and CDOs as part of a well-diversified investment portfolio of assets. Assisted with the response to enforcement agencies, including submitting a report and testimony, convincing them to drop the investigation.

- *Confidential insider trading case (S.D.N.Y.):* Using multiple event studies, provided analyses and privileged consulting on the materiality and magnitude of alleged insider trading. Also described the hedge fund industry, typical investment portfolio management policies, and common industry practices.

- *US v. Brian Block (S.D.N.Y.)*: Economic expert for the former CFO of ARCP, a REIT, in an accounting fraud case. Evaluated the theory of economic loss relied upon by the DOJ. Used event studies to assess the economic loss, if any, suffered from the stock drop. Reports submitted in Oct and Nov 2017, leading Judge Paul Oetken to reject DOJ's analysis as "overly speculative".

- *Berlin Station, LLC v. Babcock & Wilcox Construction Co., Inc* (N.H. Super.): Submitted deposition testimony regarding the economic quantum and delay damages likely to be incurred by Berlin Station due to cost overruns and delayed start up, Deposition in October 2015.

# Selected Antitrust & Competition Experience

- *Akorn, Inc.* v. Perrigo Company, Fera Pharmaceuticals, LLC, et al; Fera Pharmaceuticals, LLC, v. Akorn, Inc.; et.al. (S.D.N.Y.): Testifying economic expert for Akorn, a pharmaceutical company. Calculated economic damages and valued a portfolio of seven ANDA drugs for a leading pharmaceutical firm. The case involved allegations of abuse of market power, tying, exclusive dealing, market foreclosure, and collusion. Deposition in November 2017.

- *Foreign exchange investigation (Numerous jurisdictions including US, UK, Europe, Japan, and Australia)*: Served as a financial economic expert on behalf of a leading currency trading bank facing numerous regulatory investigations and civil class action cases concerning the bank's FX trading activities amidst allegations of market manipulation and collusion. Analyzed the bank's FX transactions to determine the causal link, if any, between the bank's trading and the subsequent market price. Investigated communications of major FX dealers for collusion and other potential competition misconduct. Performed econometric causation analyses to investigate if trader activity Granger caused rate movements.

- *In re: Visa/MasterCard Antitrust Litigation, MDL No. 1575.* (E.D.N.Y.): Assisted in the preparation of expert witness testimony on behalf of Visa in an antitrust MDL class action brought by Wal-Mart and other retailers alleging that Visa and MasterCard attempted to monopolize the debit card market by tying merchant acceptance of debit cards to credit cards, predatory non-compete agreements, and other anticompetitive conduct.

- *In re: Polyurethane Chemical Antitrust investigation*: Testifying economic expert for a chemical company in connection with an investigation into alleged collusion in the polyurethanes markets and civil class action case. Analyzed the market definition, price movements, market power, similarity in costs, and the competitive nature of the business common to defendants that could have led to uniform price changes. Determined if common proof may be used to determine class-wide liability, impact, and damages. Assisted with the negotiation with enforcement agencies, obtained dismissal of DOJ, EU, and state law claims.

- *In re: Air Cargo Shipping Services Antitrust Litigation MDL No. 1775 (E.D.N.Y.): Economic expert* examining the economic evidence on behalf of a leading air cargo shipping firm alleging price fixing in a consumer class action and criminal case. Analyzed the economics of the air cargo industry, including demand, revenue, and profitability. Assisted with calculating economic damages as part of settlement discussions with the DOJ and other enforcement agencies.

- *In re: Microsoft Antitrust Litigation, MDL No. 1332 (D. Md.):* Assisted in the preparation of expert witness testimony on behalf of Microsoft in an antitrust MDL class action brought by operating system firms, software firms, and consumers alleging that Microsoft's predatory conduct, tying, and exclusive dealing destroyed their business. Assisted with economic analysis to examine whether impact and damages can be proved on a classwide basis using common evidence. Analyzed the potential economic damages, if any, of the class.

**RICHARD BERGIN**

# Selected Antitrust & Competition Experience

- *Ticket Center, inc., et al. v. Banco Popular De Puerto Rico, et al. (D. PR.):* Submitted an expert report on behalf of the defendant addressing the economic basis for alleged violations of the Sherman and Clayton act, including exclusive dealings, attempted monopolization, and predatory pricing. Calculated the market definition, market power, pro-competitive benefits, and potential damages, if any.

- *Foreign exchange criminal investigation*: Served as the economic expert on behalf of a leading custody currency trading bank, facing potential numerous government and civil class action cases concerning the bank's FX trading activities relating to execution of customer orders. Analyzed a statistical sample of all the bank's FX transactions to estimate the total amount of improper charges, if any; this included spot sales, outright forwards, and swaps. Following the investigation, no charges were filed.

