## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ULTRA PETROLEUM CORP., *et al.,* | ) | Case No.  20-32631 (MI) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date: August 10, 2020 at 9:00 AM (CT)** |
|  | ) | **Objection Deadline: August 1, 2020, at 3:00 PM (CT)** |

## OBJECTION OF THE OFFICIAL COMMITTEE OF
## UNSECURED CREDITORS TO THE JOINT CHAPTER 11 PLAN
## OF REORGANIZATION OF ULTRA PETROLEUM AND ITS DEBTOR AFFILIATES
### [Relates to Docket Nos. 18, 20, 249]

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number (if any) are the following: Ultra Petroleum Corp. (3838); Keystone Gas Gathering, LLC (N/A); Ultra Resources, Inc. (0643); Ultra Wyoming, LLC (6117); Ultra Wyoming LGS, LLC (0378); UP Energy Corporation (4296); UPL Pinedale, LLC (7214); and UPL Three Rivers Holdings, LLC (7158). The Debtors' service address is 116 Inverness Drive East, Suite 400, Englewood, Colorado 80112.

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ...................................................................................1

II. RELEVANT FACTUAL BACKGROUND...............................................................7

    A.  General Case Background.................................................................................7

    B.  The Restructuring Support Agreement And Key Elements Of The Plan ............7

        1.  Other Plan Provisions ..............................................................................8

III. THE VALUATION OF THE REORGANIZED DEBTORS....................................10

    A.  The Goldin Valuation Report...........................................................................11

    B.  The Centerview Valuation Report ....................................................................14

    C.  The Goldin Rebuttal Valuation Report.............................................................14

IV. ARGUMENTS IN OBJECTION.............................................................................18

    A.  The Plan Cannot Be Confirmed Because The Debtors Have Failed To Meet The
        Requirements Of Bankruptcy Code Section 1129(a).........................................18

        1.  The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(1) Because
            The Plan Does Not Treat Class 6 General Unsecured Claim Holders Equally ...........19

        2.  The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(7) Because
            Class 6 General Unsecured Claim Holders May Receive Less Than They
            Would Under A Chapter 7 Liquidation ...................................................21

    B.  The Plan Cannot Be Confirmed Because It Cannot Satisfy The Cramdown
        Requirements With Respect to Class 6 General Unsecured Claims................................23

        1.  The Goldin Report Establishes That The Plan Is Not "Fair And Equitable"
            Because It Violates The Reverse Absolute Priority Rule ...........................................23

        2.  The Plan Unfairly Discriminates Against Holders Of Class 6 General
            Unsecured Claims ...................................................................................24

    C.  The Plan Contains Other Prohibited Provisions – 11 U.S.C. § 1123................................27

        1.  The Plan Cannot Be Confirmed Because It Contains Impermissible Third
            Party Releases and Broad Exculpation Provisions ...........................................27

i

D.  The Settlements Encompassed In The Plan Do Not Satisfy The Elements Of Rule
    9019 Of The Federal Rules Of Bankruptcy Procedure ......................................................30

E.  The Disclosure Statement Should Not Be Approved Because It Does Not Contain
    Adequate Information as Required by Section 1125 of the Bankruptcy Code .................32

    1.  Applicable Legal Standard ...........................................................................................32

    2.  Disclosure Statement Objections ................................................................................34

    3.  Solicitation and Procedural Objections .......................................................................37

V.  RESERVATION OF RIGHTS ................................................................................................39

VI. CONCLUSION .......................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.H. Robins Co.*,
  163 F.3d 598 (4th Cir. 1998) ................................................................32

*Ad. Hoc. Comm. Of Personal Injury Asbestos Claimants v. Dana Corp. (In re
  Dana Corp.)*,
  412 B.R. 53 (S.D.N.Y. 2008).................................................................19

*In re Applegate Prop., Ltd.*,
  133 B.R. 827 (Bankr. W.D. Tex. 1991).................................................33

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006)..................................................................25

*In re B. W. Alpha, Inc.*,
  89 B.R. 592 (Bankr. N.D. Tex. 1988), *aff'd*, 100 B.R. 831 (N.D. Tex. 1988) ........................28

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle Street P'ship*,
  526 U.S. 434 (1999)...............................................................................21

*Bank of N.Y. Tr. Co., NA v. Official Unsecured Creditors' Comm. (In re Pac.
  Lumber Co.)*,
  584 F.3d 229 (5th Cir. 2009) ...........................................................27, 28

*In re Bigler LP*,
  442 B. R. 537 (Bankr. S.D. Tex. 2010) .................................................28

*In re Cajun Elec. Power Coop., Inc.*,
  119 F.3d 349 (5th Cir. 1997) ................................................................31

*In re Camp Arrowhead, Ltd.*,
  451 B.R. 678 (Bankr. W.D. Tex. 2011)..................................................28

*In re Cantu*,
  784 F.3d 253 (5th Cir. 2015) ................................................................21

*Clarke v. Rogers*,
  228 U.S. 534 (1913)...............................................................................20

*In re Cypresswood Land Partners, I*,
  409 B.R. 396 (Bankr. S.D. Tex. 2009) ......................................18, 21, 33

*In re Divine Ripe, L.C.C.*,
  554 B.R. 395 (Bankr. S.D. Tex. 2016) .............................................32, 33

*Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*,
  3:17-CV-1958-G, 2018 WL 5113124 (N.D. Tex. Oct. 19, 2018), *aff'd sub
  nom. Matter of Thru, Inc.*, 782 F. App'x 339 (5th Cir. 2019) ..................................................28

*In re Emerge Energy Servs. LP*,
  19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ....................................29

*Feld v. Zale Corp. (In re Zale Corp.)*,
  62 F.3d 746 (5th Cir. 1995) ...................................................................................................27

*In re Ferretti*,
  128 B.R. 16 (Bankr. D.N.H. 1991) .........................................................................................33

*Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
  Ltd. P'ship)*,
  116 F.3d 790 (5th Cir. 1997) .................................................................................................18

*In re Flight Transp. Corp. Sec. Litig.*,
  730 F.2d 1128 (8th Cir. 1984) ...............................................................................................31

*In re Foster Mortg. Corp.*,
  68 F.3d 914 (5th Cir. 1995) ...................................................................................................31

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2006*), appeal dismissed,* 385 B.R. 41
  (S.D.N.Y. 2008).....................................................................................................................23

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe
  Enters., Ltd., II)*,
  994 F.2d 1160 (5th Cir. 1993) .......................................................................................18, 21

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas
  Petroleum, Inc.)*,
  522 F.3d 575 (5th Cir. 2008) .................................................................................................27

*In re Idearc, Inc.*,
  423 B.R. 138 (Bankr. N.D. Tex. 2009).....................................................................................23

*In re Jeppson*,
  66 B.R. 269 (Bankr. D. Utah 1986) ........................................................................................33

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
  *aff'd, Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .......................................25

*In re Journal Register Co.*,
  407 B.R. 520 (Bankr. S.D.N.Y. 2009).....................................................................................20

*In re Justice Oaks II, Ltd.*,
   898 F.2d 1544 (11th Cir. 1990) .............................................................................31

*In re Kong*,
   BAP CC-15-1371-KITAL, 2016 WL 3267588 (Bankr. App. 9th Cir. June 6,
   2016) .......................................................................................................................31

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) ...........................................................................19, 33

*In re Masters, Inc.*,
   141 B.R. 13 (Bankr. E.D.N.Y*.), aff'd,* 149 B.R. 289 (E.D.N.Y. 1992) ..................30

*In re MCorp Fin., Inc.*,
   137 B.R. 219 (Bankr. S.D. Tex.), *appeal dismissed and remanded*, 139 B.R.
   820 (S.D. Tex. 1992) ...........................................................................18, 20, 21, 23

*In re Metrocraft Pub. Servs., Inc.*,
   39 B.R. 567 (Bankr. N.D. Ga. 1984) ....................................................................33

*In re Patriot Place, Ltd.*,
   486 B.R. 773 (Bankr. W.D. Tex. 2013) .................................................................28

*In re Pilgrim's Pride Corp.*,
   No. 08-45664-DML-11, 2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010).......28

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968)......................................................................................30, 31

*Republic Supply Co. v. Shoaf*,
   815 F.2d 1046 (5th Cir. 1987) ..............................................................................28

*In re Schimmelpenninck*,
   183 F.3d 347 (5th Cir. 1999) ................................................................................20

*Schroeder v. New Century Liquidating Tr. (In re New Century TRS Holdings,
   Inc.)*,
   407 B.R. 576 (D. Del. 2009)..................................................................................19

*In re Sentry Operating Co. of Tex., Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001) .......................................................20, 25, 26

*In re Star Ambulance Serv., LLC*,
   540 B.R. 251 (Bankr. S.D. Tex. 2015) ..............................................................18, 19

*In re SunEdison, Inc.*,
   576 B.R. 453 (Bankr. S.D.N.Y. 2017*)* ...................................................................29

