

ENTERED
08/21/2020

## IN THE UNITED STATED BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| ULTRA PETROLEUM CORP., *et al* | § | CASE NO: 20-32631 |
| | § | |
| | § | |
| ULTRA RESOURCES, INC. | § | CASE NO: 20-32632 |
| | § | |
| KEYSTONE GAS GATHERING LLC | § | CASE NO: 20-32633 |
| | § | |
| UPL THREE RIVERS HOLDINGS, LLC | § | CASE NO: 20-32634 |
| | § | |
| ULTRA WYOMING, LLC | § | CASE NO: 20-32635 |
| | § | |
| UP ENERGY CORPORATION | § | CASE NO: 20-32636 |
| | § | |
| UPL PINEDALE, LLC | § | CASE NO: 20-32637 |
| | § | |
| ULTRA WYOMING LGS, LLC | § | CASE NO: 20-32638 |
| | § | **Jointly Administered Order** |
| **Debtors** | § | |
| | § | **CHAPTER 11** |

## MEMORANDUM OPINION

This Memorandum Opinion addresses whether Ultra Resources, Inc., may reject an executory contract with Rockies Express Pipeline LLC for the transportation of Ultra's natural gas through the Rockies Express Pipeline. The contract has been approved by the Federal Energy Regulatory Commission ("FERC"). It is undisputed that rejection would be in the Estates' best interest. The sole issue litigated by the parties is whether the Court should deny the rejection based on public policy reasons.

Both Rockies Express and FERC ask the Court to rule in a manner contrary to controlling authority from the Fifth Circuit Court of Appeals. *In re Mirant Corp.*, 378 F.3d 511 (5th Cir. 2004). Their requests are denied; the Court will apply *Mirant*. The Court concludes that:

- The Court is not authorized to graft a wholesale exception to § 365(a) of the Bankruptcy Code (the "Code") preventing rejection of FERC approved contracts.

- Public policy may, in certain circumstances, be considered when determining whether to authorize the rejection of a FERC approved pipeline contract.

- The public policy consequences of rejection that may be considered must be specific to the contract to be rejected and must evaluate whether the rejection would cause (i) any disruption in the supply of natural gas to other public utilities or to consumers; or (ii) other material harm to the public health, safety or welfare.  The public policy analysis must not include generic concerns of the macroeconomic effect of bankruptcy rejections generally.

- There is no evidence that the rejection of this contract would cause (i) any disruption in the supply of natural gas to other public utilities or to consumers; or (ii) other harm (material or not) to the public health, safety or welfare.

- Only two public policy issues are seriously raised by Rockies Express.  The first argues that FERC—and not the Bankruptcy Court—is the proper entity to determine whether rejection of an executory FERC contract is good or bad public policy.  That is a question for Congress and not for this Court or for FERC to decide.

- The second public policy issue is that FERC's anti-discrimination policy would allow Ultra to take advantage of rejection by becoming a "free rider" on the pipeline.  That issue may be addressed to and by FERC.  The order issued along with this Memorandum Opinion leaves Rockies Express free to pursue an amendment to FERC's policy.

- The rejection of the contract does not violate § 1129(a)(6) of the Code.  FERC's rate setting authority will remain intact following rejection and potential confirmation of the plan.

- The rejection of the contract is approved.

## BACKGROUND

Ultra primarily engages in natural gas exploration and production in western Wyoming.

(ECF No. 14 at 2).  Ultra develops "long-life natural gas reserves in the Pinedale and Jonah fields

located in the Green River Basin."  (ECF No. 14 at 2).  In order to transport its natural gas to

market, Ultra has entered various gathering agreements with midstream service providers.  (ECF

No. 7 at 3).  One such provider is Rockies Express.  (ECF No. 7 at 4).

Rockies Express transports natural gas along the Rockies Express Pipeline (the "REX Pipeline"). (ECF No. 7 at 4). The REX Pipeline enables Rockies Express to transport gas from southwestern Wyoming to eastern Ohio, and vice versa. (ECF No. 7 at 4). Ultra was one of the original anchor shippers on the REX Pipeline when it was constructed. (ECF No. 7 at 4). FERC regulates the REX Pipeline pursuant to the Natural Gas Act, as it does all interstate natural gas pipelines. (ECF No. 325 at 9). FERC determined that REX Pipeline construction would be in the public interest because it would "benefit consumers across the nation by providing access to new, competitive supplies of domestic natural gas." (ECF No. 325 at 10).

On June 5, 2008, Ultra and Rockies Express entered into Firm Transportation Negotiated Rate Agreement No. 553082 (the "Original Agreement"). (ECF No. 7 at 4). The Original Agreement required Rockies Express to reserve space for and transport up to 200,000 MMBtu/day of Ultra's natural gas. (ECF No. 7 at 4). In exchange, Ultra agreed to pay a fixed monthly reservation charge. (ECF No. 7 at 5). Although it could have legally demanded security, REX did not receive any security from Ultra to assure payment of Ultra's obligation. The term of the Original Agreement lasted from November 2009 through November 2019. (ECF No. 7 at 4-5).