- *Criminal Foreign exchange investigation (S.D.N.Y.)*: Economic expert on behalf of a FX trader being investigated by the U.S. Department of Justice into the alleged abuse of monopoly power and manipulation of the FX market.

- *In re: TFT-LCD (Flat Panel) Antitrust Litigation, MDL No. 1872 (N.D. Cal.):* Assisted with the defense of a major TFT-LCD manufacturer in a series of class actions alleging price fixing in TFT-LCD markets and in connection with a Department of Justice investigation. Calculating the economic damages and volume of commerce analysis as part of successful settlement discussions with the DOJ and other enforcement agencies.

- *In re: Freight Forwarding Antitrust Litigation:* Examined the economic evidence on behalf of a leading ocean shipping firm in a series of class actions alleging price fixing in polyurethanes markets and in connection with a Department of Justice, European and Asian regulators. Analyzed the economics of the cargo industry, including historical demand, barriers to entry, concentration, and profitability. Assisted with the negotiation with enforcement agencies, obtained dismissal of MDL class action, DOJ, and other claims.

AlixPartners

# Richard J Bergin – Testimonial Experience in Last Ten Years

- Deposition – Goradia Family Interests et. al. v. Sunoco et. al. (Tex. Dist.): No. 2016-08640, February 2020.

- Trial Testimony – ICDR-AAA International Arbitration (New York, NY): Trial in July 2019.

- Deposition – *Laura S. Lehman vs. Transbay Joint Powers Authority et al.; Langan Engineering and Environmental Services, Inc. vs. Millennium Tower Association; and Does 1-100, (Cal. Super. Ct., S.F. Cty.)*, No. CGC-16-553758. January 2019.

- Trial Testimony – UNCITRAL international arbitration (Toronto, Canada): Trial in August 2018.

- Deposition – *Akorn, Inc. v. Perrigo Company, Fera Pharmaceuticals, LLC, et al*; *Fera Pharmaceuticals, LLC, v. Akorn, Inc.; et.al.,* (S.D.N.Y.) November 2017.

- Deposition – *Lynn Tilton and Patriarch Partners XV, LLC v. MBIA Inc. and MBIA Insurance Corp.* (N.Y. Sup.). November 2017.

- Deposition – *Berlin Station, LLC v. Babcock & Wilcox Construction Co., Inc* (N.H. Super.), No. 214-2014-CV-00014. October 2015.

- Deposition – *AT Engine Controls, Ltd. V. Goodrich Corporation and Goodrich Pump & Engine Control Systems, Inc.* (D. Conn.), No. 3:10-CV-01539 (VLB). July 2014.

- Deposition – *Securities and Exchange Commission v. Perry Gruss* (S.D.N.Y), No. 11 CV 2420 (RWS). December 2013.

- Deposition – *Securities and Exchange Commission v. Manouchehr Moshayedi* (C.D. Ca.), No. 12-CV-01179-JVS-JPR. July 2013.

- Deposition – *Bettina M. Whyte, as the Trustee, on Behalf of the Semgroup Litigation Trust* v. C/R Energy Coinvestment II, L.P., et.al., (Bankr. D. Del.), Nos. 10-50840 and 10-51808 (BLS). January 2013.

- Trial testimony – *Bettina M. Whyte, as the Trustee, on Behalf of the Semgroup Litigation Trust* v. C/R Energy Coinvestment II, L.P., et.al., (Bankr. D. Del.), Nos. 10-50840 and 10-51808 (BLS). April 2013.

- Trial Testimony – *Immunomedics* Inc. v. Banc of America Investment Services, Inc. and Banc of America Securities, LLC (FINRA New York). June 2011 and September 2011.

- Deposition – *Leticia B. Loya v. Miguel A. Loya* (257th District Court of Harris County, Tex.), Cause No. 2008-24514. June 2010.

- Deposition – *YTY Industry v. The Dow Chemical Company* (C.D. Cal.), No. CV 05-8881 SGL (AJWx). February 2009.

- Trial testimony – *Signatures Network, Inc. v. Major League Baseball Advanced Media, L.P.* (American Arbitration Association), No. AAA NO. 13 117 Y 00659 07. March 2009.

- Deposition– *Signatures Network, Inc. v. Major League Baseball Advanced Media, L.P.* (American Arbitration Association), No. AAA NO. 13 117 Y 00659 07. January 2009.

- Trial testimony – *Haemonetics Corp. v. Baxter Healthcare Corp. and Baxter International Inc.* (*D. Mass.*), No. 1:05-cv-12572. January 2009 and May 2009.

- Deposition – *Haemonetics Corp. v. Baxter Healthcare Corp. and Baxter International Inc.* (*D. Mass.*), No. 1:05-cv-12572. October 2008.

AlixPartners