*In re Superior Tomato-Avocado, Ltd.*,
    481 B.R. 866 (Bankr. W.D. Tex. 2012)...................................................................20

*In re Taylor*,
    59 B.R. 176 (Bankr. S.D. Tex. 1986) ....................................................................30

*In re Texas Extrusion Corp.*,
    844 F.2d 1142 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).......................32

*In re Victory Constr. Co.*,
    42 B.R. 145 (Bankr. C.D. Cal. 1984).....................................................................24

*In re Vitro S.A.B. de. CV*,
    701 F.3d 1031 (5th Cir. 2012) ...............................................................................28

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ......................................................................29

*Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*,
    157 B.R. 100 (Bankr. S.D. Tex. 1993) ..................................................................32

*In re Wool Growers Cent. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007)...................................................................28

**Statutes**

11 U.S.C. § 524(e) ......................................................................................................27

11 U.S.C. § 1123(a)(4)...........................................................................................19, 20

11 U.S.C. § 1123(b)(6) ...............................................................................................27

11 U.S.C. § 1125(a) ........................................................................................32, 33, 34

11 U.S.C. § 1129(a) ....................................................................................................18

11 U.S.C. § 1129(a)(1).................................................................................................19

11 U.S.C. § 1129(a)(3).............................................................................................6, 19

11 U.S.C. § 1129(a)(7).................................................................................................21

11 U.S.C. § 1129(b)(1) ...........................................................................................23, 24

11 U.S.C. § 1129(b)(2)(B) ..........................................................................................23

**Other Authorities**

Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72
    Am. Bankr. L.J. 227 (1998) ................................................................................................... 25

Fed. R. Bankr. P. 9019 .................................................................................................................. 29

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Ultra Petroleum Corporation and its affiliated debtors (collectively, the "<u>Debtors</u>" or "<u>Ultra</u>"), by and through its undersigned counsel, submits this objection (the "<u>Objection</u>") to confirmation of the *Joint Chapter 11 Plan Of Reorganization Of Ultra Petroleum And Its Debtor Affiliates* [Docket No. 20] (the "<u>Plan</u>").[1] In support of this Objection, the Committee respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.    About two months ago, the Debtors filed these Chapter 11 cases pursuant to a restructuring support agreement ("<u>RSA</u>") with certain of their prepetition lenders. The RSA, which was purportedly the culmination of many months of negotiations, would transfer ownership of the Debtors to those parties which negotiated the RSA. Class 6 General Unsecured Creditors were not party to the RSA negotiations. It should not surprise anyone that the RSA allocates effectively no value to these creditors. After all, just a short time ago, the Debtors went through great pains (and cost) to consummate an up-tier exchange in an attempt to ensure that the creditors represented in Class 6 would receive nothing in the event the Debtors sought bankruptcy relief. The Debtors' scheme should fail. These Class 6 General Unsecured Claim holders—representing unsecured noteholders and rejection damage claimants—are entitled to more under the Plan and for the reasons set forth herein, the Plan proposed by the Debtors is not confirmable.

2.    Through the RSA, the Debtors seek to confirm and implement the terms of the Plan pursuant to which certain creditor constituencies will equitize their debt. Thus, the reorganized Debtors' equity value should determine creditor entitlements to the reorganized equity value. Here, according to the report of the Debtors' investment banker, Centerview Partners LLC

---

[1]    Capitalized terms used in this Objection but not otherwise defined shall have the meaning ascribed to them in the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of Ultra Petroleum and Its Debtor Affiliates* [Docket No. 18] (the "<u>Disclosure Statement</u>") or the Plan, as applicable.

("Centerview"), the Debtors' total enterprise value is said to be within a range of $825 million to $925 million with a midpoint of $875 million (the "Centerview Report"). The Committee takes issue with the Centerview Report's valuation conclusions and proffers the valuation derived by its own experts at Goldin Associates LLC ("Goldin"). Goldin concludes that the Debtors' reorganized enterprise value is $1.4 billion.

3.      The valuations derived by both Centerview and Goldin raise significant questions regarding the confirmability of the Debtors' proposed Plan. The Plan proposes a distribution to holders of Class 5 Second Lien Note Claims of New Interests (*i.e.*, primary equity in the reorganized Debtors) and Makewhole Instruments (*i.e.*, interests in the Debtors' litigation against certain make-whole claim recipients). If Centerview's valuation opinion is correct, then Class 5 Second Lien Note Claims are "out of the money" and the Plan unfairly discriminates against Class 6 General Unsecured Claims by offering the entire class (only if they accept the Plan) their *pro rata* share of $250,000 while offering holders of Class 5 Second Lien Note and Claims 7 Ongoing Trade Claims significantly greater consideration.

4.      On the other hand, if Goldin's valuation opinion is correct, then the issues raised by the Committee's standing motion and proposed complaint filed with this Court on June 26, 2020 (the "Standing Motion" and the complaint attached thereto, the "Proposed Complaint"),[2] become ripe and Class 6 General Unsecured Claim entitlements may be determined by the outcome of subsequent litigation. Specifically, as articulated in the Standing Motion, the Proposed Complaint seeks, *inter alia*, to avoid the "up-tier exchange" pursuant to which certain unsecured

---

[2]      The Committee incorporates the facts and arguments from the Standing Motion [Docket No. 338] into this Objection.

noteholders converted their unsecured debt to secured debt—in the form of today's Second Lien Notes (the "Up-Tier Exchange").[3]

5.      If the Committee's challenge to the Up-Tier Exchange (the "Up-Tier Challenge") is successful then the Second Lien Noteholders, at a minimum, will hold unsecured debt in their original pre-exchange principal amount and such resulting claims should be classified as Class 6 General Unsecured Claims under the Plan. Alternatively, the Second Lien Notes may be wholly disallowed or subordinated to the Class 6 General Unsecured Claims. Assuming either outcome is possible, the Plan is unconfirmable because the Plan lacks the structural mechanisms to ensure that it will be "fair and equitable" to holders of Class 6 General Unsecured Claims.

6.      More to the point, if the Goldin valuation is correct, Class 3 First Lien RBL Claims (which elect to receive the First Lien Distribution) and Class 4 First Lien Term Loan Claims— which are slated to share in 97.5% of the equity to be issued by the reorganized Debtors[4]—will receive value under the Plan in excess of the Allowed amount of such Claims.  Such an outcome is in violation of the "reverse absolute priority rule" embodied in Bankruptcy Code section

---

[3]     The Proposed Complaint alleges the following causes of action against certain of the proposed defendants, which include (i) Wilmington Trust, National Association and U.S. Bank National Association, in their sole capacities as the former and current indenture trustee for the Unsecured Notes, respectively; (ii) certain funds, and their associated entities, that formed an ad hoc group after being privately solicited for the Up-Tier Exchange, including Avenue Capital Management II, L.P. ("Avenue Capital"), Capital Research and Management Company, Oaktree Opportunities Fund X Holdings (Delaware), L.P. ("Oaktree X Holdings"), Oaktree Opportunities Fund Xb Holdings (Delaware), L.P. ("Oaktree Xb Holdings" and together with Oaktree X Holdings, "Oaktree"), and J.P. Morgan Investment Management Inc.; (iii) certain current and former Ultra directors and officers, including Evan Lederman, Chairman of Ultra's Board of Directors and managing director, co-head of restructuring, and a partner on the investment team at Fir Tree Capital Management LP and its affiliated entities ("Fir Tree"); (iii) certain holders of the Unsecured Notes who participated in the Up-Tier Exchange; and (iv) Fir Tree:  Constructive fraudulent transfer; Intentional fraudulent transfer; Breach of fiduciary duty; Equitable subordination; Disallowance of claims; Unjust enrichment; Aiding and abetting fraudulent transfer; Aiding and abetting breach of fiduciary duty; and Corporate waste.  On July 15, 2020, the Court held a status conference on the Standing Motion and, by agreement of the parties, continued the hearing on the Standing Motion to the Confirmation Hearing.

[4]     Notably, the Plan fails to allocate the Second Lien Notes Distribution, inclusive of 2.5% of the equity to be issued by the Debtors upon the Effective Date and Makewhole Instruments to any other holder of Claims assuming the Up-Tier Challenge is successful.

3

1129(b)(2)(A)(B). To be confirmable, the Plan has to provide for the allocation of this excess value (*i.e.*, the value after Class 4 First Lien Term Loan Claims are satisfied in full) to holders of Class 6 General Unsecured Claims if the Up-Tier Challenge is ultimately successful.

7.      As noted above, the Committee submits that the Plan is premised on an exceedingly low and flawed valuation. As will be shown by the evidence at the Confirmation Hearing, the Centerview Report is unreliable. It reflects a flawed analysis, which applies overly conservative and/or unreasonable judgments and assumptions (both those of Centerview and by the Debtors' management team), not justified by the facts, to drive a predetermined output showing unsecured creditors "out of the money."