As an anchor shipper, Ultra's financial commitment helped induce construction of the REX Pipeline. (ECF No. 325 at 4). Ultra benefitted significantly from construction of the REX Pipeline because the Pipeline brought "the Rocky Mountain prices available to Ultra in line with the much higher national prices." (ECF No. 325 at 4). Prior to completion of the REX Pipeline, natural gas at the Opal Hub in Wyoming traded at an average annual price that was $2.88/MMBtu below the prices at the Henry Hub in Louisiana. (ECF No. 325 at 5). By 2010, Opal gas traded at only $0.40/MMBtu below Henry Hub. (ECF No. 325 at 5). Although there was a slight dispute as to

how much of the price differential was due to the REX Pipeline, the Court finds that Ultra received material benefits from the construction of the REX Pipeline.

Pursuant to the Original Agreement, Ultra made regular payments to Rockies Express totaling over $625 million.  (ECF No. 7 at 5).  Those funds provided financial support for the construction of the REX Pipeline.  (ECF No. 7 at 5).  However, on March 28, 2016, Rockies Express asserted that the Original Agreement terminated on account of Ultra failing to meet creditworthiness requirements.  (ECF No. 7 at 5).  Rockies Express then filed a $300 million breach of contract action against Ultra in Texas state court.  (ECF No. 7 at 5).

That lawsuit was stayed when Ultra filed its first chapter 11 petition (Case No. 16-32202) on April 29, 2016.  (ECF No. 7 at 5).  During Ultra's first bankruptcy, Ultra and Rockies Express negotiated a settlement of the breach of contract action.  The settlement gave Rockies Express a $150 million general unsecured claim, which was paid in full pursuant to Ultra's confirmed plan of reorganization.  (ECF No. 7 at 6).  Additionally, on February 23, 2017, Ultra and Rockies Express executed a new Transportation Service Agreement and Firm Transportation Negotiated Rate Agreement (the "Agreement").  (ECF No. 7 at 6).  The term of the Agreement runs from December 1, 2019 through December 31, 2026.  (ECF No. 7 at 7).

Without requiring Ultra to dedicate any of its natural gas to the REX Pipeline, the Agreement created a firm capacity reservation on the REX Pipeline at a set rate.  (ECF No. 7 at 7).  Ultra must pay for the capacity reservation whether or not it utilizes the pipeline.  (ECF No. 7 at 7).  Over time, the Agreement requires Ultra to pay approximately $169 million for the reservation.  (ECF No. 7 at 8).  Although Ultra had just concluded a bankruptcy case, Rockies Express again did not obtain any security for Ultra's $169 million obligation.

Ultra and Rockies entered the Agreement in early 2017, but the Agreement did not take effect until December 2019.  By the time the Agreement's term began, commodity prices were materially lower than when the parties entered the Agreement.  (*E.g.*, ECF No. 7 at 7).  Ultra suspended its drilling program in September 2019 and has never shipped natural gas on the REX Pipeline pursuant to the Agreement.  (ECF No. 7 at 7).  Instead, Ultra has released its REX Pipeline capacity to other natural gas shippers.  From December 2019 until March 2020, Ultra released its capacity to four separate shippers.  (ECF No. 7 at 8).  From April 2020 until October 31, 2020, Ultra has released its entire capacity to Occidental Energy Marketing, Inc.  (ECF No. 7 at 8).  Ultra is required to pay Rockies Express the difference between the released rates and the rate under the Agreement.  (ECF No. 7 at 8).  Ultra has not yet released any capacity for natural gas to be shipped after October 31, 2020.  (ECF No. 7 at 8).

On April 29, 2020, Rockies Express filed a petition with FERC seeking a declaratory ruling that Ultra may not reject the Agreement in bankruptcy without FERC's prior approval.  (Petition for Declaratory Order and Request for Expedited Action of Rockies Express Pipeline LLC, dated April 29, 2020, FERC Docket No. RP20-822-000).  FERC established May 29, 2020 as the comment due date for the petition.  (ECF No. 7 at 12).  On May 14, 2020, prior to the comment due date, Ultra filed its present chapter 11 bankruptcy petition.  (ECF No. 1).  Ultra filed this rejection motion that same day. (ECF No. 7).  At a hearing on May 29, 2020, the Court informed Rockies Express that pursuing the FERC petition for declaratory order would violate the automatic stay.

Consistent with the Fifth Circuit's teachings in *Mirant*, the Court requested that FERC "participate as a party-in-interest in these proceedings to argue and to comment on whether"

rejection of the Agreement "would harm the public interest." (ECF No. 274). FERC ultimately accepted the Court's request and fully participated in the proceedings before the Court. It examined witnesses, argued, and was a full participant. Although FERC participated in the proceedings, FERC's stated that it would not take a position on the public interest implications of rejecting this specific Agreement.

Rockies Express moved for relief from the automatic stay on June 29, 2020, in order to pursue a declaratory judgment action with FERC regarding the public interest impact of rejection. (ECF No. 349 at 2). FERC supported that motion. (ECF No. 439 at 3). On July 22, 2020, the Court denied the motion for relief from the automatic stay. (ECF No. 454).

The Court held an evidentiary hearing on the rejection motion and heard testimony from David Honeyfield and Dr. Jeff Makholm on July 24, 2020. (ECF No. 503). The Court continued the hearing to August 5, 2020, when the Court heard the conclusion of Dr. Makholm's testimony, as well as testimony from Crystal Heter, and Dr. Richard Bergin. (ECF No. 562). Dr. Bergin concluded his testimony on August 6, 2020. (ECF No. 591). The Court orally issued its ruling authorizing Ultra to reject the Agreement at the conclusion of the August 6, 2020 hearing. The Court issues this memorandum opinion in accordance with its oral ruling.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The issue of whether to permit the rejection of an executory contract is a core proceeding under 28 U.S.C. § 157(b).