8.      In contrast, the Committee's experts from Goldin prepared a valuation analysis (the "Goldin Report") that, by applying the three generally accepted valuation methodologies and correcting for unduly conservative and/or unreasonable assumptions, demonstrates that the Reorganized Debtors' value as of a projected emergence date of September 2, 2020 is *$1.4 billion.* At this valuation, coupled with the assumed avoidance of the Up-Tier Exchange, the secured debt hurdle ahead of Class 6 General Unsecured Creditors is cleared leaving surplus value which should inure to the benefit of Class 6 General Unsecured Creditors.

9.      The Goldin Report demonstrates that the Centerview Report is predicated upon a failure to apply generally accepted valuation methodologies. As a result, the Centerview Report's valuation conclusion borders on the absurd: Centerview concludes that the midpoint going concern value of the Debtors is within approximately $50 million of the Debtors' mid-point liquidation value as reflected in the Hypothetical Liquidation Analysis (the "Liquidation Analysis"), prepared by Mr. Alan Boyko of FTI Consulting, Inc. ("FTI") on behalf of the Debtors. The Committee will

methodically demonstrate at the Confirmation Hearing that Goldin's conclusion of enterprise value is more reflective of the reorganized Debtors' enterprise value.

10.     Class 6 General Unsecured Creditors may yet be "in the money" even if the Court does not accept the Goldin's valuation and the Committee is denied standing to challenge the Up-Tier Exchange directly. The Standing Complaint asserts various claims and causes of action against participants to the Up-Tier Exchange that would result in the recovery of damages to the Debtors' estates. For instance, the Standing Complaint identifies breach of fiduciary claims, aiding and abetting fraudulent transfer and corporate waste claims against the Debtors' fiduciaries which approved and implemented the Up-Tier Exchange, unjust enrichment claims against the exchanging noteholders, and aiding and abetting breach of fiduciary claims against the exchanging noteholders and others.

11.     The Liquidation Analysis fails to address the scenario pursuant to which a Chapter 7 trustee may pursue these claims related to (but not directly attacking) the Up-Tier Exchange, avoidance actions or successfully challenges the secured lenders' prepetition liens. The possibility that such recoveries may augment recoveries of Class 6 General Unsecured Claims in a hypothetical liquidation scenario means that the Plan may not satisfy the "best interests" test embodied in Bankruptcy Code section 1129(a)(7).

12.     But, assuming some or all of the relief requested by the Standing Motion is granted, then various elements of the Plan are objectionable. If the Debtors intend to consummate the Plan while the Standing Complaint is being litigated, (a) the releases set forth in Article VIII of the Plan need to scaled back appropriately to allow for the prosecution of the claims asserted in the Standing Complaint that the Court finds colorable, (b) New Interests need to be placed into a reserve to ensure that holders of Class 3 First Lien RBL Claims and Class 4 First Lien Term Loan Claims do

not receive in excess of a 100% recovery on account of such claims based upon the Court's determination of enterprise value at the Confirmation Hearing, (c) the Second Lien Notes Distribution should be placed into a reserve pending the outcome of the Up-Tier Challenge, (d) the Plan needs to provide for the continued existence and funding of the Committee to pursue the Up-Tier Challenge and other claims the Court finds are colorable and (e) the proceeds of unencumbered property (including litigation recoveries) should be allocated among unsecured creditors. The Committee also questions whether the Plan is at all confirmable if the Committee is granted standing to pursue certain of the claims asserted by the Standing Motion and Complaint. For instance, it is unfathomable to the Committee that the Plan could be proposed in good faith consistent with Bankruptcy Code section 1129(a)(3) if the Court concludes that the Committee's claims of breach of fiduciary duty, aiding and abetting fraudulent transfers, and/or corporate waste as alleged against the Debtors' fiduciaries in the Standing Motion and Standing Complaint are colorable.

13.     In addition to the foregoing, the Disclosure Statement fails to provide adequate information for creditors to make meaningful determinations regarding the Plan. Among other things, the Plan is missing key terms critical to any hypothetical investor's decision-making process:  notably the potential enhancement to Class 6 General Unsecured Claim recoveries if the Committee successfully pursues the claims asserted in the Standing Complaint. There are also deficiencies with respect to the Disclosure Statement solicitation process that serve to disenfranchise and potentially confuse creditors asked to vote on the Plan or otherwise respond to the Plan's third-party releases. Accordingly, final approval of the Disclosure Statement should be denied.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     General Case Background

14.     On May 15, 2020 (the "Petition Date"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been appointed in these cases.

15.     On May 29, 2020, the Office of the United States Trustee appointed the Committee pursuant to Bankruptcy Code section 1102. [Docket No. 174]. As of the date of the filing of this Objection, the Committee is composed of:  (i) UMB Bank, NA; (ii) U.S. Bank, NA; (iii) Plustick Partners; (iv) IngleSea Capital Advisor ("IngleSea"); (v) Schultze Asset Management; (vi) MPLX LP; and (vii) Rockies Express Pipeline LLC. IngleSea subsequently resigned from the Committee.

16.     On May 15, 2020, the Debtors filed the Plan and Disclosure Statement. [Docket Nos. 18 and 20, respectively]. On May 15, 2020, the Court conditionally approved the Disclosure Statement. [Docket No. 62].

### B.     The Restructuring Support Agreement And Key Elements Of The Plan

17.     The Debtors' bankruptcy filings were commenced pursuant to and in accordance with the RSA dated as of May 14, 2020, by and among the Debtors, an ad hoc group of Term Loan Lenders (the "Term Lender Group"), the RBL Lenders, and certain holders of Second Lien Notes (the "Second Lien Noteholder Group"). *See* Johnson Decl. ¶ 8.

19.     Through the Plan, the Debtors seek to confirm and implement the terms of the RSA.

The Plan proposes the following treatment of claims:

| Claims | Treatment |
|---|---|
| Class 3 First Lien RBL Claims | Either:<br>(a) Cash in an amount equal to 85% of allowed claim, or<br>(b) Pro rata share (along with Holders of Class 4 First Lien Term Loan Claims) of 97.5% of reorganized equity (subject to dilution on account of MIP and Rights Offering) |
| Class 4 First Lien Term Loan Claims | (a) Right to participate in the Rights Offering of up to $85 million, and<br>(b) Pro rata share (along with participating Holders of Class 3 First Lien RBL Claims) of 97.5% of reorganized equity (subject to dilution on account of MIP and Rights Offering) |
| Class 5 Second Lien Notes Claims | (a) Right to receive 45% of net proceeds of Make-Whole Litigation, and<br>(b) Pro rata share of 2.5% of the reorganized equity (subject to dilution only on account of MIP) |
| Class 6 General Unsecured Claims (including holders of the Unsecured Notes) | Either:<br>(a) Pro rata share of $250,000, if the class votes to accept the Plan; or<br>(b) Nothing, if the class votes to reject the Plan. |
| Class 7 Ongoing Trade Claims | Such claims will be Reinstated |

20.     The sources of funds to implement the Plan include a new $60 million exit revolving based loan and proceeds from the Rights Offering.

### 1.     Other Plan Provisions

21.     <u>Direct and Third Party Releases</u>. The Plan contains broad Debtor and third party releases for the benefit of Debtors' present and former officers and directors, lenders, consenting creditor parties (and their Related Parties) and others. Specifically, the Plan includes broad releases by the Debtors of the following parties (the "<u>Released Parties</u>"):

(a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Creditor Parties; (d) the Term Agent; (e) the First Lien RBL Agent and the First Lien RBL Issuing Bank; (f) the DIP Agent; (g) the DIP Lenders; (h) the Exit RBL Facility Agent; (i) the Exit RBL Facility Secured Parties; (j) the Committee and the members thereof (solely in their capacity as such); (k) all holders of Claims and Interests who vote to accept the Plan; (l) all holders of Claims in Classes that are deemed to accept the Plan and who do not opt out of the releases provided by the Plan; (m) all holders of Claims and Interests in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (n) the Backstop Parties; and (o) with respect to each of the foregoing parties in clauses (a) through (n), each of such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, including, for the avoidance of doubt, the Consenting Creditor Parties' Advisors; provided that any holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

*See* Plan, Article VIII.B.

22.     The Debtors assert that the releases are consensual because (i) they are integral to the Debtors' overall restructuring efforts and were an essential element of the Plan and (ii) the Released Parties made substantial and valuable contributions to the Debtors' restructuring through their efforts to negotiate and implement the Plan. *See* Disclosure Statement at p. 8. The proposed releases do not expressly carve any claims and Causes of Action determined by a Final Order of the Court to be for actual fraud, gross negligence or willful misconduct. *See* Plan, Article VIII. The Releases, as proposed, would also release the claims identified by the Committee in the Standing Complaint.