## DISCUSSION

Ultra seeks to reject the Agreement pursuant to 11 U.S.C. § 365(a).  No party questions that the Agreement is an executory contract or that rejection of the Agreement is an appropriate exercise of Ultra's business judgment.  Instead, Rockies Express opposes rejection based on the special nature of FERC approved natural gas pipeline contracts, the public interest implications of rejection, and Ultra's ability to "free ride" on the REX Pipeline, post-rejection.  For the reasons that follow, the Court holds that FERC's regulatory involvement does not except the Agreement from rejection.  The Court authorizes rejection because the uncontroverted evidence demonstrates that rejection of this Agreement does not harm the public interest.  Rejection will not cause (i) any disruption in the supply of natural gas to other public utilities or to consumers; or (ii) other material harm to the public health, safety or welfare.

### FERC's Regulatory Responsibility

Before discussing whether rejection is appropriate, it is helpful to understand FERC's role in regulating interstate natural gas pipelines.  FERC is tasked with protecting the public interest by regulating rates and terms for interstate natural gas transport.  When FERC approves a pipeline contract, the filed rate is given the force of law.  The parties may not modify or abrogate the filed rate without obtaining FERC approval.  Separately, FERC regulations also prohibit Rockies Express from operating the REX Pipeline in a discriminatory or preferential manner.  This gives Rockies Express little to no discretion over which natural gas shippers have access to the REX Pipeline.

FERC's jurisdiction over the Agreement derives from the Commission's authority to enforce the Natural Gas Act.  "The Natural Gas Act has the fundamental purpose of protecting

interstate gas consumers from pipelines' monopoly power." *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 995 (D.C. Cir. 1987). Congress "declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest," when it passed the Natural Gas Act. 15 U.S.C. § 717(a). Accordingly, the Natural Gas Act "permits the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts, which to that end must be filed with [FERC] and made public." *United States Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 339 (1956).

FERC's supervisory role often requires the agency to evaluate the public interest implications when parties seek to modify or abrogate FERC approved contracts. Abrogation or modification of a FERC filed rate contract is only appropriate where the existing rates and terms harm the public. *Id.* Before expressing its view of the public interest implications, FERC must hear from both sides and come to a determination "on the record, after an opportunity for an agency hearing." 42 U.S.C. § 7172(d).

Rockies Express provides service along the REX Pipeline as an "open access" system. FERC regulations require that Rockies Express provide service that is not unduly discriminatory or preferential. *See Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, Order No. 436, FERC Stats. & Regs. ¶ 30,665, 50 Fed. Reg. 42408-01 (1985) (prescribing open access requirements). Rockies Express operates the REX Pipeline under a tariff approved by FERC that allows Rockies Express to contract with shippers to provide transportation service and to terminate service at the end of a contract. (ECF No. 162 at 6). FERC requires an open access interstate pipeline to allow any shipper that meets minimal creditworthiness requirements (ordinarily

consisting of three months of advance charges) to transport gas on the pipeline. 18 C.F.R. §§ 284.7(b); 284.9(b) (implemented in the Rockies Express Tariff, GT&C Section 17.1); *see also Creditworthiness Standards for Interstate Natural Gas Pipelines*, 111 FERC ¶ 61,412 (2005). Obtaining bankruptcy relief does not cause a shipper to become uncreditworthy under FERC regulations. *See id.* Shippers must simply adhere to the rules set out in the Rockies Express tariff in order to access the REX Pipeline. *See* Rockies Express Tariff, GT&C Section 13.1(B)(1).

The Free Rider Problem

The thrust of the Rockies Express and FERC objections does not relate to whether the Agreement qualifies as an executory contract or whether the Agreement burdens the Ultra estate. Instead, their concerns are both based in general public policy and whether FERC regulations may unfairly favor Ultra if rejection is approved. The public policy objection is dealt with extensively later in this opinion. The latter objection focuses on Ultra's access to the REX Pipeline following rejection. FERC's open access pipeline regulations prevent Rockies Express from discriminating against natural gas shippers. Rockies Express must charge uniform prices for use of the REX Pipeline and cannot pick and choose which shippers may access the REX Pipeline. In light of these regulatory constraints, Rockies Express argues that, post-rejection, Ultra will still be able to ship natural gas along the REX Pipeline, only for substantially less than the cost imposed under the Agreement. Rockies Express contends that it has no recourse against that outcome.

Rockies Express' concerns are bolstered by the fact that Ultra was an anchor shipper on the REX Pipeline. Ultra's financial promises in the Original Agreement partially induced Rockies Express to construct the REX Pipeline. Therefore, according to Rockies Express, Ultra is attempting to free ride on the REX Pipeline. Rockies Express alleges that Ultra hopes to realize

the benefits of the REX Pipeline infrastructure without having to pay what amounts to its promised share of construction costs.

Subsumed in this issue is the position that Ultra will be allowed to both reject the Agreement and then, in bad faith, use the pipeline at favorable rates.  FERC prohibits Rockies Express from discriminating against a shipper entity based on debts that have been discharged in bankruptcy.  However, FERC allows pipelines to discriminate against a similarly situated shipper entity who has breached a FERC regulated contract by non-payment outside of bankruptcy.