23.     Exculpation Provisions. The Plan includes broad exculpation provisions against Causes of Action relating to the Chapter 11 Cases. The Plan enjoins all Entities from pursuing claims against the Debtors, the Reorganized Debtors, the Released Parties and the Exculpated Parties. *Id.*

24.     The exculpation provisions carve out claims based on actual fraud, gross negligence and willful misconduct and also extends to the Exculpated Parties' ***prepetition*** conduct. Specifically, Article VIII.D. of the Plan provides that the Exculpated Parties shall be exculpated for any claim:

> related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement and related prepetition transactions (including the First Lien RBL Credit Documents, the First Lien Term Loan Credit Agreement and the Second Lien Notes Indenture), the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including, for the avoidance of doubt, the Plan Supplement), the DIP Facility, the Exit Financing, the Backstop Purchase Agreement, the Rights Offering or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into **before or during the Chapter 11 Cases** (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. (emphasis added).

### III.     THE VALUATION OF THE REORGANIZED DEBTORS

25.     On July 13, 2020, the Committee and the Debtors exchanged expert valuation reports of Christopher Miller and Manish Kumar of Goldin, attached hereto as Exhibit A, and Karn Chopra of Centerview, attached hereto as Exhibit B, respectively.

26.     According to the Centerview Report, the refreshed calculation of the total enterprise value of the Debtors is said to be within a range of $825 million to $925 million with a midpoint

of $875 million (including the value for make-whole claims). At Centerview's mid-point enterprise valuation of $875 million, holders of Class 5 Second Lien Note Claims and Class 6 General Unsecured Claims are out of the money. As set forth herein, the Committee asserts the Centerview Report underestimates the reorganization value of the Debtors' by upwards of $525 million.

## A.    The Goldin Valuation Report

27.    In conjunction with the development of the Goldin Report, Goldin assessed Ultra's financial projections for the period beginning September 2020 through December 2024 ("2020 Management Projections"). Goldin found that the 2020 Management Projections were unreasonable and the Valuation Analysis attached to the Disclosure Statement improperly undervalued Ultra as a going concern due to its reliance on the flawed 2020 Management Projections that were predicated on a so-called "Blow Down Business Plan" without concomitant reductions in its cost structure.

28.    

29.    As part of a detailed analysis, the Goldin Report concluded that the Reorganization Value for the Debtors as of September 1, 2020 is $1.428 billion, and is comprised of: (i) $1.211 billion attributed to going concern value; (ii) $217.0 million attributed to value for nonoperating assets, which includes: (a) an estimated $139.9 million settlement value for the Make-Whole

Claims and (b) $77.1 million value for undrilled locations. The Goldin Report does not include incremental value the Debtors' estates may realize upon recovery on claims identified in the Standing Complaint.

30.    To reach its valuation conclusions, Goldin utilized three generally accepted valuation methodologies, applying a different weighting to each, as summarized below:

- **Income Approach - Discounted Cash Flow ("DCF") Methodology**: Goldin calculated an implied enterprise value range of $1.042 billion to $1.550 billion with a midpoint estimate of $1.284 billion. Goldin arrived at this value by determining an indicated value of an enterprise as the present value ("PV") of expected future cash flows to all of its sources of capital, both debt and equity. Goldin measured the Debtors cash flows on an unlevered basis, as the hypothetical investor would use an optimal capital structure for the business, instead of the actual indebtedness that the firm employs.

  Goldin weighted this methodology at 50%, accounting for the fact that the most accepted and widely used method for estimating the fair market value of oil and gas properties is by using projections of cash flow based on expected income from production and sale of gas using a discount rate to recognize time value of money.

- **Income Approach - Net Asset Value ("NAV") Methodology**: Goldin calculated an implied enterprise value range from $828.4 million to $988.1 million with a midpoint estimate of $941.1 million. Goldin arrived at this value by averaging the Risk Adjustment Factors Net Asset Value ("RAFNAV") and Risk Adjusted Discount Rate Net Asset Value ("RADRNAV") methodologies. The indication of value using RAFNAV ranges from $884.7 million to $941.1 million with a midpoint estimate of $941.1 million and an indication of value using RADRNAV ranges from $772.1 million to $1,035.1 million with a midpoint estimate of $941.1 million.

- **Market Approach - Guideline Public Companies Methodology**: Goldin calculated an implied enterprise value of range of $1.165 billion to $1.502 billion with a midpoint estimate of $1.333 billion. In this method, Guideline Companies are evaluated on metrics of EBITDAX, unlevered free cash flow, proved developed producing reserves and the standardized measure. Given that Ultra has suspended drilling and is operating as a 100% PDP business generating significant free cash flow, the Guideline Companies methodology presents issues as the peer companies continue to drill and therefore have growth expectations in the market.

- **Precedent Transaction Analysis**: Goldin considered the Precedent Transaction method but ultimately rejected the findings and deemed it an unreliable indicia of fair market value in the current environment where acquisition financing is sparse and investor interest *de minimis*.

31.     Goldin's overweights the income methodologies relative to market methodologies given the nature of the Debtors' Blowdown Business Plan.  The totality of Goldin's valuations is depicted below:



32.     Relevant to the Court's consideration of the Standing Motion, the Goldin Report also evaluated whether the Debtors received reasonably equivalent value with respect to the Up-Tier Exchange and whether the Debtors were solvent or rendered insolvent by the Up-Tier Exchange. The Goldin Report concludes that the Debtors did not receive reasonable equivalent value through the Up-Tier Exchange and were insolvent before and upon consummation of the Up-Tier Exchange.

**B.**     **The Centerview Valuation Report**

33.     The Centerview Report varies from the Valuation Analysis attached as Exhibit D to the Disclosure Statement insofar as it concludes a midpoint total enterprise value ("TEV") of $875 million while the Valuation Analysis reported a midpoint total enterprise value of $900 million.

34.     As shown below, the Centerview Report attributes the $875 million TEV with an assumed effective date of July 31, 2020, comprised of (i) $835 million attributed to going concern value; and (ii) $40 million attributed to Make-Whole Claims. The Centerview Report attributes no value to future undrilled locations, avoidance actions (including those identified in the Standing Complaint) and potential unencumbered assets. Notably, the total enterprise value from the Centerview Report is only marginally higher than the Liquidation Analysis, which opines a net liquidation value ranging from $778 million to $868 million.

35.     The Centerview Report does not properly apply generally accepted valuation methodologies and ignores the fundamental corporate finance concepts of (i) time value of money and (ii) the relationship between risk and expected returns. Further, the Centerview Report is flawed by virtue of omitting any expert opinion on the Up-Tier Exchange and a solvency analysis related to the Up-Tier Exchange.

**C.**     **The Goldin Rebuttal Valuation Report**

36.     On July 23, 2020, Goldin issued the rebuttal expert report of Christopher Miller and Manish Kumar (the "Goldin Rebuttal Report") on behalf of the Committee, attached hereto as Exhibit C in response to the Centerview Report.

37.     The Goldin Rebuttal Report concludes that:

- Centerview relies on management projections without assessing them for reasonableness, which undermines the reliability and credibility of the valuation; and

- Centerview consistently applies conservative judgments not justified by facts and circumstances for the Debtors that underestimates the Debtors' Reorganization Value.

38.     Specifically, the Goldin Rebuttal Report concludes that Centerview's total enterprise value was the product of several fundamentally flawed analyses that materially suppress value. The Goldin Rebuttal Report distills the errors to: (a) misapplied valuation methodologies resulting in off-market valuations; (b) artificially conservative judgments not justified by the facts; (c) no opinion on the Up-Tier Exchange; and (d) failure to provide a solvency analysis.

39.     <u>Misapplied Generally Accepted Valuation Methods</u>. The Goldin Rebuttal Report concludes that Centerview relies on management projections in the Centerview Report without assessing them for reasonableness, which undermines the reliability and credibility of Centerview's valuation. Specifically, the Goldin Rebuttal Report concludes that the projections by Ultra's management are unreasonable because they are predicated on a Blow Down Business Plan, while maintaining incremental costs for options for the Debtors to continue drilling or expanding its business.

40.     ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

41.     ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

42.      ██████████████████████████████████████████

████████████████████████████████████████████ As a result, the
free cash flow multiple is a key metric for valuing the Debtors but Centerview tellingly ignores
that important metric. *Goldin Rebuttal Report*, page 9.

43.      Application Of Artificially Conservative Judgments Not Justified By Facts And
Circumstances. The Goldin Rebuttal Report concludes that Centerview consistently applies
conservative judgments not justified by facts and circumstances for Ultra that underestimated the
Debtors' reorganization value.

44.      Both the DCF and NAV method were applied in an overly-conservative way in the
Centerview Report. With respect to the DCF method, Centerview renders a projection period that
is not representative of normalized free cash flows to determine the Debtors' value in the terminal
year in the DCF method. ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

45.      ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

16

████████████████████████████████████████████

███████████████████████████

46.  <u>No Opinion On the Debt Exchanges</u>. Although more relevant to the Court's adjudication of the Standing Motion than confirmation of the Plan, both the Goldin Report and Centerview Report address the issue of whether the Debtors received reasonable equivalent value through the Up-Tier Exchange. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

47.  ██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████

48.      <u>Failure to Provide A Solvency Analysis</u>. Although solvency is critical in assessing the Up-Tier Exchange, the Centerview Report does not include a solvency analysis for the Debtors as of the dates of the Up-Tier Exchange. The Goldin Report, in contrast, assessed the solvency of the Debtors at the time of the Up-Tier Exchange and concluded that the Debtors were insolvent before, during, and immediately after consummation of the Up-Tier Exchange.