Even if Ultra itself does not ship natural gas along the pipeline, Rockies Express believes "that rather than pay a transporter itself to ship gas on the [REX] Pipeline under the rates set forth in the [Agreement], Ultra can instead sell its gas to marketers at the nearby Opal Hub in Lincoln County, Wyoming, who then act as shippers on the [REX] Pipeline to move Ultra's gas downstream to financially attractive markets in the Midcontinent and Eastern United States." (ECF No. 325 at 3-4).

Rockies Express describes the dilemma as Ultra using "the bankruptcy rejection power as a sword to cease performance under its existing rate, while using FERC's open access policy as a shield to maintain access to the pipeline at a lower rate—either directly or through an intermediary—all while obtaining the unquestionable benefits that have existed from the moment the pipeline was built."  (ECF No. 325 at 22).  This issue does not arise from the Bankruptcy Code, the proposed bankruptcy plan in this case, or the proposed rejection of the contract.  Instead, the issue arises from the FERC regulations.  The Bankruptcy Code is explicit in two ways:

- The rejection of the contract "constitutes a breach of such contract . . . immediately before the date of the filing of the petition."  11 U.S.C. § 365(g)(1).

- The antidiscrimination provisions of the Bankruptcy Code, contained in § 525, do not bar a private entity from discriminating from doing business with another business entity based on discharged debt.  11 U.S.C. § 525.

If Ultra's rejection of the Agreement constitutes a sword, it is a sword that the Bankruptcy Code explicitly provides.  Rejection is a tool that Congress provided for all debtors.  As this opinion will discuss, rejection is merely a breach of the contract.  Ultra could have breached the Agreement outside of bankruptcy.  Rejection here does not provide Ultra with greater rights to access the REX Pipeline than it possessed outside of bankruptcy.

There is, of course, a benefit to Ultra from rejection.  Rejection will entitle Rockies Express to a general unsecured claim in Ultra's case, and Rockies Express will be treated on the same basis as all other holders of unsecured claims.  But, that is only fair.  Rockies Express does not hold a secured claim, and Congress dictated the consequences of rejection.  Rockies Express may not elevate its unsecured status to obtain a greater recovery than other holders of unsecured claims.

Rockies Express' concern lies not with Ultra's rights under the Bankruptcy Code, but with how FERC regulations may favor Ultra, post-rejection.  The concerns do not derive from this Court's application of the Bankruptcy Code.  The Court is tasked with applying the Bankruptcy Code and determining whether rejection is appropriate under § 365(a).  For the reasons below, Ultra may reject the Agreement.  After explaining why rejection is appropriate, the Court will return to its discussion of the free rider issue.

<u>Legal Standard for Rejection</u>

A)  *Executory Contracts are Broadly Defined*

The Code permits debtors to assume or reject executory contracts.  11 U.S.C. § 365(a).  Rejection helps "relieve the bankruptcy estate of burdensome agreements."  *Stewart Title Guar.*

11 / 26

*Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996). Executory contracts are those contracts where both parties have material obligations yet to be performed. *See Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657 (2019). Rejection of an executory contract is authorized by 11 U.S.C. § 365(a), which states:

> Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

Rejection of an executory contract "constitutes a breach of such contract." 11 U.S.C. § 365(g). "A rejection breaches a contract but does not rescind it." *Tempnology*, 139 S. Ct. at 1657-58. Although the Code does not provide specific guidance on when a court should approve a proposed rejection, the general standards are well-established in the case law. An executory contract may normally be rejected under the deferential business judgment rule. *E.g.*, *id.* at 1658 (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984)). The business judgment rule requires that a court approve the debtor's business decision unless the decision is the product of "bad faith, or whim, or caprice." *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001).

By its terms, § 365(a) applies broadly to "any executory contract." Congress, however, crafted a handful of exceptions to rejection. Those exceptions are of particular interest in this proceeding. The exceptions are:

| Exception | Description | Applicability to Issue Before Court |
|---|---|---|
| § 765 | An exception dealing with the Commodity Exchange Act | None |
| § 766 | A second exception dealing with the Commodity Exchange Act | None |

| § 365(b) | The § 365(b) exceptions all are exceptions to the ability to assume a contract.  They do not limit the ability to reject a contract. | None |
| § 365(c) | The § 365(c) exceptions all are exceptions to the ability to assume and assign contracts.  They do not limit the ability to reject a contract. | None |

Tellingly, none of the exceptions to § 365(a) limit a debtor's ability to reject a FERC approved contract.  It is noteworthy that when Congress chose to create exceptions to assumption and rejection of contracts, it did not choose to create a general exception for contracts that are regulated by FERC.  That omission suggests that, although Congress knew how to craft exceptions to rejection, Congress declined to except FERC approved contracts.  Justice Kennedy, writing for a unanimous Supreme Court, explained how a court should approach its interpretation of statutory exceptions:

> When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.

*United States v. Johnson*, 529 U.S. 53, 58 (2000).

Indeed, the Supreme Court previously applied the same analysis to § 365 of the Bankruptcy Code:

> Obviously, Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted to; its failure to do so in this instance indicates that Congress intended that § 365(a) apply to all collective-bargaining agreements covered by the NLRA.