49.      Due to the inherent unreliability of the Centerview Report, the Court should rely on the Goldin Report, which demonstrates, among other things, a significantly higher Reorganized Value of the Debtors and the flawed analysis by Centerview in preparing the Centerview Report.

## IV.      ARGUMENTS IN OBJECTION

### A.      The Plan Cannot Be Confirmed Because The Debtors Have Failed To Meet The Requirements Of Bankruptcy Code Section 1129(a)

50.      The Debtors, as proponents of the Plan, bear the burden of proving that the Plan complies with the confirmation requirements in Bankruptcy Code section 1129, as well as all other applicable Bankruptcy Code provisions incorporated thereby. *See* 11 U.S.C. § 1129(a); *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993); *In re MCorp Fin., Inc.*, 137 B.R. 219, 225 (Bankr. S.D. Tex.), *appeal dismissed and remanded*, 139 B.R. 820 (S.D. Tex. 1992). This burden is a heavy one and requires careful consideration of each of the relevant inquiries articulated by Bankruptcy Code section 1129. *See Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),* 116 F.3d 790, 801 (5th Cir. 1997); *In re Star Ambulance Serv., LLC,* 540 B.R. 251, 259 (Bankr. S.D. Tex. 2015) ("As the proponent of the Plan, the Debtor must establish by a preponderance of the evidence that each of the confirmation requirements set forth in Bankruptcy Code § 1129 has been met."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009)

51. As demonstrated below, the Debtors cannot meet their burden. The Plan violates several provisions of the Bankruptcy Code: (i) the requirements in sections 1129(a)(1) disallowing discriminatory treatment; (ii) the best interest of creditors test in section 1129(a)(7); (iii) the feasibility requirement in section 1129(a)(11); (iv) section 1129(b)(1) requiring the plan to be fair and equitable; and (v) section 1123, which limits what provisions can permissibly be included in plans. As a result, the Plan cannot be confirmed. Moreover, if the Court grants standing to the Committee with respect to breach of fiduciary duty claims, aiding and abetting fraudulent transfer, and/or corporate waste claims as to the Debtors' fiduciaries (as alleged by the Standing Complaint) the Court cannot find that the Plan has been proposed in good faith consistent with Bankruptcy Code section 1129(a)(3).

### 1. The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(1) Because The Plan Does Not Treat Class 6 General Unsecured Claim Holders Equally

52. Bankruptcy Code section 1129(a)(1) provides that a plan cannot be confirmed unless it "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). One such "applicable provision" includes Bankruptcy Code section 1123. *See Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Co-op., Inc.)*, 150 F.3d 503, 513, n.3 (5th Cir. 1998). Bankruptcy Code section 1123(a)(4) provides that a plan shall "provide the same treatment for each claim . . . of a particular class, unless the holder of a particular claim . . .agrees to a less favorable treatment of such particular claim. . ." 11 U.S.C. § 1123(a)(4)..

53. The law is clear that "if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable." *Schroeder v. New Century Liquidating Tr. (In re New Century TRS Holdings, Inc.)*, 407 B.R. 576, 592 (D. Del. 2009); *see also In re Star Ambulance Serv., LLC*, 540 B.R. at 260-61 (where plan "does not provide the same treatment for each claim

19

or interest of a particular class . . . the Debtor has not established by a preponderance of the evidence that the requirements of § 1123(a)(4) are met"). "The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity." *Ad. Hoc. Comm. Of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)*, 412 B.R. 53, 62 (S.D.N.Y. 2008).

54.     Here, the Plan fails to address the scenario whereby the Committee is granted standing and successfully pursues the Up-Tier Challenge. As such, the Plan needs to be modified to address the possibility of a successful prosecution of the Standing Complaint, specifically the Up-Tier Challenge. *See In re MCorp Fin., Inc.*, 137 B.R. at 225-28 (refusing to confirm a plan that did not include sufficient reserves to ensure that all claimants in a class received a pro rata share of recovery based on their allowed claim after the claims allowance process was complete).

55.     Otherwise, the Plan's proposed enhanced treatment to holders of the disputed Second Lien Notes Claimants, who may actually be holders of unsecured claims pending the outcome of the Up-Tier Challenge, violates a fundamental tenant of bankruptcy law—that similarly situated creditors receive similar treatment. *In re Schimmelpenninck*, 183 F.3d 347, 359 (5th Cir. 1999) (recognizing bankruptcy code policy that "ensuring equal distribution of that property to similarly situated creditors should remain a paramount concern."); *In re Superior Tomato-Avocado, Ltd.,* 481 B.R. 866, 872 (Bankr. W.D. Tex. 2012) (stating that "the fundamental purpose of the Bankruptcy Law . . . is, equality between creditors") (citing *Clarke v. Rogers,* 228 U.S. 534, 544 (1913)).

56.     Moreover, the Debtors cannot attempt to justify this disparate treatment by characterizing the enhanced recoveries to Second Lien Noteholders as a "gift" by the Debtors' secured lenders as gifting may not be used to circumvent the Bankruptcy Code. *See In re Sentry*

*Operating Co. of Tex., Inc.*, 264 B.R. 850, 862-66 (Bankr. S.D. Tex. 2001) (holding that a gift from secured creditors could not circumvent the Bankruptcy Code's proscription against unfair discrimination between classes of equal rank under section 1129(b)(1)). This principle applies with equal force to "gifts" that violate Bankruptcy Code section 1123(a)(4)'s prohibition against disparate treatment. *See In re Journal Register Co.*, 407 B.R. 520, 532-33 (Bankr. S.D.N.Y. 2009) (applying gifting doctrine analysis to disparate treatment within a class under section 1123(a)(4)).

### 2. The Debtors Cannot Satisfy Bankruptcy Code Section 1129(a)(7) Because Class 6 General Unsecured Claim Holders May Receive Less Than They Would Under A Chapter 7 Liquidation

57.     The Court must deny confirmation of the Plan because it fails to provide Class 6 General Unsecured Claims with the value they would receive in a hypothetical chapter 7 liquidation. To confirm a plan, Bankruptcy Code section 1129(a)(7) requires that each holder of a claim in an impaired class must either accept the plan or must "retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7). This provision, commonly referred to as the best interest test, "ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan." *In re Cypresswood Land Partners*, I, 409 B.R. at 428 (citing *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 441 n.13 (1999)). A plan proponent must prove that the plan satisfies the best interest test by a preponderance of the evidence. *In re Briscoe Enters., Ltd. II,* 994 F.2d at 1165.

58.     A plan of reorganization "may not be confirmed where the evidence is not sufficient on which to base an independent factual determination that the proposed plan is in the best interests of the creditors pursuant to § 1129(a)(7)." *In re MCorp Fin., Inc.*, 137 B.R. at 228; *see also In re Cantu*, 784 F.3d 253, 262 (5th Cir. 2015) ("A reorganization plan must either be accepted by each

creditor or satisfy the Code's 'best interests of the creditor' rule, which requires that the holder of a claim receive under the reorganization plan at least as much as the holder would receive in the event of chapter 7 liquidation"). The best interests test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan. *See Bank of Am. Nat'l Tr. & Sav. Ass'n*, 526 U.S. at 441 n.13.

59.     Critically, the Liquidation Analysis prepared by FTI fails to account for any recovery of damages resulting from the Up-Tier Exchange in a hypothetical Chapter 7 liquidation. As noted above, the Committee is asserting that the Up-Tier Exchange gave rise to claims for breaches of fiduciary duty, corporate waste and aiding and abetting breach of fiduciary duty. In a hypothetical Chapter 7 liquidation, the proceeds of litigation may be distributable to holders of Class 6 General Unsecured Claims. The Liquidation Analysis also does not take into account the recovery of any ordinary chapter 5 preference claims or the potential value of unencumbered assets identified by the Committee in its recently filed *Motion Second Expedited Motion of the Official Committee of Unsecured Creditors For (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority Filed by Creditor Committee Official Committee of Unsecured Creditors* [Docket No. 534] (the "Lien Challenge").  If the value of such recoveries exceeds zero (assuming Class 6 General Unsecured Claims votes to reject the Plan) or $250,000 (if holders of Class 6 General Unsecured Claims vote to accept the Plan), then the Plan fails the best-interests test. Accordingly, the Plan cannot be confirmed as the Debtors have failed to meet their burden that the Plan satisfies the "best interests test" of Bankruptcy Code section 1129(a)(7).