*N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 522–23 (1984).  *Bildisco* looms large over the Court's decision today.  The Supreme Court held that the decision whether to except collective bargaining contracts from rejection in a chapter 11 bankruptcy case belongs to Congress, not the

judiciary.  Although *Bildisco* dealt with a collective bargaining agreement, as opposed to a FERC contract, the Supreme Court specifically addressed rejection under § 365(a).  The Supreme Court dismissed the argument that special aspects of collective bargaining agreements place them outside the scope of § 365(a).  *Id.* at 522.  Instead, the Supreme Court instructed that § 365(a) "by its terms includes all executory contracts except those expressly exempted."  *Id.* at 521.  Like collective bargaining agreements, the FERC approved contract at issue here falls within the broad scope of "all executory contracts."  *See id.*  Thus, the Agreement is subject to rejection.  The remaining issue is whether the business judgment rule, or something more, applies to rejection of a FERC approved contract.

### B) Certain Contracts Require Heightened Scrutiny

The Fifth Circuit relied on both *Johnson* and *Bildisco* when it issued its controlling authority on that issue.  *In re Mirant Corp.*, 378 F.3d 511, 522 (5th Cir. 2004).  In *Mirant*, the Fifth Circuit held that a bankruptcy court must "carefully scrutinize the impact of rejection upon the public interest," before rejecting a FERC approved power purchase agreement.  *Id.* at 525.  Contrary to Ultra's arguments, the teachings of *Bildisco* and *Mirant* are not that a Bankruptcy Court should ignore public policy considerations.  Far from it.  Instead, both *Bildisco* and *Mirant* authorize a bankruptcy court to conduct a fact specific inquiry into whether the specific rejection at issue has significant public interest implications.

In *Bildisco*, after stating that collective bargaining agreements fall within the purview of § 365(a), the Supreme Court considered whether authorizing rejection was appropriate.  Because of the unique importance of collective bargaining agreements, the Supreme Court applied a more rigorous rejection standard than the business judgment rule.  Although urged to do so by the NLRB,

the Supreme Court declined to adopt a stringent standard requiring a bankruptcy court to allow rejection only if the debtor "can demonstrate that its reorganization will fail unless rejection is permitted." *Bildisco*, 465 U.S. at 524; *see also Brotherhood of Railway Emps. v. REA Express, Inc.*, 523 F.2d 164 (2d Cir. 1975). Instead, the Supreme Court instructed that a heightened standard should be applied to determine if rejection should be authorized on a review of whether the collective bargaining agreement "burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract. The standard which we think Congress intended is a higher one than that of the 'business judgment' rule, but a lesser one than that embodied in the *REA Express* opinion of the Court of Appeals for the Second Circuit." *Bildisco*, 465 U.S. at 526. Thus, *Bildisco* instructed courts to balance the financial burden of an executory collective bargaining agreement with the harm caused by rejection.

The Fifth Circuit, applying *Bildisco* and other precedent to power contracts, instructed that "it is clear that Congress intended § 365(a) to apply to contracts subject to FERC regulation." *Mirant*, 378 F.3d at 522. The Fifth Circuit recognized that the "usual business judgment standard" typically applies to the rejection of executory contracts. *Id.* at 524. However, based on Supreme Court precedent, a "more rigorous standard" should be applied to the rejection of the FERC contract at issue. *Id.* Although Ultra suggests that the Fifth Circuit did not actually mandate the use of a more rigorous standard, this Court disagrees. While the Fifth Circuit politely suggested that the district court "should consider" applying a more rigorous standard, that suggestion came after the Fifth Circuit instructed that "[u]se of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity." *Id.* at 525.

*Mirant* did not define the precise rigor with which a bankruptcy court should scrutinize rejection of a power purchase contract. But the Fifth Circuit did state that "the courts should carefully scrutinize the impact of rejection upon the public interest and should . . . ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers." *Id.* at 525. The court must then decide whether "the equities balance in favor of rejecting that [] contract." *Id.*

*C)  Rejection of This Agreement Satisfies Mirant Scrutiny*

This Court finds that *Mirant* is controlling authority on three points. First, the Agreement is not excepted from rejection under § 365(a). Second, the Court must scrutinize the impact of rejection on the public interest and on the supply of natural gas to consumers. Third, after determining the public interest and supply concerns, the Court must weigh those concerns against the Agreement's burden on Ultra's reorganization.

FERC approved natural gas agreements can have sizable public interest considerations. Pipeline contracts have a determinative effect on the price and availability of natural gas to consumers. Absent FERC regulation, pipelines might exercise monopoly power and demand higher shipping costs. *See Associated Gas Distributors*, 824 F.2d at 995. Congress placed gas pipeline contracts within FERC's jurisdiction to protect the public from that harm. *Id.* Rockies Express and FERC argue that—as a matter of public policy—FERC regulated contracts should not be rejected because of potential long-term effects on pricing and stability. *Bildisco* and *Mirant* prohibit this Court from crafting such a wholesale exception to § 365(a). An argument that applies to an entire category of rejections must be addressed to Congress—not to this Court. *See Bildisco*, 465 U.S. at 523.

16 / 26

However, the potential public interest implications of rejection in this case warrant *Mirant* scrutiny.  Although Congress did not except pipeline contracts from rejection, Congress tasked FERC with substantial responsibility to oversee pipeline contracts in order to protect the public interest.  That delegation of responsibility suggests that Congress viewed pipeline contracts as having a particularly sensitive effect on public welfare.  As Congress set out heightened oversight for pipeline contracts, it is similarly appropriate for a bankruptcy court to apply heightened scrutiny when a debtor moves to reject a pipeline contract.  Consistent with *Mirant*, the Court must determine the public interest and natural gas supply implications of rejection and weigh them against the Agreement's burden on Ultra's reorganization.