60.     The Liquidation Analysis also suffers from a number of additional flawed assumptions which make the conclusions unreliable.  Among others, the Liquidation Analysis

relies upon unsupportable recovery values for the Makewhole Litigation and the fact that the Debtors' estates (versus their secured creditors) will bear the entirety of costs of liquidating the Debtors' estates.

**B.      The Plan Cannot Be Confirmed Because It Cannot Satisfy The Cramdown Requirements With Respect to Class 6 General Unsecured Claims**

61.     Bankruptcy Code section 1129(b)(1) provides that if all confirmation requirements of section 1129(a) are met other than section 1129(a)(8), the court "shall confirm the plan notwithstanding the requirements of [section 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Bankruptcy Code section 1129(b)(2)(B), in turn, describes examples of how a plan may be "fair and equitable" to a class of impaired, non-accepting general unsecured claims. 11 U.S.C. § 1129(b)(2)(B).

62.     The Committee assumes, for the purposes of this Objection, that Class 6 General Unsecured Notes Claims did not vote to accept the Plan by the margins required under Bankruptcy Code section 1126(c). Accordingly, the Debtors will be required to satisfy the requirements of Bankruptcy Code section 1129(b)—the "cramdown requirements"—as to Class 6 General Unsecured Notes Claims.

**1.      The Goldin Report Establishes That The Plan Is Not "Fair And Equitable" Because It Violates The Reverse Absolute Priority Rule**

63.     The fair and equitable standard has two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed. 7 COLLIER ON BANKRUPTCY ¶1129.03[4][a]. Multiple courts have held that in order for a plan to be "fair and equitable," a class of creditors may not receive more than 100% of its claim. *See, e.g., In re MCorp Fin., Inc.*, 137 B.R. at 235 ("[A] dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims . . . The safeguards that no claim or interest receive more than

23

100 percent of the allowed amount of such claim . . . will insure that the plan is fair and equitable"); *In re Idearc, Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009) ("The corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%) recovery for their claims.") (citing *In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2006*), appeal dismissed,* 385 B.R. 41 (S.D.N.Y. 2008)*; In re Victory Constr. Co.*, 42 B.R. 145, 155 (Bankr. C.D. Cal. 1984)).

64.     As will be shown at the Confirmation Hearing, the Committee's valuation demonstrates that holders of Class 3 First Lien RBL Claims electing to receive the First Lien Distribution and Class 4 First Lien Term Loan Claims are receiving in excess of 100% of the value on account of such claims. Such treatment violates the Bankruptcy Code's "fair and equitable" requirement, especially where, as here, Class 6 General Unsecured Noteholders are slated to receive nothing if they vote to reject the Plan.  The Committee asks the Court to apply the "fair and equitable" test assuming the Committee is granted standing and successfully pursues the Up-Tier Challenge.

### 2.     The Plan Unfairly Discriminates Against Holders Of Class 6 General Unsecured Claims

65.     The Plan proposes to treat the various classes of general unsecured creditors drastically differently. Despite the fact that the Class 5 Second Lien Note Claims, the Class 6 General Unsecured Claims, and the Class 7 Ongoing Trade Claims are just that—general unsecured claims—the Plan proposes wildly disparate treatment among such holders of general unsecured claims.  Holders of Class 5 Second Lien Note Claims receive the Second Lien Distribution.  Holders of Class 7 Ongoing Trade Claims receive payment in full upon the Reinstatement of their Claims.  All of this while holders of Class 6 General Unsecured Claims receive no recovery (if the class votes against the Plan) or their *pro rata* share of $250,000.

66.     Bankruptcy Code section 1129(b)(1) provides that to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" with respect to the non-accepting impaired class. 11 U.S.C. § 1129(b)(1). "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes. Thus, a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). The burden is upon the Debtors to prove that the plan does not discriminate unfairly. *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 122 (D. Del. 2006); *In re Sentry Operating Co.*, 264 B.R. at 853.

67.     Under Section 1129(b)(1) of the Bankruptcy Code, a plan discriminates unfairly when it treats similarly situated classes differently without a reasonable basis for the disparate treatment. *See In re Armstrong*, 348 B.R. at 121. In determining whether a plan discriminates unfairly, at least one Court in this District has adopted and applied a test colloquially known as the "Markell test." *See In re Sentry Operating Co.*, 264 B.R. at 864.  Under the Markell test, a rebuttable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Id.* (*quoting* Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227 (1998)).

68.     If there is an allegation of a materially lower percentage recovery, the presumption can be rebutted only "by showing that, outside of bankruptcy, the dissenting class would similarly

receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain." *In re Armstrong*, 348 B.R. at 121 (internal quotation marks and citations omitted).  Under the Markell test, the Debtors' Plan is patently unconfirmable.

69.     First, the class of Class 6 General Unsecured Creditors is assumed to have voted to reject the Plan. Second, as unsecured claims, the classes of Class 5 Second Lien Note Claims, Class 6 General Unsecured Claims and Class 7 Ongoing Trade Claims have the same priority.

70.     As to the third element, the Plan proposes to pay provide Class 5 Second Lien Note Claims with significant consideration in the form of New Interests and Makewhole Instruments and Class 7 Ongoing Trade Claims will be paid in full.  However, Class 6 General Unsecured Claims will receive no distribution because such class voted to reject the Plan.

71.     Without question, Class 6 General Unsecured Claims are receiving a materially lower percentage than other unsecured claims classes. Under the Markell test, there is a presumption of unfair discrimination.

72.     Next, the Debtors cannot rebut the presumption of unfair discrimination. Outside of the bankruptcy context, Class 5 Second Lien Note Claims, Class 6 General Unsecured Claims and Class 7 Ongoing Trade Claims would all be entitled to the same recovery as general unsecured claims. In addition, there is no allegation that the Class 5 Second Lien Note Claims and Class 7 Ongoing Trade Claims will infuse any new value into the reorganization to offset this grossly inequitable gain.

73.     Further, the Debtors' justification for the grossly disparate treatment, namely that the trade creditors are critical to the success of the Debtors, is unavailing. *See In re Sentry Operating Co.*, 264 B.R. 850. In *Sentry*, the debtor proposed a plan with a grossly disparate

treatment of two classes of unsecured claims. One class, consisting of the debtor's trade creditors, would receive full payment on its claims while the other class, with whom the debtor did not anticipate doing future business, was to recover only 1% on its claims. *Id*. at 862. Not surprisingly, the court denied confirmation of that proposed plan.

74.     Here, the Debtors' proposed disparate treatment of Class 6 General Unsecured Claims is inconsistent with one of the fundamental purposes of the Code: equality in treatment of similarly situated creditors.

75.     In sum, the Plan "unfairly discriminates" against a dissenting class of creditors in favor of other identically situated classes and should not be confirmed under the 1129(b)(1) "cramdown" section of the Bankruptcy Code.

**C.     The Plan Contains Other Prohibited Provisions – 11 U.S.C. § 1123**

76.     In addition to foregoing flaws, the Plan also violates Bankruptcy Code section 1123, which dictates the permissible contents of a chapter 11 plan. Section 1123(b)(6) limits the provisions that can be included in a plan to those that are "not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). Here, at least two significant provisions of the Plan run afoul of Bankruptcy Code section 1123(b)(6): the Plan's non-consensual third party releases and the Plan's exculpation of non-estate fiduciaries.

**1.     The Plan Cannot Be Confirmed Because It Contains Impermissible Third Party Releases and Broad Exculpation Provisions**

77.     As discussed herein, the Plan contains extremely broad third party releases in favor of the Released Parties, which should be rejected by the Court unless the Debtors provide sufficient basis for the releases.

78.     The Fifth Circuit has expressly held that Bankruptcy Code section 524(e) prohibits non-debtor discharges or non-consensual third-party releases under a plan. *See Feld v. Zale Corp.*

*(In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995); *Bank of N.Y. Tr. Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009); *see also Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 590 (5th Cir. 2008) (holding that section 524(e) prohibits non-debtor discharges and finding that a plan may not release third-party claims against a non-debtor).[5]

79.     Under Fifth Circuit law, nondebtor releases do not violate the Bankruptcy Code only if they are (1) consensual, (2) specific in language, (3) a condition of settlement, and (4) given for consideration. *See*, *e.g.*, *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987). *See also In re Bigler LP*, 442 B. R. 537, 543-44 (Bankr. S.D. Tex. 2010) ("It would require, *inter alia*, consent and consideration by each participant in the agreement to be valid.").