Over the course of a multi-day evidentiary hearing, the Court heard extensive testimony on the public interest implications of rejection.  That testimony generally fell into two categories.  The first category addressed the implications stemming from rejection of *this* Agreement.  Testimony falling within the first category included expert opinions regarding how rejection of the Agreement would increase or decrease natural gas prices, how it would alter the amount of natural gas flowing through the REX Pipeline, and whether rejection might harm public health or safety.  The second category of testimony dealt with the generic macroeconomic effects of rejecting pipeline contracts.  Testimony in that category discussed how rejection of these contracts might chill infrastructure investment, increase the economic risk shouldered by natural gas transporters, and increase transactional costs for natural gas pipeline development.

The evidence in the second category is unrelated to the specifics of this Agreement.  Instead, Rockies Express presents the macroeconomic costs as evidence that natural gas pipeline contracts should not be rejected as a matter of public policy.  In other words, because a debtor's

ability to reject might adversely affect future investments in currently unplanned pipelines, rejection is contrary to the public interest.  That logic applies to any rejection of a FERC contract under § 365(a).  Rejection allows debtors to breach contracts and treat the resulting damages as unsecured claims, typically paying out only cents on the dollar.  Rejection itself presents considerable risk to a debtor's contractual counterparties.  Even if macroeconomics should be considered, the evidence shows that concern about rejection's macroeconomic effects on future pipeline investment is unfounded.

If the Court were to supplant Congress's role as a policy-maker for FERC contracts, where would the Court draw the line on its policy-making?  Social policy would impact most bankruptcy decisions.  For example, it cannot be disputed that the policy of the United States favors a robust housing supply.  Nor can it be disputed that landlords would be in an improved economic position if tenants could not reject residential leases.  Yet the policy decision of whether to allow rejection of residential leases is not the Court's to make.  Despite these types of macroeconomic effects, Congress allows debtors to reject burdensome executory contracts.  The Court finds that the macroeconomic evidence presented by Rockies Express relates to the providence or improvidence of an Act of Congress, and not to the providence or improvidence of the rejection of this Agreement.  The Court's role is to apply the law and determine whether rejection of this Agreement is consistent with *Mirant*.

The testimony that properly dealt with the effects of rejecting this Agreement shows that there is no evidence that rejection would harm the public interest.  The Court asked Dr. Jeff Makholm, Ultra's expert witness, "is there anything that makes the Ultra Rockies contract unique in its effect on the public interest from other transmission contracts with Rockies or with other

18 / 26

transmission-pipeline transmission companies?  What's unique here about the public interest?"  In response, Dr. Makholm stated "not in my perspective.  It is another—just one of many, many natural gas interstate transmission contracts that flow gas tethering on throughout the United States.  In that respect, to me it is not unique."  (ECF No. 606 at 33-34).  No party submitted any evidence suggesting that Ultra's rejection threatens the public health, safety, or welfare.  Rejecting the Agreement effects the economic relationship between Ultra and Rockies Express, but poses no threat to the public.

Crystal Heter, the President of Rockies Express, was questioned about the public interest impact of rejecting the Agreement.  FERC's counsel asked "would the rejection of this contract cast a burden on other customers, whether they be shippers or ultimate customers?"  (ECF No. 606 at 92).  To which Ms. Heter replied "at this point in time, with the contractual makeup that we have in negotiated rate agreements, no.  It would not."  (ECF No. 606 at 92-93).

The evidence also shows that rejection will have no negative effect on the supply of natural gas to public utilities or consumers.  David Honeyfield, Ultra's Chief Financial Officer, testified that Ultra has not shipped any natural gas on the REX Pipeline since the Agreement became effective.  (ECF No. 516 at 83 ("We've not shipped any gas.  Certainly we've contracted all our sales at Rockies' delivery points and that's where we get paid and where title transfers.  So, at this point, we released our capacity.")).  Additionally, Mr. Honeyfield stated that rejection would neither increase nor decrease Ultra's overall natural gas production in the near term.  (ECF No. 516 at 99 ("I think under our current business plan, which is to merely produce developed reserves, I don't know that really changes the amount of gas that we'll produce.")).  Thus, rejection will

neither reduce the volume of natural gas travelling along the REX Pipeline nor decrease the volume of natural gas that Ultra produces.

Dr. Makholm also testified that rejection would not disrupt the supply of natural gas. (ECF No. 606 at 34). That testimony was uncontroverted and illustrates that rejection cannot diminish the REX Pipeline's supply of natural gas. Ultra's contribution of natural gas to the REX Pipeline— already at zero—cannot dip below zero. There is simply no evidence in the record suggesting that the supply of natural gas traveling along the REX Pipeline would decrease post-rejection. Nor would rejection threaten Rockies Express as a going concern. Crystal Heter testified that there is no risk that rejection of the Agreement would cause the REX Pipeline to shut down. (ECF No. 606 at 74).

Importantly, the Agreement does not require Ultra to commit any natural gas to the REX Pipeline, and Ultra has not directly shipped any of its natural gas along the REX Pipeline under the current Agreement. (ECF No. 516 at 83). It is difficult to envision how rejection of a contract which sets above market shipping rates without requiring Ultra to utilize any pipeline volume would diminish the public supply of natural gas.