80.     Based on these principles, courts in the Fifth Circuit have consistently stricken exculpation and injunction provisions that extend non-consensual releases to parties other than debtors, reorganized debtors, statutory committees, statutory committee members, and statutory committee professionals. *See In re Pac. Lumber Co.*, 584 F.3d at 252-53 (striking non-debtor releases, including releases of the debtors' officers and directors, except with respect to creditors' committee and members); *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, 3:17-CV-1958-G, 2018

---

[5]     Other courts in Texas have noted that "[t]he Fifth Circuit takes a very restrictive approach to non-debtor releases in bankruptcy cases . . .  non-consensual, non-debtor releases in bankruptcy proceedings in this circuit have been 'explicitly prohibited', this circuit has 'firmly pronounced its opposition to such releases', and the 'Bankruptcy Code precludes non-consensual, non-debtor releases." *In re Patriot Place, Ltd.*, 486 B.R. 773, 822 (Bankr. W.D. Tex. 2013) (quoting *In re Vitro S.A.B. de. CV*, 701 F.3d 1031, 1051-55 (5th Cir. 2012)); *see also In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 700 (Bankr. W.D. Tex. 2011) (Fifth Circuit law requires the court to "approve through confirmation of the Plan third-party protections"); *In re Pilgrim's Pride Corp.*, No. 08-45664-DML-11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010) (same); *In re Wool Growers Cent. Storage Co.*, 371 B.R. at 776 ("The Fifth Circuit has held that a nondebtor release violates section 524(e) when the affected creditor timely objects to the provision."); *In re B. W. Alpha, Inc.*, 89 B.R. 592, 595 (Bankr. N.D. Tex. 1988), *aff'd*, 100 B.R. 831 (N.D. Tex. 1988). Moreover, courts in the Fifth Circuit have declined to follow other circuits that have taken a more lenient view toward non-debtor releases under certain "extraordinary circumstances." *See In re Patriot Place, Ltd.*, 486 B.R. at 822-23.

WL 5113124, at *20 (N.D. Tex. Oct. 19, 2018), *aff'd sub nom. Matter of Thru, Inc.*, 782 F. App'x

339 (5th Cir. 2019)(unpublished) (reversing bankruptcy court's approval of injunction and

exculpation provisions that released non-debtor third parties, such as the debtor's parent company,

officers, and directors).

81.     Here, the Plan contains several provisions that violate the Fifth Circuit's prohibition

on third-party releases. The Debtors portray the third party releases—by creditors who do not

expressly opt-out of the third party release—as consensual and thus permissible under Fifth Circuit

law. However, a number of circumstances and factors raise questions as to whether such releases

would truly be consensual,[6] and the Debtors have provided no basis to find that adequate

consideration will be given by each Released Party.

82.     Further, the exculpation provisions are overly broad insofar as it applies to liability

for actions taken prior to and after the Petition Date. Pursuant to 1125(e) of the Bankruptcy Code,

the good faith protections for solicitation of acceptance of a plan are limited to postpetition actions.

83.     The Plan's release and exculpation provisions are provided without sufficient basis

or grounds in the law. Accordingly, the Plan cannot be confirmed.

---

[6]     While the Committee is aware that this Court has allowed non-consensual third party releases to be inferred, the practice conferring consent to plan provisions from unresponsive creditors has been the subject of criticism in some recent decisions elsewhere, including *In re Emerge Energy Servs. L.P*. In refusing to confirm the terms of a plan containing third-party releases subject to a negative notice opt-out process, the *Emerge Energy* court discussing the issues in the context of basic contract principles, held as follows:

The Court must respectfully disagree with its colleagues who have held differently as it has concluded that a waiver cannot be discerned through a party's silence or inaction unless specific circumstances are present. A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify.

*In re Emerge Energy Servs. LP*, 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019). *See also In re SunEdison, Inc.*, 576 B.R. 453, 458-61 (Bankr. S.D.N.Y. 2017*); In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).

**D.     The Settlements Encompassed In The Plan Do Not Satisfy
        The Elements Of Rule 9019 Of The Federal Rules Of Bankruptcy Procedure**

84.     The compromises embodied in the Plan fails to meet the tests of Fed. R. Bankr. P.

9019 as required by Title XI.  The Plan proposes, *inter alia*, the following compromise:

> As discussed in detail in the Disclosure Statement and as otherwise provided herein,
> pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and
> in consideration for the classification, distributions, releases, and other benefits
> provided under the Plan, upon the Effective Date, the provisions of the Plan shall
> constitute a good faith compromise and settlement of all Claims and Interests and
> controversies resolved pursuant to the Plan, including (1) any challenge to the
> amount, validity, perfection, enforceability, priority or extent of the DIP Claims,
> First Lien Claims, and Second Lien Notes Claims and (2) any claim to avoid,
> subordinate, or disallow any DIP Claims, First Lien Claims, and Second Lien Notes
> Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any
> equitable theory (including equitable subordination, equitable disallowance, or
> unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the
> good faith compromise and settlement of all such Claims, Interests, and
> controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation
> Order shall constitute the Bankruptcy Court's approval of such compromise and
> settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019,
> as well as a finding by the Bankruptcy Court that such settlement and compromise
> is fair, equitable, reasonable and in the best interests of the Debtors and their
> Estates. Subject to Article VI hereof, all distributions made to holders of Allowed
> Claims and Allowed Interests (as applicable) in any Class are intended to be and
> shall be final.

Plan Article IV.A.

85.     Bankruptcy Rule 9019, has a "clear purpose . . . to prevent the making of concealed

agreements which are unknown to the creditors and unevaluated by the court." *In re Masters, Inc*.,

141 B.R. 13, 16 (Bankr.  E.D.N.Y*.), aff'd,* 149 B.R. 289 (E.D.N.Y. 1992)*.* The Court must make

an informed and independent judgment as to whether a proposed compromise is "fair and

equitable" after apprising itself of "all facts necessary for an intelligent and objective opinion of

the probabilities of ultimate success should the claim be litigated." *Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  The *TMT Trailer*

30

factors are well known, as is the requirement of adequate notice. Notice is required of the material facts, in public. *See*, *In re Taylor*, 59 B.R. 176 (Bankr. S.D. Tex. 1986) (secret compromise rejected because creditors are entitled to notice of the issues). While notice of the compromise can be shortened and waived in exigent circumstances where notice cannot be timely provided[7], no such exigent circumstances exist here.

86.     Here, Bankruptcy Rule 9019 requires that the creditor body receive notice of the *bona fides* of the issues being compromised. The Debtors did not include any details relating to the Standing Motion or the Standing Complaint in the Disclosure Statement. The Debtors should have supplemented their Disclosure Statement with such details before the expiration of the Voting Deadline.

87.     Real notice entails an outline of the *TMT Trailer* factors so all creditors can form an opinion on the wisdom of the proposed compromise. A compromise that does not disclose the relevant facts, or that improperly or inaccurately describes the facts, should not be approved.

88.     Additionally, the Court should give deference to the paramount interest of creditors who are *not* self-interested in the compromise. *In re Cajun Elec. Power Coop., Inc*., 119 F.3d 349, 356 (5th Cir. 1997); *In re Foster Mortg. Corp*., 68 F.3d 914, 917 (5th Cir. 1995); *In re Justice Oaks II, Ltd*., 898 F.2d 1544, 1549 (11th Cir. 1990); *In re Flight Transp. Corp. Sec. Litig*., 730 F.2d 1128, 1135 (8th Cir. 1984).

89.     Finally, the Committee does not agree that the compromise within the Plan reflects a proper exercise of business judgment. The Debtors are now aware of the Standing Motion and

---

[7]     Notice for a Rule 9019 motion can only be waived in truly exigent circumstances and, when due process is violated, the lack of notice is reviewable de novo. *In re Kong,* BAP CC-15-1371-KITAL, 2016 WL 3267588, at *8 (Bankr. App. 9th Cir. June 6, 2016) ("While bankruptcy courts have discretion to reduce or eliminate the notice period for settlements or compromises, that discretion is limited.")

claims articulated by the Standing Complaint but are seeking to compromise such claims for no value.

90.     As a central element of the Plan, because the aforementioned compromise cannot be approved under Bankruptcy Rule 9019, neither can the Court confirm the Plan as proposed by the Debtors.

**E.     The Disclosure Statement Should Not Be Approved Because It Does Not Contain Adequate Information as Required by Section 1125 of the Bankruptcy Code**

91.     The Disclosure Statement does not contain information sufficient to allow unsecured creditors to make an informed decision whether to accept or reject the Plan, and in some instances contains incomplete, inaccurate or misleading information. The Disclosure should be amended to address the objections and issues raised below, failing which the Court should not approve the Disclosure Statement as containing adequate information.

### 1.     Applicable Legal Standard

92.     Bankruptcy Code section 1125(b) requires that a disclosure statement contain "adequate information," which is defined as "information of a kind, and in sufficient detail . . . [to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a). *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988), *In re Divine Ripe, L.C.C.*, 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016). *See also In re A.H. Robins Co.*, 163 F.3d 598 (4th Cir. 1998) ("The disclosure statement must contain 'adequate information,' i.e. sufficient information to permit a reasonable, typical creditor to make an informed judgment about the merits of the proposed plan.").