As set forth above, the Court does not believe that macroeconomic issues concerning the general effect of the rejection of FERC contracts are the proper focus for a court. Nevertheless, for the purpose of completeness, the Court concludes that there is an absence of credible evidence that would justify a wholesale, or macroeconomic, exception under § 365.

The macroeconomic evidence shows that the public is more likely to benefit (rather than be harmed) by allowing the rejection of FERC regulated pipeline contracts. Dr. Makholm offered two relevant conclusions on this point. First, rejection of the Agreement will not have a material

effect on the natural gas market.  (ECF No. 516 at 119).  Second, Ultra's rejection would further

the public interest by promoting competition in the natural gas market.  (ECF No. 516 at 119).

Elaborating on the second conclusion, Dr. Makholm said:

> that creating a barrier through a rejection of a contract in a bankruptcy proceeding
> like this in my opinion would raise the cost of exit.  And raising the cost of exit
> from industry for a bankrupt firm like Ultra could inherently raise the cost of entry.
> Because if it means that any firm like Ultra that solved barrier to exit and hence
> would make it profitable to operate even at a loss because of those barriers, would
> inherently raise the cost of entry.  And that kind of entry barrier if widely applied
> could raise the cost of new transport in the U.S. and damage the gas market.

(ECF No. 516 at 125).  Further, when asked if rejection would disrupt natural gas markets, Dr.

Makholm replied that it would not.  (ECF No. 516 at 119).  Dr. Makholm went on to explain that

the market would expect Ultra to reject this Agreement because shipping eastward from the Opal

Hub is not economic under present conditions.  (ECF No. 606 at 23 (describing shipping eastward

as "bringing sand to the beach")).  The Court accepts Dr. Makholm's testimony.

Dr. Richard Bergin, testifying as an expert on behalf of Rockies Express, offered the

contrasting view that approving rejection will discourage future investment in pipelines.  The

Court rejects that conclusion.  Dr. Bergin was not a credible witness.  He exaggerated his

qualifications, gave unreliable testimony, and routinely engaged in hyperbole.  The Court gives no

weight to Dr. Bergin's testimony.

Dr. Bergin testified that the REX Pipeline was responsible for closing the price gap

between the Opal and Henry Hubs.  Rather than relying on a *Daubert* qualifying analysis of this

issue, Dr. Bergin simply relied on a public statement by Steven Malcolm, the President and CEO

of The Williams Company, crediting the REX Pipeline for closing the gap.  (ECF No. 606 at 172);

*see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Based on the cumulative evidence

before the Court, Dr. Bergin's conclusion was correct.  But, Dr. Bergin reached that conclusion in a manner unsuitable for an expert witness.  Dr. Bergin was an expert on an advocacy mission.  An economist would not rest his conclusions about a price differential on the statement of a marketplace participant.  Expert opinions should reflect reasoned and objectively sustainable views.  Dr. Bergin's conclusions, even when correct, were based on inexplicable bias.

Dr. Bergin also routinely described the harmful effects of rejecting pipeline contracts as "extremely significant" or having a "profound impact."  (ECF No. 606 at 149).  When pushed, Dr. Bergin was unable to quantify how or why rejection would cause such extreme effects.  For example, Dr. Bergin testified that rejection would have a "chilling effect on future shippers to invest."  (ECF No. 606 at 150).  Ultra's counsel then asked "and you don't have an opinion on how big the increased chance that investors may not invest in pipelines is, correct?"  (ECF No. 606 at 150).  To which Dr. Bergin replied "that's correct."  (ECF No. 606 at 150).  Ultra's counsel next asked "and you haven't done any analysis to determine how investors in pipelines have historically factored in the risk of rejection by shippers into their investment decisions, correct?"  (ECF No. 606 at 150).  Dr. Bergin again replied "that's correct."  (ECF No. 606 at 150).  His testimony was not based on any reliable methodology.  Moreover, even if the Court accepted his testimony in total, the testimony failed to demonstrate any material likelihood of harm to the public interest.

Despite the alleged chilling effect that rejection would have on pipeline investment, Dr. Bergin also testified that since 2004, the year the Fifth Circuit issued *Mirant*, there has been "$92 billion spent on building [] pipelines."  (ECF No. 606 at 129).  The Court then asked the witness "if having [the contracts] rejectable still has led to billions of dollars of investments, what's the

problem?"  (ECF No. 606 at 129).  Dr. Bergin had no satisfactory answer.  He dismissively responded "yeah, I'm not sure if [pipeline investors] knew."  (ECF No. 606 at 129).

Rejection of this Agreement will not harm the public interest or disrupt the supply of natural gas.  The Court heard no evidence suggesting rejection of this Agreement would cause any concrete public harm.  Mr. Honeyfield testified that rejection would not affect the supply of natural gas along the REX Pipeline because Ultra is not currently utilizing the REX Pipeline.  Viewing supply disruption more generally, Mr. Honeyfield also testified that rejection will not cause Ultra to produce less natural gas.  The Court credits Dr. Makholm's testimony that barring rejection of pipeline contracts would create barriers to exit for shippers, which might increase costs to consumers and diminish supply.  The Court entirely rejects Dr. Bergin's testimony.

Having determined that rejection will not harm the public interest or decrease the supply of natural gas, the Court must weigh those effects against the burden the Agreement places on Ultra's reorganization.  The Agreement plainly burdens the Ultra estate by requiring substantial monthly payments, whether or not Ultra utilizes its volume reservation, and locking Ultra into above market shipping rates.  Balanced against the alleged, but unproven effects that are likely to benefit the public interest, the equities plainly favor approving rejection.