93.     The obligation to provide adequate information is "pivotal." *Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993). In determining whether a plan proponent has provided "adequate information" to creditors and parties in interest, the

standard is not whether the failure to disclose information would harm creditors but "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991). 11 U.S.C. § 1125(a)(1); *see also In re Cajun Elec. Power Coop., Inc.*, 150 F.3d at 518. For a creditor to fairly evaluate the results of a proposed plan, the court must ensure that a disclosure statement sets forth "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (holding that a proper disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting their [sic] distribution."). Whether or not adequate information is given is left to the judicial discretion of the court and will necessarily be governed by the circumstances of the case. *See In re Cajun Elec. Power Coop., Inc.*, 150 F.3d at 518.

94.     Courts consider numerous factors when determining the sufficiency of the information in a disclosure statement, including, but not limited to, (i) a description of the available assets and their value, (ii) the estimated return to creditors under a chapter 7 liquidation, (iii) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the chapter 11 plan, (iv) information relevant to the risks posed to creditors under the plan, and (v) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers. *See In re Divine Ripe, L.L.C.*, 554 B.R. at 401-02 (listing 19 non-exhaustive factors set forth in *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984));

*see also In re Cypresswood Land Partners, I*, 409 B.R. at 424 (applying the *Metrocraft* standard to determine adequacy of disclosure statement).

### 2.    **Disclosure Statement Objections**

95.     Here, the Disclosure Statement fails to provide sufficient information necessary for impaired Holders of Class 6 General Unsecured Claims to make an informed decision when voting on the Plan. In its current form, the Disclosure Statement is both facially and substantively deficient with respect to critical Plan-related issues, and thus fails to satisfy the basic disclosure requirements of Bankruptcy Code section 1125(a). The glaring deficiencies in the Disclosure Statement include:

96.     **Basis for Classification Structure**: The Disclosure Statement provides no information concerning the basis for separately classifying Class 5 Second Lien Note Claims and 7 Ongoing Trade Claims from Class 6 General Unsecured Claims. As a result, the Disclosure Statement is lacking key pieces of information necessary to enable creditors to value the proposed consideration offered to them under the Plan.

97.     **The Committee's Investigation And Potential Causes Of Action**: The Disclosure Statement fails to provide adequate information about the Committee's Standing Motion or the Lien Challenge and the potential impact on the outcome of these cases and the distributions to creditors. There is no discussion on the potential remedies the Court may fashion if the Committee is successful in prosecuting the Up-Tier Challenge. These missing items of critical information makes it impossible for Class 6 creditors to understand the value of what they are being offered under the Plan, likely the most important fact a voting creditor would look to find in a Disclosure Statement. Consequently, the Disclosure Statement fails to provide adequate information to creditors.

98.     **Unencumbered Assets**: There is also no discussion in the Disclosure Statement about the value of unencumbered assets—including, but not limited to, affirmative claims that may be asserted by the Committee related to the Up-Tier Exchange or the Lien Challenge. The Committee is working to ascertain the value of such assets, but, at a minimum, the unencumbered assets, and the dispute as to the value of the unencumbered assets, should be disclosed and discussed in the Disclosure Statement.

99.     **Releases**: As discussed herein, the Plan contains a number of releases. The Disclosure Statement fails to describe the potential claims and causes of action that are being released by the estates pursuant to the Plan release and exculpation provisions, whether any investigations were performed, the value of the claims being released and exculpated, or the availability of insurance coverage for such claims. Nor is there any mention of the alleged consideration being provided by the Released Parties. In short, the Disclosure Statement does not provide any, let alone adequate, information on what claims are being released, for how much and why. The Debtors portray the third-party releases—by creditors who do not expressly opt out—as consensual and, thus, permissible. However, the lack of disclosure here as to the substance or value of potential claims that would be released raises questions as to whether such releases would be truly consensual.

100.    Rather than setting forth any of the above-mentioned specifics, the Disclosure Statement makes only broad statements that (a) the Releases are integral to the Debtors' overall restructuring efforts and were an essential element of the Plan and (b) the Released Parties made substantial and valuable contributions to the Debtors' restructuring through their efforts to negotiate and implement the Plan. *See* Disclosure Statement at p. 8. Further, it is unclear whether the Debtors have carved out from the releases any claims and Causes of Action determined by a

Final Order of the Court to be for actual fraud, gross negligence or willful misconduct. *See* Disclosure Statement at pp. 24-26.

101.     In order for the Court to approve the releases, the Disclosure Statement must contain the following information: (i) what Causes of Action exist against the Released Parties; (ii) what is the value of those Causes of Action; (iii) what consideration is provided by each of the Released Parties to the Debtors' estates in exchange for the Releases; (iv) how are each of the Released Parties contributing to the Plan and creditor recoveries under the Plan; and (v) evidence that the business restructuring proposed by the Plan would not be feasible but for the Releases.

102.     In the instant case, the Disclosure Statement must not be approved without adequate facts showing a substantial contribution by the Released Parties to the restructuring.

103.     **Management Incentive Plan**: The Disclosure Statement fails to provide adequate information on the terms of the MIP, which provides for 7% of the reorganized Ultra's new equity to Ultra's management team, with half (or 3.5% of the reorganized Debtors' equity) issued within 4 months of the Effective Date of the Plan. The Disclosure Statement states that the form of the Awards pursuant to the MIP will be determined by the New Board in its sole discretion. *See* Plan, Article IV.Q. Without further disclosures, there is no means for the Committee to assess whether the MIP is fair and reasonable. On its face, and considering the treatment contemplated for Class 6 General Unsecured Creditors, the MIP appears to provide disparate treatment to the Debtors' management.

104.     **Plan Settlements**: As discussed above, nothing in the Plan or the Disclosure Statement supports the settlement of the Claims, specifically as they relate to the Up-Tier Exchange. The Debtors should be required to include in their Disclosure Statement the facts

allegedly supporting the standards set forth above for approval of a settlement as to each Released Party.

### 3.  Solicitation and Procedural Objections

105.     There are also problems with the solicitation and confirmation related procedures and processes proposed by the Debtors which need to be addressed.

106.     **Plan Supplement**: The Plan proposes that the Plan Supplement, which will contain numerous important documents, need not be filed until just seven days before the Confirmation Hearing and three days after the Voting Deadline. Given the materiality, number and complexity of the Plan-related documents to be included in the Plan Supplement (including the (a) the New Organizational Documents; (b) a list of retained Causes of Action; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Exit RBL Credit Agreement; (e) the identity of members proposed to serve on the New Board and management for the Reorganized Debtors; and (f) the form Make-Whole Instruments), substantial additional time and opportunity for review of the Plan Supplement documents should be given to the Committee, creditors and other parties in interest. *See, e.g., In re Seadrill Ltd.*, Docket No. 1015 ¶ 16, Case No. 17-60079 (DRJ) (Bankr. S.D. Tex. Feb. 26, 2018) (order approving disclosure statement and procedures, requiring that Plan Supplement, including contract related lists, be filed/served by 14 days prior to the Voting Deadline).

107.     Due process requires that a party-in-interest be given notice that is reasonably calculated to reach such party and that such notice conveys the required information as well as provides a reasonable amount of time for response. In these cases, the Debtors have failed to provide creditors with the information in the Plan Supplement necessary to inform their vote on the Plan. The Debtors owe fiduciary obligations to creditors and also bear the burden to prove the

Disclosure Statement contains adequate information. As such, creditors should be given sufficient time to review the Plan Supplement.

## V.   <u>RESERVATION OF RIGHTS</u>

108.   The Committee and its members reserve all of their respective rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to raise additional objections during the Confirmation Hearing.

[*Remainder of page intentionally left blank.*]

## VI.   CONCLUSION

WHEREFORE, for the reasons discussed herein, the Committee respectfully requests that this Court: (i) sustain this Objection; (ii) deny confirmation of the Plan; and (iii) grant to the Committee such other and further relief as the Court may deem just, proper and equitable.

Dated: August 1, 2020
      Houston, Texas

Respectfully submitted,

/s/ *John J. Sparacino*

**MCKOOL SMITH LLP**
John J. Sparacino
600 Travis Street
Suite 7000
Houston, TX 77002
Telephone: 713-485-7300
Email:  jsparacino@mckoolsmith.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark*
Bennett S. Silverberg*
Uchechi Egeonuigwe*
Seven Times Square
New York, NY 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801
Emails:  rstark@brownrudnick.com
        bsilverberg@brownrudnick.com
        uegeonuigwe@brownrudnick.com

-and-

Jeffrey L. Jonas*
James Stoll*
Stephanie Calnan*
One Financial Center
Boston, MA 02111
Telephone: 617-856-8200
Email:  jjonas@brownrudnick.com
      jstoll@brownrudnick.com
      scalnan@brownrudnick.com

*admitted *pro hac vice*
*Proposed Counsel to the Official Committee of Unsecured Creditors*

## **CERTIFICATE OF SERVICE**

I certify that on August 1, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ John J. Sparacino*
John J. Sparacino

# EXHIBIT A

# FILED UNDER SEAL

# EXHIBIT B

# FILED UNDER SEAL

# EXHIBIT C

# FILED UNDER SEAL