Rockies Express contends that "[a] balancing of the equities must also consider that Ultra has benefitted greatly from the existence of the [REX] Pipeline, and the [REX] Pipeline was constructed based on the expectation that Ultra would honor its long-term commitments."  (ECF No. 325 at 6).  Rockies Express is correct that Ultra benefits from the REX Pipeline and that Rockies Express relied on Ultra's promise when it built the REX Pipeline.  However, *Mirant* does not require the Court to balance a debtor's decision to reject against the fairness to the contractual

23 / 26

counterparty.  Nothing in § 365(a) suggests that a court may limit a debtor's right to reject simply because rejection seems unfair to the rejected party.  *Every* opposed rejection of a contract probably meets that criteria.   Like other unsecured creditors, counterparties rarely get paid in full. Bankruptcy is fair because it requires parties to share the burden of economic loss ratably and in known and predictable ways.  Fairness is a Congressional consideration.  Congress has determined that all holders of unsecured claims should bear the same burden.  *Mirant* instructs the Court to balance the equities of Ultra's decision to reject with rejection's impact on the public interest and natural gas supply.  Here, that balancing weighs in Ultra's favor.  Ultra may reject the Agreement.

<u>Rejection is not Rate Modification or Abrogation</u>

The Court is compelled to answer an additional argument that the rejection of the Agreement impermissibly infringes upon FERC's exclusive jurisdiction to modify or abrogate filed rates.  As set forth above, Congress has declared that the rejection of a contract "constitutes a breach."  11 U.S.C. § 365(g).  Rejection does not 'have the effect of a breach,' nor is it 'deemed to be a breach.'  Rejection is, simply, a breach.  The only difference between rejection and a breach outside of bankruptcy is that following rejection, the rejected party will have an allowed unsecured claim equal to the damages from the debtor's breach.  In most cases, that claim will not be paid in full.

What is clear is that "[a] rejection breaches a contract but does not rescind it.  And that means all the rights that would ordinarily survive a contract breach . . . remain in place." *Tempnology*, 139 S. Ct. at 1657-58.  Rejection does not abrogate, rescind, or terminate a contract. *See id.*  Nor does rejection modify the terms of a contract.  "A debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy."  *Id.* at 1666.

24 / 26

The Code and the Supreme Court make it clear that by authorizing rejection, the Court is neither modifying nor abrogating the Agreement.  Nothing about rejection changes the terms of the Agreement or alters Ultra's shipping rates along the REX Pipeline.  Nor does rejection abrogate the Agreement.  Rejection only relieves the estate of the burdens of the Agreement, and allows Rockies Express to recover a bankruptcy claim against Ultra based on the full amount of its damages.  FERC's jurisdiction concerning rate setting is unaltered by rejection.  Because rejection does not modify the filed rate, rejection does not implicate 11 U.S.C. § 1129(a)(6), which requires regulatory approval before a court may confirm a chapter 11 plan that includes a "rate change."

<u>Resolution of the Free Rider Issue</u>

Returning to the free rider issue, Rockies Express' inability to deny Ultra access to the REX Pipeline following rejection is not mandated by the Bankruptcy Code.  FERC regulations prohibit open access pipelines from discriminating against shippers, including shippers who recently obtained bankruptcy relief.  It appears that these FERC regulations may place Ultra in a better position than a typical party that breaches a contract.  Absent FERC regulations, Rockies Express would be free to turn Ultra's business away.  Section 525(a) of the Code prevents governmental units from discriminating against debtors on account of a bankruptcy filing.  FERC is a governmental unit under § 525(a).  However, no provision of the Code restricts a private party from declining to do business with a debtor on account of a bankruptcy filing or on account of a debt that was discharged in bankruptcy.

Today, FERC's open access pipeline regulations do not violate § 525(a) by discriminating against Ultra on account of Ultra's bankruptcy.  In fact, FERC may provide Ultra with a benefit because its regulations allow Ultra to ship natural gas when other breaching parties might not be

able to do so.  However, although the regulations do not run afoul of § 525(a), they limit Rockies Express' discretion to decline future business from a breaching party.  There may be nothing improper about FERC extending Congressionally imposed antidiscrimination statutes to prevent bankruptcy discrimination on FERC regulated pipelines.  FERC has made a decision forcing regulated pipeline operators like Rockies Express to take a credit risk that the Bankruptcy Code would not require.  That policy decision may be sound and consistent with FERC's obligation to carry out the provisions of the Natural Gas Act.  However, the consequences of that regulation create the "free rider" issue argued by Rockies Express and by FERC.

The remedy for the free rider issue is not asking the Court to prohibit rejection; the remedy lies with the policy choices made by FERC.  This Court does not possess authority to craft exceptions to rejection, or to change or modify the parties' obligations to comply with FERC regulations.  However, the Court acknowledges the free rider dilemma, and the difficult position in which it places Rockies Express and similarly situated pipeline operators.  As such, the Court clarifies that FERC is free to modify its own regulatory scheme.

CONCLUSION

For the reasons set forth in the Court's oral ruling and this Memorandum Opinion, the Court will authorize rejection.  A separate order will be entered.


Signed: August 21, 2020

Marvin Isgur
United States Bankruptcy Judge